SUPREME COURT OF CALIFORNIA
Electronically RECEIVED on 9/27/2019 at 12.01.33 PM

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically FILED on 9/27/2019 by Celia Rivera, Deputy Clerk

S258243

**Supreme Court Case No._____**

**Petition for Writ of Habeas Corpus, United State District Court, Central District of California, Case No. 15-cv-00987-DMG-KS**

**First Petition for Writ of Habeas Corpus, California Supreme Court Case No. S240764**

**California Supreme Court Case No. S216690 (Direct Appeal)**

**California Court of Appeal Case No. G047466 (Direct Appeal)**

**Superior Court of Orange County, Trial Case No. 10CF2001**

---

**IN THE SUPREME COURT OF THE STATE OF CALIFORNIA**

---

**IN RE RAMON ALVAREZ, Petitioner**
**On Habeas Corpus**

---

**PETITION FOR WRIT OF HABEAS CORPUS; EXHIBITS A-K**

---

Tony Faryar Farmani (State Bar No. 211101)
P.O. Box 8727
Rancho Santa Fe, CA 92067
Phone:  310-926-1150
Fax:    619-923-2975
E-mail:  tffarmani@aol.com

Attorney for Petitioner Ramon Alvarez

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    JURISDICTIONAL ALLEGATIONS . . . . . . . . . . . . . . . . . . .7

II.   INCORPORATION OF EXHIBITS AND REQUEST FOR JUDICIAL NOTICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III.  BACKGROUND AND SUPPORTING FACTS. . . . . . . . . . . 8

      A.    State Court Proceedings. . . . . . . . . . . . . . . . . . . . . . . 8

      B.    Federal Habeas Proceedings.. . . . . . . . . . . . . . . . . . . 22

IV.   THE INSTANT PETITION IS TIMELY. . . . . . . . . . . . . . . 34

V.    CLAIMS FOR RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Ground One:  The Prosecution Violated the Due Process Clause of the Fourteenth Amendment by Suppressing Material Evidence Favorable to the Defense ("*Brady* Violation").. . . . . . . . . . . . . . . . . . . . . . . . 38

      A.    Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      B.    The *Brady* Violation Here. . . . . . . . . . . . . . . . . . . . . 46

Ground Two:  The Prosecution Violated the Due Process Clause of the Fourteenth Amendment by Presenting False Evidence and Failing to Correct it Once Presented ("*Napue* Violation"). . . . . . . . . . . . . . . . 62

      A.    Governing Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

      B.    The *Napue* Violation Here. . . . . . . . . . . . . . . . . . . . . 67

VI.    PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  71

VII.    VERIFICATION OF THE PETITION. . . . . . . . . . . . . . . . . .  73

VIII.    CERTIFICATION OF WORD COUNT.. . . . . . . . . . . . . . .  74

PROOF OF SERVICE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

# TABLE OF AUTHORITIES

**Page(s)**

## *Cases*

*Alcorta v. Texas*, 355 U.S. 28 (1957). . . . . . . . . . . . . . . . . . . . . . 57

*Amado v. Gonzalez*, 758 F.3d 1119 (9th Cir. 2014). . . . . . . 33, 35, 36

*Arizona v. Fulminante*, 499 U.S. 279 (19911). . . . . . . . . . . . . . . . 55

*Banks v. Dretke*, 540 U.S. 668 (2004).. . . . . . . . . . . 32, 36, 44, 46, 48

*Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002). . . 34, 38, 45, 52, 55

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . 1, 32

*Broam v. Bogan*, 320 F.3d 1023 (9th Cir. 2003). . . . . . . . . . . . . . 41

*Browning v. Baker*, 875 F.3d 444 (9th Cir. 2017). . . . . . . . 33, 34, 42

*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) (en banc). . . 33, 35, 42, 46, 49, 52

*Comstock v. Humphries*, 786 F.3d 701 (9th Cir. 2015). . . . . . . . . . 43

*Cowan v. Peery*, 2015 WL 3953656 (E.D. Cal. 2015). . . . . . . . . . . 58

*Dixon v. Baker*, 847 F.3d 714 (9th Cir. 2017). . . . . . . . . . . . . . . . 31

*Dow v. Virga*, 729 F.3d 1041 (9th Cir. 2013). . . . . . . . . . . 57, 59, 63

*Giglio v. United States*, 405 U.S. 150 (1972). . . . . . . . . . . . 34, 37, 57

*Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011). . . . . . . . . . . . . . 32

*Gonzalez v. Wong*, 667 F.3d 965, 979 (9th Cir. 2011). . . . . 31, 49, 54

*Gudino v. Allison*, 2013 WL 1281620 (E.D. Cal. 2013).. . . . . . . . . 61

*Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc).. 47, 48, 57, 59-63, 65

*Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005). . . . 47, 49, 51, 56, 64

*Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006). . . . . . . . . . . . . . 36

*In re Harris*, 5 Cal. 4th 813 (1993). . . . . . . . . . . . . . . . . . . . . 28

*In re Pine*, 66 Cal. App. 3d 593 (1977).. . . . . . . . . . . . . . . . . 15

*In re Reno*, 55 Cal. 4th 428 (2012). . . . . . . . . . . . . . . . . . . . 29

*In re Robbins* (1998) 18 Cal. 4th 770. . . . . . . . . . . . . . . . . . . 16

*Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008). . . . . . . . . . . 58, 60

*Jimenez v. Quarterman*, 555 U.S. 113 (2009). . . . . . . . . . . . . . 15

*Killian v. Poole*, 282 F.3d 1204 (9th Cir. 2002). . . . . . . . . . 40, 58, 60

*Kyles v. Whitley*, 514 U.S. 419 (1995). . . . . . . . . 32, 34, 35, 38-40, 48

*LaCaze v. Warden Louisiana Corr.*, 645 F.3d 728 (5th Cir. 2011). 37

*Lawrence v. Florida*, 549 U.S. 327 (2007). . . . . . . . . . . . . . . . . 31

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001). . . . . . . . . . . . . . 42

*Massiah v. United States*, 377 U.S. 201 (1964). . . . . . . . . . . . . . 16

*Maxwell v. Roe*, 628 F.3d 486 (9th Cir. 2010). . . . . . . . . . . . . *passim*

*Milke v. Ryan*, 711 F.3d 998 (9th Cir. 2013). . .  33, 35, 36, 38, 45, 49

*Morris v. Ylst*, 447 F.3d 735 (9th Cir. 2006).. . . . . . . . . . . . . . . . 62

*Napue v. Illinois*, 360 U.S. 264 (1959). . . . . . . . . . . . . . .  1, 50, 51, 57

*Paradis v. Arave*, 130 F.3d 385 (9th Cir. 1997). . . . . . . . . . . . . . 39

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987). . . . . . . . . . . . . . . . 40

*People v. Alvarez*, No. G047466, 2014 WL108613 ( 2014).. . . . .  3, 15

*Phillips v. Ornoski*, 673 F.3d 1168 (9th Cir. 2012). . . . . . . . . . . . 44

*Pyle v. Kansas*, 317 U.S. 213 (1942). . . . . . . . . . . . . . . . . . . . . 57

*Rhines v. Weber*, 544 U.S. 269 (2005). . . . . . . . . . . . . . . . . . 28, 30

*Silva v. Brown*, 416 F.3d 980 (9th Cir. 2005).. . . . . . . . . . . . . *passim*

*Sivak v. Hardison*, 658 F.3d 898 (9th Cir. 2011). . . . . . . . . . . . *passim*

*Smith v. Cain*, 565 U.S. 73 (2012). . . . . . . . . . . . . . . . . . . . . . 48

*Smith v. Roberts*, 115 F.3d 818 (10th Cir. 1997). . . . . . . . . . . . . . 42

*Souliotes v. Grounds*, 2013 WL 875952 (E.D. Cal. 2013). . . . . . . . 58

*Strickler v. Green*, 527 U.S. 263 (1999). . . . . . . 33, 34, 38, 42, 43, 62

*Tarver v. Hopper*, 169 F.3d 710 (11th Cir. 1999).. . . . . . . . . . . . . 37

*Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Thomas v. Goldsmith*, 979 F.2d 746 (9th Cir. 1992). . . . . . . . . . . . 41

*Thompson v. Calderon*, 151 F.3d 918 (9th Cir. 1998). . . . . . . . . . .  41

*United States v. Agurs*, 427 U.S. 97 (1976). . . . . . .  33, 48, 59, 60, 62

*United States v. Bagley*, 473 U.S. 667 (1985).. . . . .  32, 37, 38, 46, 51

*United States v. Curtis*, 380 F.3d 1311 (11th Cir. 2004). . . . . . . . .  51

*United States v. Gale*, 314 F.3d 1 (D.C. Cir. 2003). . . . . . . . . . . . .  60

*United States v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993).. . . . . . . . . .  49

*United States v. Price*, 566 F.3d 900 (9th Cir. 2009). . . . . . . . . . . .  45

*United States v. Sedaghaty*, 728 F.3d 885 (9th Cir. 2013). . . . .  49, 54, 56, 64

*United States v. Service Deli, Inc.*,151 F.3d 938 (9th Cir. 1988). . .  55

*United States v. Shaffer*, 789 F.2d 682 (9th Cir. 1986).  . . . . . .  37, 45

*United States v. Sigillito*, 759 F.3d 913 (8th Cir. 2014). . . . . . . . .  37

*United States v. Steinberg*, 99 F.3d 1486 (9th Cir. 1996).. . . . . . . .  52

*Valdovinos v. McGrath*, 598 F.3d 568 (9th Cir. 2010).. . . . . . . . .  31

*Wearry v. Cain*, 136 S. Ct. 1002 (2016). . . . . . . . . . . . .  37, 40, 47, 51

*Weiler v. United States*, 323 U.S. 606 (1945). . . . . . . . . . . . . . . . .  50

*Williams v. Brown*, 609 F.2d 216 (5th Cir. 1980).. . . . . . . . . . . . .  37

*Wood v. Ercole*, 644 F.3d 83 (2nd Cir. 2011).. . . . . . . . . . . . . . . .  54

*Youngblood v. West Virginia*, 547 U.S. 867 (2006) . . . . . . . . . . . .  34

**TO THE HONORABLE TANI CANTIL-SAKAUYE, CHIEF JUSTICE, AND THE HONORABLE ASSOCIATE JUSTICES OF THE CALIFORNIA SUPREME COURT:**

Ramon Alvarez, by and through counsel, respectfully petitions this Court for writ of habeas corpus because he is in custody in violation of the Constitutions of California and the United States.

## I.    JURISDICTIONAL ALLEGATIONS

Alvarez's conviction for second-degree murder with personal use of a firearm in the Orange County Superior Court Case No. 10CF2001 was obtained in violation of the Due Process Clause of the Fourteenth Amendment because the prosecution suppressed material evidence favorable to the defense ("*Brady*[1] Violation"), and presented false evidence and failed to correct it once presented ("*Napue*[2] Violation").

This Court has jurisdiction over this petition for writ of habeas corpus under Article VI, Section 10 of the California Constitution.

Alvarez's habeas petition in the United States District Court is currently stayed pending the outcome of the instant petition.

---

[1]  *Brady v. Maryland*, 373 U.S. 83 (1963).

[2]  *Napue v. Illinois*, 360 U.S. 264 (1959).

7

## II.   INCORPORATION OF EXHIBITS AND REQUEST FOR JUDICIAL NOTICE

Alvarez incorporates in this Petition the attached declarations and exhibits, and the records from the Superior Court of Orange County, Case No. 10CF2001, the California Court of Appeal Case No. G047466, and the records in this Court, Case Nos. S216690 and S240764.

In addition, Alvarez respectfully requests that this Court take judicial notice of the entire file in the pending habeas action in the District Court, *Ramon Alvarez v. Attorney General*, Case No. 15-cv-00987-DMG-KS.

## III.   BACKGROUND AND SUPPORTING FACTS

### A.   State Court Proceedings

In June 1998, Ruben Leal died from a gunshot wound to the head. (*See* Reporter's Transcript ("RT")[3] 250.)   Twelve years later, in December 2010, Alvarez was charged with murder in connection with Leal's death. (*See* Clerk's Transcript ("CT") 157-158.) Orange County Deputy District Attorney Mark Geller was the lead prosecutor and Detective David Rondou was the lead investigator. (*See* CT 3, 98, 101.)

---

[3] "RT" refers to the Reporter's Transcript fo Alvarez's second trial. "CT" refers to the Clerk's Transcript.

8

Alvarez's first trial resulted in a hung jury with six jurors voting for an acquittal. (*See* RT 4-7.) In June 2012, Alvarez was tried again, (*see* RT 17), and convicted, as the California Court of Appeal found, "largely on the testimony of Craig Gonzales, a jailhouse informant, who claimed [Alvarez] had confessed to [him] that he had committed the crime." *People v. Alvarez*, No. G047466, 2014 WL108613 at *1 (2014).

There was no physical evidence connecting Alvarez to Leal's death, and no weapon was ever recovered. (*See* RT 258-260, 288-289.) Although Gonzales claimed Alvarez confessed to him while they were in the same cell, the prosecution presented no evidence that Alvarez and Gonzales were in the same cell either at Chino State Prison where, according to Gonzales, they first met, or at the Santa Ana Jail where, Gonzales claimed, Alvarez confessed. (*See* RT 217, 230.) "The only thing" the prosecution showed was that Alvarez and Gonzales "were both housed in the same housing unit," in Santa Ana with "64 [other] inmates," (RT 229, 230), and in the same facility at Chino with "1200 other inmates." (RT 217.) The prosecution never presented any "written" agreements, as would be required, to show that Gonzales and Alvarez had agreed to be in the same cell. (*See* RT 214-216.) Alvarez

9

has also passed a polygraph examination showing that he has never been in the same cell as Gonzales.  (*See* Exhibit ("Ex.") J.[4])

Before trial, in August 2010, Alvarez requested from the prosecution to disclose "[a]ny promises and/or inducements of any kind made by the prosecution to induce or encourage a witness to assist the prosecution . . . or to induce a witness to testify for the prosecution," as well as "[a]ny information relevant to impeachment of any witness that the prosecution intend[ed] to call at the trial[.]"  (CT 95.)

In September 2010, in a letter addressed to Deputy District Attorney Geller, Alvarez's trial counsel again requested "all cases" in which Gonzales had "worked on as an informant" or "has been involved with as an informant."  (Dkt. No. 23-1 at 3.)  On October 22, 2010, defense counsel followed up and again wrote to Geller, asking for Gonzales's "informant packet."  (*Id.* at 4.)

Finally, on October 22, 2010, District Attorney Investigator F. Lee Smith sent defense counsel an "information report," stating:

> On October 5, 2010, District Attorney Investigator John Kenney checked Jaw enforcement resources to determine if Craig Gonzales had a background as an informant in

---

[4]  "Ex." refers to the Exhibits attached to this Petition.

> California and other states there was none *[sic]*.

> Craig Gonzales has no history as an informant in Orange County per the Orange County District Attorney's Office.

(CT 402 (some capitalization omitted).)

At the preliminary hearing, in response to prosecutor Geller's questioning, Gonzales testified that he was offered "nothing at all" for his testimony; Gonzales and Geller also made it seem as though Gonzales's motivation for testifying was to clear his conscience before his imminent death while, at the same time, also putting his life in danger by testifying for the prosecution:

[Geller]:          And so then here we are 12 years later and you're in Corcoran, you're wheelchair bound, you've got some health issues that you think are probably going to end your life before you get out of prison, have you been offered any consideration for this?

[Gonzales]:          Not at all.

[Geller]:          Did my office, the Orange County D.A.'s office, offer you anything?

[Gonzales]:          I've never even been in contact with your office.

[Geller]:          Okay. Did the Santa Ana police guys who came up to state prison and interviewed you offer you anything?

11

| [Gonzales]: | Nothing. |
|---|---|
| [Geller]: | So then the obvious question is why are you here? |
| [Gonzales]: | I was contacted and asked if I would be interested in testifying, and I thought about it hard. At first I was, like, no. And then I thought about it some more and I thought, you know what, it's the right thing to do. This way if I die I die with a clear conscience. |
| [Geller]: | Are you concerned for your safety going back to Corcoran whenever you go back there and being labeled a rat? |
| [Gonzales]: | Well, of course. |

(CT 125-126.)

At the same hearing, in response to defense counsel, Gonzales testified that he had not been an informant at federal or state level:

| [Defense Counsel]: | Have you done other informant work in the federal jurisdiction? |
|---|---|
| [Gonzales]: | No, sir. |
| [Defense Counsel]: | Have you ever done it on the state level? |
| [Gonzales]: | No, sir. |

(CT 130.)

At trial, Gonzales testified that, in 2010, Rondou visited him in prison, (RT 154), and asked "if I would be willing to testify about a prior statement that I had made regarding Alvarez." (RT 155.) Gonzales testified that although by agreeing to testify against Alvarez he was putting his life in danger by being labeled a "snitch or rat," he agreed to testify because he had "turned [his] life over to God, asked for his forgiveness and just decided to try to do the right thing." (RT 156.) This exchange between prosecutor Geller and Gonzales followed:

[Geller]: What are you getting in exchange for your testimony here today?

[Gonzales]: Nothing. A cup of water. Nothing.

[Geller]: Do you have any expectation whether anything's on the table right now, that you're going to get anything in return for your testimony?

[Gonzales]: No, not at all.

[Geller]: And so we're clear, nobody from the Orange County District Attorney's office, my office, myself included, have ever offered you anything for your testimony; correct?

[Gonzales]: No, nothing.

[Geller]: Anything from the Santa Ana Police Department, Detective Rondou or any of his

|   |   |
|---|---|
| | colleagues, Detective Andrade, who is sitting up there next to you there? Anybody offer you anything at any point in time from the pendency of this case since 2010 in exchange for your testimony? |
| [Gonzales]: | Absolutely nothing. |
| [Geller]: | So why are you doing it? |
| [Gonzales]: | Like I said, I – I talked this over with my family, my daughter, my – my – my son, my dad, and they all just told me to do what was right, you know.  They said, "do the right thing," you know.  "Don't – if somebody – don't lie.  If somebody's asking you something, just tell 'em the truth."<br><br>And – and when Rondou asked me to testify, I told him, you know, that I had come to grips with it myself that it was the right – right thing to do as long as I was just up here telling the truth. |

(RT 158-159.)

|   |   |
|---|---|
| [Geller]: | Has there been any sort of under-the-table promise between you and Rondou to get you down to Southern California? |
| [Gonzales]: | No, nothing. |

(RT 194.)

In response to defense counsel's questions, Gonzales claimed he

had never testified for the prosecution and had not been "an informant

before" at "anyplace":

| [Defense Counsel]: | Mr. Gonzales, have you ever testified for the district attorney's office before? |
| [Gonzales]: | No. |

(RT 174.)

| [Defense Counsel]: | Are you telling us that this is the first time you've ever testified for the district attorney? |
| [Gonzales]: | Here, yes. |
| [Defense Counsel]: | You've never been an informant before? |
| [Gonzales]: | Are you talking about here?  No. |
| [Defense Counsel]: | Anyplace, Sacramento, Fort worth. |
| [Gonzales]: | No, either place. |

(RT 175.[5])

Rondou testified he talked to Gonzales about testifying "[a] couple times."  (RT 143.)  Rondou "took Sergeant [Eric] Paulson with

---

[5]  The trial court instructed the jury that "whatever the attorneys say is not evidence," (RT 21), but that one of the "exceptions to that rule" is "where the only way that an answer makes any sense is if you adopt the attorney's question."  (RT 22.)  For example, the court explained, "if a witness is asked it's now 20 to 4:00. 'Is it now 20 to 4:00, sir?' and the answer is yes. The yes means nothing standing by itself, so you adopt the attorney's question, yes, it's 20 minutes to 4:00.  Pretty simple, pretty straightforward."  (RT 22.)

[him] to the interview." (RT 144.) Rondou claimed that he told Gonzales "'I can't promise anything. You're not going to get anything out of this." (*Id.*) This exchange between Rondou and Geller followed:

| [Geller]: | At any point in time did you promise Mr. Gonzalez *[sic]* anything in exchange for his testimony? |
|---|---|
| [Rondou]: | No. He'll tell you that anytime we've talked – and the majority of my conversations with him are on tape[6] – when we talk, he knows he's getting nothing out of it. I've never promised him anything. I couldn't do anything for him anyways. I'd be lying. He's a sentenced prisoner, that I can't unwind that kind of stuff. So there's nothing I can do for him. |

(RT 145.)

During closing arguments, Geller reminded the jury that "[o]bviously, a fair portion of my case rests on you folks believing Craig Gonzales." (RT 480.) "Quite frankly," Geller added, "Craig Gonzales makes it." (RT 483.) And, according to Geller, "Craig Gonzales dots every I and crosses every T." (RT 484.) Geller not only relied

---

[6] The Orange County District Attorney's file that was produced in response to a subpoena related to Deputy District Attorney Geller's deposition, contains no taped interviews, or transcript of any interviews, between Rondou and Gonzales. At his deposition, Geller testified "[o]ff the top of my head right now I don't recall whether or not I was successful in finding an audiotape of that interview. I'm not – I do not recall whether or not that interview even existed." (Ex. G at 14.)

16

extensively on Gonzales's testimony, but he also repeatedly asserted and represented to the jury that they should believe Gonzales because he was "getting nothing for this" – and, in fact, was risking and putting his life in danger by testifying – and that the only thing motivating Gonzales to testify was that he wanted to do something good before dying:

> You know, on the surface, Craig Gonzales is probably not the kind of guy you want to invite for dinner. I mean, he's a career criminal. He's been in and out of the joint for the past 30 years. He's got a record as long as my arm. Probably not a lot of good reasons to give a lot of faith into what he told you, except the condition that he's in now and the fact that he's getting nothing for this. Nothing for this. You can't overlook that.

(RT 480-481.)

> Craig Gonzales' testimony was spot on and it absolutely reeked of the truth.
>
> He didn't come in here and tell you anything that he wasn't. He did not, as I said up there, sugar-coat who he is as a person, but remember this man is serving a sentence in prison that he will not survive. Doctors have told him, regardless of how he looks today . . . doctors have told him, "you will not live long enough." He is in a stage of liver failure. He is going to die in prison. He is gaining nothing from this.
>
> We talked to Mr. Gonzales. We talked to detective Rondou. Craig Gonzales is getting absolutely no consideration for this. And I cannot emphasize that enough. Because if he was getting a deal, if he was getting out, if he was getting five years knocked off his sentence, well then I would encourage you to be suspect about what he had to tell you folks because he's gaining

something, but he is not.

(RT 481-482.)

There is absolutely no benefit for Craig Gonzales.  In fact, there's a detriment to him because he is now back at state prison.  He's no longer here.  He's been transported to where he came from before he got here and talked to you folks.  And now he has a rat jacket on him.  He is looked at as a snitch, a rat, whatever term you want to refer to it as.  So what he's done in exchange for nothing is put his life in danger.  That's what he gets out of all this is putting his life in danger.

What he said is that he wants to do something good before he dies. That's his –   that's what's motivating him.

(RT 482.)

And Craig Gonzales came in here and is absolutely putting his life at risk, whatever life he has left, he is putting it at risk for nothing to share that story with you because he wants to do something good, something good that he probably hasn't done, something altruistic, something to help a victim's family maybe get some closure.

(RT 498.)

But in 2000 and 12 Craig Gonzales at his peril, gaining nothing for this other than, as I said yesterday, a big target on his back, that's what Craig Gonzales is getting paid for his testimony.  He's getting – he's getting green lighted, if you know what that means.

(RT 526.)

And I've said it before, and I'll say it again, and I won't say it anymore.  He's gaining nothing.  What possible motivation does this man have to come into court and testify and accuse that man

of murder, whether he's going to die next year or five years from now or even if he gets out of prison some day?

Let's say he miraculously survives his stage four liver failure. What is he gaining here?  He said he found God.  Whether he did or he didn't . . . how cold hearted would somebody have to be, their last – basically their last act on the face of this planet is to accuse and help convict an innocent man of murder and gain nothing for it?  And that's why Craig Gonzales was telling the truth.

(RT 545; *see also* RT 528:  ["You know, Gonzales, he's getting nothing for this.  So that's why his testimony reeks of truth."].)

After the jury's verdict, defense counsel discovered that, contrary to what the prosecution had represented before and at trial, Gonzales had, in fact, previously testified as a "jailhouse informant" for the prosecution in Nevada.  (*See* CT 453; *see also* Ex. I.)  Defense counsel had found out about this suppressed information from a pleading that the Sacramento District Attorney's Office had submitted in February 2008 to the superior court when opposing Gonzales's motion to strike his prior convictions during sentencing.  (*See* CT 436.)

Alvarez moved for a new trial because the prosecution had suppressed and misrepresented Gonzales's informant history and because Gonzales had lied during his testimony.  (*See* CT 372-480.)

19

Prosecutor Geller did not file an opposition to the motion and declined to say anything at the hearing. (*See* RT 568.) In denying the motion, the trial court said that Gonzales had not testified falsely because, in that court's view, Gonzales had "testified he had not testified for the district attorney [in Orange County] and that he had not been an informant in Sacramento or Fort worth." (RT 569.) "At any rate," the court went on, "Gonzales' lengthy criminal history was discussed at trial. One additional conviction[7] would have had little, if any, impact on the jury's evaluation of his credibility." (*Id.*) The court found it important that "Gonzales received no consideration for his testimony and decided to testify after concluding that he had been a bad guy his whole life and wanted to do something good before he guide died." (RT 572.)

On September 28, 2012, the Superior Court sentenced Alvarez to state prison for 25-years-to-life. (*See* RT 568, 576-577.)

In affirming the judgment, the California Court of Appeal "conclude[d] the information about Gonzales's testimony in the Nevada case was not subject to disclosure by the prosecution under *Brady*."

---

[7] It appears the trial court misunderstood the basis for the new trial, which was the prosecution's suppression of Gonzales's *prior informant work* and not, as the court seems to have thought, a failure to disclose *a prior conviction*.

20

*Alvarez*, 2014 WL 108613 at *6. Even "[i]f the prosecution had failed to turn over exculpatory evidence in its possession (actual or constructive)[,]" *id.* at *6, the court thought that it was "not reasonably probable that evidence Gonzales also had been an informant in Nevada would have changed the result in this case[,]" *id.* The Court of Appeal also "agree[d] with the trial court that Gonzales did not commit perjury in his testimony regarding his history as an informant." *Id.* at *7. While "Gonzales was clearly being evasive in his responses to defendant's counsel's questions," in the Court of Appeal's view, "that d[id] not necessarily equate to perjury." *Id.*

This Court denied review, and Alvarez's conviction became final on July 8, 2014, when the time to petition the United States Supreme Court for writ of certiorari expired. *See* Supreme Court Rule 13.1; *see also Jimenez v. Quarterman*, 555 U.S. 113, 120 (2009) ("[P]etitioner's conviction was again capable of modification through direct appeal to the state courts and to this Court on certiorari review. Therefore, it was not until [the] time for seeking certiorari review in this Court expired, that petitioner's conviction became 'final[.]'"); *In re Pine*, 66 Cal. App. 3d 593, 594 (1977) ("[A] judgment is not final so long as the courts may

provide a remedy on direct review. That includes the time within which to petition to the United States Supreme Court for writ of certiorari.").

### B.    Federal Habeas Proceedings

On June 19, 2015, proceeding *pro se*, Alvarez petitioned the United States District Court, Central District of California, for habeas corpus relief on grounds that his conviction was obtained in violation of his due process rights because: (1) the prosecution had failed to disclose Gonzales's informant history; (2) Gonzales had committed perjury; and (3) the prosecution had used a jailhouse informant in violation of *Massiah v. United States*, 377 U.S. 201 (1964).

On May 18, 2016, the District Court appointed counsel for Alvarez. After a hearing on August 3, 2016, the court ordered briefings regarding the appropriateness of an evidentiary hearing. Another hearing was held on December 13, 2016. On January 18, 2017, the District Court stayed the action pending Alvarez's exhaustion of his state court remedies. Alvarez filed a habeas petition in this Court in Case No. S240764, which was denied: "The petition for writ of habeas corpus is denied. (See *In re Robbins* (1998) 18 Cal. 4th 770, 780 [courts will not entertain habeas corpus claims that are untimely].)"

Following this Court's denial of Alvarez's habeas petition, on August 23, 2017, the District Court relieved the Office of the Federal Public Defender as counsel and appointed the undersigned counsel. During the investigations that followed, on August 9, 2018, Alvarez obtained a declaration from the jailhouse informant Craig Gonzales and filed it in the District Court. (*See* Ex. C, Declaration of Craig Gonzales.) Gonzales asserted, under penalty of perjury, that "[i]n exchange for testifying against Alvarez, Detective David Rondou told [Gonzales] that [he] would get paid, be moved to any prison that [he] wanted, and get a reduction on [his] sentence." (*Id.* ¶ 3.) "Approximately four months after [he] had testified against Alvarez, Detective Rondou visited [Gonzales] in prison and handed [him] a check for $11,000." (*Id.*) The $11,000 check that was issued to Gonzales was dated December 5, 2012, (*see* Ex. A), which was two months after Alvarez had been sentenced, but had a direct appeal pending in California Court of Appeal.

Gonzales also "told Detective Rondou about [his] prior work as an informant long before Alvarez's first trial, and Detective Rondou told [him] that he had verified that [Gonzales] had testified as an informant in the Nevada case." (Ex. C, ¶ 4.) Deputy District Attorney Geller "told

23

[Gonzales] that he had spoken with the district attorney in Nevada about [Gonzales'] testimony as an informant there." (*Id.*)

Alvarez next obtained a supplemental declaration from Gonzales, which provided some additional information that the Attorney General had requested. (*See* Ex. B.) In his supplemental declaration, Gonzales explained that "[i]n exchange for testifying against Alvarez, before the preliminary hearing, Detective David Rondou promised that [Gonzales] would get paid without specifying the amount; and as the case proceeded, Detective Rondou would continue to reassure [Gonzales] that [he] was going to be paid for [his] testimony without specifying the amount." (*Id.* ¶ 3.) "Detective Rondou then instructed that if asked in court whether [Gonzales] was going to receive any benefit for [his] testimony, that [he] should say no." (*Id.*) Gonzales also explained that Detective Rondou "instructed that if asked in court whether [Gonzales] had worked as an informant before, that [Gonzales] should avoid the question as much as possible." (*Id.* ¶ 4.) And, Gonzales explained that "[b]efore testifying at Alvarez's first trial, Detective Rondou took [him] to the district attorney's office where [he] met with" Geller, and it was there and then that Geller "told [Gonzales] that he had been in contact

24

and spoken with the district attorney in Nevada about [his] testimony as an informant there." (*Id.* ¶ 5.)

Given this "extraordinary new" evidence, the District Court ordered counsel to meet and confer. (Docket No. 59 at 2.[8]) "Significantly," the District Court observed, "Gonzales had testified that: he was getting 'Nothing. A cup of water. Nothing,' in exchange for his testimony[]; no one from the Santa Ana Police Department or the Orange County District Attorney's Office had ever offered him anything in exchange for his testimony against [Alvarez]; and he had not testified as an informant before." (*Id.* at 1.) "Additionally," the court noted, "in preparation for [Alvarez's] first trial, the Orange County District Attorney's Office sent defense counsel the results of its October 5, 2010 'check[] of law enforcement resources to determine if Craig Gonzales had a background as an informant,' which found that Gonzales had no background as an informant 'in California and other states.'" (*Id.*)

The "check" to Gonzales "triggered further investigation" by the Attorney General, "the preliminary results of which [were] contained in

---

[8] References are to the pleadings and orders docketed in *Ramon Alvarez v. Attorney General*, 15-cv-00987-DMG-KS.

the investigative report of a Department of Justice investigator." (Docket No. 60 at 2.)  "The report corroborate[d] a significant portion of the declaration of Mr. Gonzales:  (1) the check is valid; (2) it was issued by the City of Santa Ana; (3) the funding source is the Homicide Reward Fund Account; and (4) the basis for authorization was for cooperation 'regarding the murder of Ruben Leal.'"  (*Id.*)

Further, "the check was authorized at the recommendation of Deputy Chief Harrelson, and Police Chief Carlos Rojas approved payment."  (Ex. E)  "Commander [Eric] Paulson also stated [that] . . . Gonzales cooperated with the case agent, and without his coming forward with information regarding this crime, the suspect may not have been convicted[,]" and that "Gonzales testified at trial and provided important testimony to convict the suspect in this case."  (*Id.*)

The Attorney General's Office interviewed Detective Rondou. Rondou admitted "that he went to an unknown prison and handed Gonzales a check" and that "the check given to Gonzales was for $11,000.00."  (Ex. F.)  Rondou claimed, however, that the check "was supposed to cover Gonzales' burial costs[.]"  (*Id.*)  Rondou also claimed "when he met with Gonzales in . . . prison to give him the check, he saw

26

Gonzales endorse the check to his daughter and hand it to a prison guard to mail it immediately." (*Id.*) Rondou "stated payment to Gonzales was approved through the Orange County District Attorney's Office . . . and the City of Santa Ana." (*Id.*)

Rondou claimed "he would have never transported Gonzales from jail to the [district attorney's] office for a meeting. Rondou stated instead he would have the District Attorney come to jail to meet with Gonzales." (Ex. F at 2.) And, Rondou claimed that "he was unaware" of Gonzales's prior informant work in Nevada. (*Id.* at 1.)

Although the Attorney General's Office was "working . . . with Detective Rondou to produce a declaration under oath incorporating those denials[,]" (Docket No. 67 at 3), to date, the Attorney General has not produced or filed any declaration from Rondou.

On December 19, 2018, Alvarez's counsel and private investigator Jose L. Newman interviewed Danielle Gonzales, Craig Gonzales's daughter. (*See* Ex. D.) Danielle Gonzales is married, has four children and is employed. (*Id.* at 1.) "Asked about contacts she might have had with Detective Rondou," Danielle explained: "'About five or six years ago, my dad (Craig Gonzales) had given me his

27

(Rondou's) phone number because he told me he was working with him. My dad was in prison in northern California, but he would be traveling to the jail in Santa Ana.  Detective Rondou couldn't tell my dad when they were going to be picking him up, but Detective Rondou stayed in contact with me, and informed me within a two-to-three week window when my dad would be coming down. Detective Rondou also told me that he had put me on my dad's books so I could visit him; so I could have visitation with my dad.'" (*Id.*)  Danielle "'had lots of discussions with Detective Rondou about getting [her] dad moved down here, to be able to see him more often, and not incur as much expenses.'" (*Id.* at 2.) "[T]he last time she spoke with Detective Rondou 'He said he was done with my dad, that he was going back to Solano, and was still trying to get him moved.  I called him a couple of times after that, within about a month, to see what the status of my dad being moved was.  Detective Rondou said he was working on it, but it never happened.'" (*Id.*)

When asked "if she had ever called Detective Rondou and asked for money for burial costs for her father," Danielle "stated, 'No.'" (Ex. D at 2.)  She "'never had any financial discussions whatsoever with Detective Rondou.'" (*Id.*)  And, when asked "if she had ever received

28

a check from her father, Craig Gonzales, that was endorsed to her, for eleven thousand dollars," Danielle stated, "'No.  I never received anything like that.  My dad never endorsed a check to me, or gave me a check for eleven thousand dollars ($11,000.00), or anything like that. I knew my dad had physical issues, like back pain and things like that, but not that he was dying.  I never received any check like that.'"  (*Id.*) When "[a]dvised that Detective Rondou [had] said that [her father] had endorsed a check to her," Danielle stated, "'I never received a check like that, a check like that was never deposited through my bank.  My contacts and communications with Detective Rondou were about visitation with my dad, and having my dad moved down here; never about him . . . paying anything.'"  (*Id.*)

On January 31, 2019, Deputy District Attorney Geller was deposed at his counsel's office.  Geller testified that he "consider[ed] [Rondou] the lead detective" in Alvarez's prosecution.  (Ex. G at 23.) Geller knew Commander Eric Paulson and, "in this relevant period of time[,]" Paulson and Rondou "were colleagues."  (*Id.*)

Geller first "met [Gonzales] when they brought him down for the preliminary hearing."  (Ex. G at 21.)  "Detective Rondou" and another

detective had "brought [Gonzales] to the office on the morning of the preliminary hearing."  (*Id.* at 22.)   When asked if Gonzales "was physically in your office?" Geller testified "Yes."  (*Id.*)  Geller had no explanation as to why Rondou had claimed he would have "never" brought Gonzales to the District Attorney's office.  (*See id.* at 21.) Geller also testified that he "[m]ay have had that same brief meeting" with Gonzales and Rondou "right before [Geller] put [Gonzales] on at the jury trial[.]" (*Id.* at 83.)

According to Geller, Gonzales "was a very important witness" for the "prosecution."  (Ex. G at 29.)  Indeed, Geller added, "[i]t was only because . . . Gonzales agreed to testify that we were able to go forward on the case."  (*Id.* at 66.)  Gonzales's "credibility in front of the jury" was thus essential.  (*Id.*)  And, Geller testified that he wanted "to find out everything that [he] could about [Gonzales]," and he "obviously" was aware of his "*Brady* obligations.  I got to make sure that I've given everything to the defense."   (*Id.* at 29.)  Geller expected the same compliance from Rondou and other investigators. (*See id.* at 34, 73-74.)

Asked about the report that was produced to defense counsel's discovery requests, which stated that "District Attorney Investigator

John Kenney checked law enforcement resources to determine if Craig Gonzales had a background as an informant in California and other states there was none[,]" Geller testified "I don't even know who John Kenney is." (Ex. G at 35.)  As to the author, "Investigator F. Lee Smith" Geller testified Smith "was [his] D.A. Investigator at the time."  (*Id.*)  Geller did not recall whether he had discussed the report with Smith before producing it to defense counsel.  (*See id.* at 35-36, 40-41.)  Geller, however, agreed that the report clearly stated, and represented to defense counsel, that Gonzales had no prior informant work in California *and* other states.  (*See id.* at 43-44.)

With respect to defense counsel's requests for production of Gonzales's prior informant work, Geller had "no independent recollection" of those requests.  (Ex. G at 37, 38, 41.)

Geller claimed he "probably" or "may have" learned about Gonzales's prior informant work from the defense's motion for a new trial, but did not "have an independent recollection." (Ex. G at 48, 49.[9])

---

[9]  Despite testifying that the first time he had learned about Gonzales's prior informant work was from the defense's motion for a new trial, when later confronted with his failure to oppose the motion, Geller claimed he did not remember Alvarez's motion for a new trial.  (*See* Ex. G at 54.)

Geller agreed that Gonzales's informant history, and that he was being paid for his testimony, should have been disclosed. (*Id.* at 48-49.) When asked if he would have disclosed the same information after sentencing, Geller testified "probably not." (*Id.* at 51; *see also id.* at 94.)

When asked about his custom and practice with respect to a motion for a new trial, Geller testified he "obviously" would "write a response brief." (Ex. G at 51.) But, Geller could not explain why he did not file a response in this matter other than to concede that he "did not" file one. (*Id.*) Geller testified that "[m]ore than likely" he would have argued against the motion in court. (*Id.* at 52.) When confronted with the record that he made no arguments in court, Geller could not explain why that was other than to say that he "trusted [the trial judge] to do the right thing with respect to the legal analysis." (*Id.* at 52, 53.)

Geller admitted that he knew about the $11,000 check that was issued to Gonzales. He claimed that he learned about the check from Rondou "years later." (Ex. G at 54, 56.) When Rondou told him about the check, Geller had "asked Dave why." (*Id.* at 57.) When asked if he recalled Rondou saying the check was for "burial services," Geller claimed "I just don't recall." (*Id.* at 62.)

32

Geller claimed that when Rondou told him about the check, he "was annoyed" and "upset." (Ex. G at 69.) "And the reason [Geller] was upset[,]" was not because the prosecution had failed to disclose the payment to the defense, but "because," Geller testified, "[Gonzales] didn't deserve it. I mean . . . this guy is a scumbag. He's a career criminal, you know. I mean why are we giving him money? He said – you know, I mean that's it." (*Id.* at 68-69.) But, Geller didn't do anything about it because "[t]hey already made the payment years earlier. What am I supposed to do at that point in time?" (*Id.* at 69.)

With respect to planting informant Brian Ruorock in Alvarez's jail while he was awaiting trial, Geller claimed he "was completely unaware of it." (Ex. G at 30.) Geller claimed "[t]he first time I ever heard of that was in . . . the *Dekraai* case." (*Id.* at 30.) Geller agreed that Ruorock trying to obtain statements from Alvarez should have been disclosed. (*See id.* at 72, 74, 76.) But, Geller had admittedly done "nothing" after he found out about Ruorock's activities. (*Id.* at 74-75.)

Following Geller's deposition, on May 31, 2019, Alvarez filed an amended habeas petition in the District Court. On June 10, 2019, the District Court ordered the Attorney General to respond to the petition,

33

and, on July 25, 2019, the Attorney General moved to dismiss the petition asserting that Ground One of the petition has not been exhausted in state courts.  On August 7, Alvarez filed an unopposed motion for a stay.

In an order dated August 30, 2019, the District Court granted Alvarez's motion to stay the action pending further state court exhaustion proceedings.  (*See* Ex. K.)  The District Court determined that Alvarez had demonstrated "'good cause'" for the failure to exhaust, his unexhausted claims are "'potentially meritorious'" and that he had not engaged in "'intentionally dilatory litigation tactics'" thus satisfying the requirements under *Rhines v. Weber*, 544 U.S. 269 (2005).  (*Id.* at 2.) The District Court then ordered Alvarez to file a habeas petition in this Court while the proceedings in the federal court are stayed pending this Court's resolution of this Petition.  (*Id.*)

## IV.   THE INSTANT PETITION IS TIMELY

A habeas petition "must be filed within a reasonable time after the petitioner or counsel knew, or with due diligence should have known, the facts underlying the claim as well as the legal basis of the claim." *In re Harris*, 5 Cal. 4th 813, 828 n. 7 (1993).

This Court's "rules establish a three-level analysis for assessing whether claims in a petition for a writ of habeas corpus have been timely filed. First, a claim must be presented without *substantial* delay. Second, if a petitioner raises a claim after a substantial delay, [this Court] will nevertheless consider it on its merits if the petitioner can demonstrate *good cause* for the delay. Third, [this Court] will consider the merits of a claim presented after a substantial delay without good cause if . . . th[e] error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner[.]" *In re Reno*, 55 Cal. 4th 428, 460 (2012) (emphasis in original).

Here, this Court denied Alvarez's first habeas petition in Case No. S240764 on June 14, 2017. Thereafter, on August 11, 2017, Alvarez's appointed counsel in the District Court, the Federal Public Defender, filed a motion to be relieved due to a conflict and, on August 23, 2017, the District Court granted the request and appointed the undersigned counsel for Alvarez. (*See* Docket Nos. 39, 40.)

On July 2, 2018, Alvarez's new counsel located Craig Gonzales and they immediately had an in person meeting. On August 9, 2018,

Alvarez's counsel obtained Gonzales's declaration and the check that was issued to him for testifying against Alvarez, which are exhibits to this Petition. Alvarez's counsel then met and conferred with the Attorney General's Office in light of this newly discovered evidence.

The Attorney General then conducted its own investigation and requested additional information from Alvarez's counsel, which was provided in Gonzales's supplemental declaration, also an exhibit to this Petition. Thereafter, the parties engaged in multiple meet and confer sessions, which ultimately resulted in the taking of Deputy District Attorney Geller's deposition at his counsel's office on January 31, 2019. The transcript and video of Geller's deposition was completed on March 27, 2019. Alvarez then filed an amended habeas petition in the District Court, which, pursuant to Alvarez's unopposed request, has now been stayed pending the resolution of this Petition.

Thus, Alvarez has done everything reasonably expected to develop and present his claims to this Court as expeditiously as possible. Alvarez has "engaged in intentionally dilatory litigation tactics." *Rhines*, 544 U.S. at 278; indeed, he has no reason to delay. *Cf. id.* at 277-78 ("[C]apital petitioners might deliberately engage in dilatory

tactics to prolong their incarceration and avoid execution of the sentence of death."); *Lawrence v. Florida*, 549 U.S. 327, 344 (2007) ("Most prisoners want to be released from custody as soon as possible, not to prolong their incarceration. They are therefore interested in the expeditious resolution of their claims."); *Valdovinos v. McGrath*, 598 F.3d 568, 574 (9th Cir. 2010), *vacated for reconsideration on other grounds*, 562 U.S. 1196 (2011) (petitioner "had not engaged in dilatory tactics and he had no motivation for delay, as he is not a capital defendant.").

Moreover, courts "have found good cause when . . . the prosecution has wrongfully withheld information." *Dixon v. Baker*, 847 F.3d 714, 720 (9th Cir. 2017); *see also Gonzalez v. Wong*, 667 F.3d 965, 979, 980 (9th Cir. 2011) (finding "good cause" for failure to exhaust *Brady* claim based on newly discovered evidence during federal habeas proceedings because "[r]esponsibility for the late appearance of those documents lies with the state" and "remand[ing] to the district court with instructions that it stay and abey the habeas proceedings to allow Gonzales to present to state court his *Brady* claim including the subsequently-disclosed materials.").

## V.    CLAIMS FOR RELIEF

**Ground One:  The Prosecution Violated the Due Process Clause of the Fourteenth Amendment by Suppressing Material Evidence Favorable to the Defense ("*Brady* Violation").**

### A.    Governing Law

"The prosecution's affirmative duty to disclose evidence favorable to a defendant . . . is of course most prominently associated with th[e] Court's decision in *Brady v. Maryland*, 373 U.S. 83, 86 [] (1963)." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (citations omitted). "*Brady* . . . held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citation omitted).

"In *United States v. Bagley*, the Supreme Court recognized that 'impeachment evidence . . . falls within the *Brady* rule,' because it is 'favorable to an accused.'" *Gonzalez v. Wong*, 667 F.3d 965, 981 (9th Cir. 2011) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)); *see also Kyles*, 514 U.S. at 433 ("*Bagley* . . . disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes.").

38

"[T]he government is obligated to disclose '*all* material information casting a shadow on a government witness's credibility.'" *Carriger v. Stewart*, 132 F.3d 463, 481-82 (9th Cir. 1997) (en banc) (emphasis in original; citation omitted). And, "[t]he prosecution is obligated by the requirements of due process to disclose material exculpatory evidence on its own motion, without request." *Id.* at 479 (citations omitted).

Thus, "[t]he prosecutor's duty to disclose material evidence favorable to the defense 'is applicable even though there has been no request by the accused, and encompasses impeachment evidence as well as exculpatory evidence.'" *Browning v. Baker*, 875 F.3d 444, 459 (9th Cir. 2017) (quoting *Strickler v. Green*, 527 U.S. 263, 280 (1999)); *see also Milke v. Ryan*, 711 F.3d 998, 1016 (9th Cir. 2013) ("A defendant doesn't have to make a request for . . . impeachment evidence.").

Further, "[u]nder *Brady*, as the United States Supreme Court's decisions clearly establish, the prosecutor has a 'broad duty of disclosure.'" *Amado v. Gonzalez*, 758 F.3d 1119, 1136 (9th Cir. 2014) (quoting *Strickler*, 527 U.S. at 281). "The prosecutor must presume in favor of disclosure, and resolve his doubts about the exculpatory nature of a document in favor of producing it." *Id.* (citing *United States v.*

39

*Agurs*, 427 U.S. 97, 108 (1976) (ruling that "the prudent prosecutor will resolve doubtful questions in favor of disclosure")).  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  *Kyles*, 514 U.S. at 439.

"*Brady* applies not only to information known to the prosecutor, but also to 'evidence known only to police investigators and not to the prosecutor.'"  *Sivak v. Hardison*, 658 F.3d 898, 908 (9th Cir. 2011) (quoting *Strickler*, 527 U.S. at 281-82).  Therefore, "the prosecutor's personal knowledge does not define the limits of constitutional liability.  *Brady* imposes a duty on prosecutors to learn of material exculpatory and impeachment evidence in the possession of state agents, such as police officers."  *Browning*, 875 F.3d at 460 (citing *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) ("*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" (citation omitted)).

"Similarly, the disclosure requirements set forth in *Brady* apply to a prosecutor even when the knowledge of the exculpatory evidence is in the hands of another prosecutor."  *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002) (citing *Giglio v. United States*, 405 U.S. 150, 154

40

(1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government.")); *see also Amado*, 758 F.3d at 1134 ("The prosecution's duty to reveal favorable, material information extends to information that is not in the possession of the individual prosecutor trying the case.").

Moreover, "the prosecution has a duty to learn of any exculpatory material known to others acting on the government's behalf." *Carriger*, 132 F.3d at 479-80. "Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Id.* at 480; *see also Kyles*, 514 U.S. at 437-38 ("[T]he . . . prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."); *Milke*, 711 F.3d at 1012 ("The prosecutor is charged with knowledge of any *Brady* material of which the prosecutor's office or the investigating police agency is aware." (citation omitted)).

"The prosecutor's obligation under *Brady* is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence." *Amado*, 758 F.3d at 1134-35. "[A] prosecutor

should not be excused from producing that which the law requires him to produce, by pointing to that which conceivably could have been discovered had defense counsel expended the time and money to enlarge his investigations. No *Brady* case discusses such a requirement, and none should be imposed." *Id.* at 1136-37 (citation omitted). "In other words, defense counsel may rely on the prosecutor's obligation to produce that which *Brady* and *Giglio* require him to produce." *Id.* at 1136; *see also Banks*, 540 U.S. 695-96 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecutor represents that all such material has been disclosed."); *Milke*, 711 F.3d at 1017 ("That the court documents showing Saldate's misconduct were available in the public record doesn't diminish the state's obligation to produce them under *Brady*.").

Moreover, "'the deal or promise need not be express; failure to disclose an agreement . . . without making a bald promise also may violate *Brady*." *Sivak*, 658 F.3d at 910 (quoting *Hovey v. Ayers*, 458 F.3d 892, 917 (9th Cir. 2006)). Courts have "even found a *Brady* violation where the evidence 'implied that a tacit agreement was reached between a witness and the government in exchange for his

42

cooperation.'" *Id.* (quoting *United States v. Shaffer*, 789 F.2d 682, 689 (9th Cir. 1986)); *see also id.* ("[A]lthough there is no evidence of an explicit meeting of the minds between Leytham and the prosecutor's office, there is ample evidence of an implicit *quid pro quo* between [them], and . . . some type of deal in exchange for his cooperation.'"); *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (granting *Brady* relief based, in part, on an undisclosed verbal police promise "that they would 'talk to the D.A. if he told the truth'" in exchange for testimony against the accused); *United States v. Sigillito*, 759 F.3d 913, 930 (8th Cir. 2014) ("[T]he prosecutor must disclose the possibility of a reward that gives the witness a personal stake in the defendant's conviction." (citing *Bagley*, 473 U.S. at 683)); *LaCaze v. Warden Louisiana Corr. Inst. for Women*, 645 F.3d 728, 735 (5th Cir. 2011) ("'[E]vidence of any understanding or agreement as to a future prosecution would be relevant to the witness's credibility.'" (quoting *Giglio*, 405 U.S. at 155)); *Tarver v. Hopper*, 169 F.3d 710, 717 (11th Cir. 1999) ("'[E]ven mere 'advice' by a prosecutor concerning the future prosecution of a key government witness may fall into the category of discoverable evidence.'" (citation omitted)); *Williams v. Brown*, 609 F.2d 216, 221 (5th Cir. 1980) ("The

43

law is clear that the failure of the government to disclose . . . the existence of any promises, agreements, and understandings made with key witnesses deprives a defendant of due process of law.").

"A *Brady* violation has three elements. First, there must be evidence that is favorable to the defense, either because it is exculpatory or impeaching. Second, the government must have willfully or inadvertently failed to produce the evidence. Third, the suppression must have prejudiced the defendant." *Milke*, 711 F.3d at 1012 (citing *Strickler*, 527 U.S. at 281, 282). With respect to the third prong, "[t]he Supreme Court refers to the requirement that the defense establish that the suppressed evidence was prejudicial to the outcome as a 'materiality' requirement and/or a 'prejudice' requirement." *Benn*, 283 F.3d at 1053.

"Four aspects of materiality . . . bear emphasis." *Kyles*, 514 U.S. at 434. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." *Id.*; *see also Bagley*, 473 U.S. at 680 ("[T]he Court rejected a standard that would require the

defendant to demonstrate that the evidence if disclosed probably would have resulted in acquittal.").

"The second aspect of . . . materiality bearing emphasis . . . is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35; *see also Paradis v. Arave*, 130 F.3d 385, 393 (9th Cir. 1997) ("A *Brady* claim does not aim at undermining the sufficiency of the evidence[.]").

"Thus materiality does not require a showing that the defendant would have been acquitted had the suppressed evidence been disclosed, or that disclosure of the suppressed evidence would have reduced the quantum of inculpatory evidence below that required to convict the defendant." *Silva v. Brown*, 416 F.3d 980, 986 (9th Cir. 2005).

"Third . . . once a reviewing court  . . . has found [*Brady*] error there is no need for further harmless-error review." *Kyles*, 514 U.S. at 435; *see also Silva*, 416 F.3d at 986 ("Once the materiality of the suppressed evidence is established, no further harmless error analysis is necessary, even in the context of habeas review.").

"The fourth and final aspect of . . . materiality . . . is [that] suppressed evidence [is] considered collectively, not item by item." *Kyles*, 514 U.S. at 436-37; *see also Wearry*, 136 S. Ct. at 1007 ("[T]he state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively."); *Killian v. Poole*, 282 F.3d 1204, 1210 (9th Cir. 2002) ("Prejudice is determined by looking at the cumulative effect of the withheld evidence[.]").

## B.    The *Brady* Violation Here

Even if we take the prosecution at its word – that is, even if Geller, as he so claims, did not know about the promises to Gonzales and his informant history, and even if, as Rondou so claims, the $11,000 payment to Gonzales was for "funeral expenses," Alvarez is still entitled to a new trial.  This is simply because less than two and half months after Alvarez was sentenced to life imprisonment, Rondou, by his own admission, hands Gonzales, the prosecution's chief witness, an $11,000 check, and admittedly never discloses that to the defense, even though Alvarez had a direct appeal pending and his conviction was not yet final.

The prosecution's "duty to disclose is ongoing[,]" *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987), and continues even throughout post-

46

conviction proceedings, *see Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003) ("A prosecutor's decision not to preserve or turn over exculpatory material before trial, during trial, or after conviction is a violation of due process under *Brady*."); *Thompson v. Calderon*, 151 F.3d 918, 935 n. 12 (9th Cir. 1998) ("The *Brady* duty is an ongoing one, and continued to bind the prosecution throughout Thompson's habeas proceedings." (citing *Ritchie*, 480 U.S. at 60)); *Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992) ("We do not refer to the state's past duty to turn over exculpatory evidence at trial, but to its present duty to turn over exculpatory evidence relevant to the instant habeas corpus proceeding."); *Thompson v. Calderon*, 151 F.3d 918, 935 n. 12 (9th Cir.) (Reinhardt, J., concurring and dissenting), *cert. denied*, 524 U.S. 965 (1998) ("The *Brady* duty is an ongoing one, and continued to bind the prosecution throughout Thompson's habeas proceedings."); *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1094 (9th Cir. 2009) ("The fact that the Inspectors received the tape of the confession after the guilty verdict was rendered is immaterial because the record discloses that they received the tape while they were still involved in the new trial and post-conviction proceedings for both Tennison and

47

Goff."); *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) ("*Brady* requires disclosure of information that the prosecution acquires during the trial itself, or even afterward."); *Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) ("We also agree, and the State concedes, that the duty to disclose is ongoing and extends to all stages of the judicial process.").

Moreover, "*Brady* applies not only to information known to the prosecutor, but also to 'evidence known only to police investigators and not to the prosecutor.'" *Sivak*, 658 F.3d 908 (quoting *Strickler*, 527 U.S. at 281-82). Thus, "the prosecutor's personal knowledge does not define the limits of constitutional liability. *Brady* imposes a duty on prosecutors to learn of material exculpatory and impeachment evidence in the possession of state agents, such as police officers." *Browning*, 875 F.3d at 460; *Price*, 566 F.3d at 910 ("The suppression prong of *Brady* may be met . . . even though a 'record is not conclusive as to whether the individual prosecutor . . . ever actually possessed' the *Brady* material."); *Carriger*, 132 F.3d at 479 ("The prosecutor's actual awareness (or lack thereof) of exculpatory evidence in the government's hands . . . is not determinative of the prosecution's disclosure obligations.").

But, the facts and circumstances here tell us more.  They tell us that the prosecution knew, or should have known, about Gonzales's prior informant work and misled defense counsel in discovery responses, and then failed to correct Gonzales's false testimony at trial and the preliminary hearing; the facts also tell us that Gonzales was promised and expected payment and favors for his testimony while the prosecution repeatedly asserted to the jury that Gonzales was getting "nothing," but "a big target on his back, that's what Craig Gonzales is getting paid for his testimony."  (RT 526.)

As noted, "[t]here are three components of a *Brady* claim:  (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued."  *Maxwell v. Roe*, 628 F.3d 486, 509 (9th Cir. 2010).

"[E]vidence that has any affirmative, evidentiary support for the defendant's case or any impeachment value is, by definition, favorable."  *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015) (citing *Strickler*, 527 U.S. at 281-82).  "[E]vidence is favorable to a defendant

even if its value is only minimal." *Id.* (citations omitted). Here, the secret deals between Gonzales and the prosecution, as well as his prior informant work, were unquestionably "favorable" and would have discredit the prosecution's case. *See Banks*, 540 U.S. at 691 ("As to the first *Brady* component . . . beyond genuine debate . . . Farr's paid informant status, qualifies as evidence advantageous to Banks."); *Maxwell*, 628 F.3d at 510 ("*Brady* requires prosecutors to disclose any benefits that are given to a government informant[.]" (citing *Giglio*, 405 U.S. at 150; *Benn*, 283 F.3d at 1057); *Sivak*, 658 F.3d at 910 ("It is well established that 'evidence of a deal or promise of lenient treatment in exchange for a witness's testimony against a defendant may constitute evidence that must be disclosed under *Brady* and *Napue*." (citing *Banks*, 540 U.S. at 700-02 (finding a *Brady* violation where prosecution failed to disclose that key witness "was an informant and that he had been paid $200 for his involvement in the case"); *Phillips v. Ornoski*, 673 F.3d 1168, 1188 (9th Cir. 2012) ("That . . . an offer was extended was indisputably evidence 'favorable to the accused because it is impeaching,' and was clearly subject to the duty of disclosure established in *Brady*."); *Maxwell*, 628 F.3d at 511 ("[A]lthough [the

50

informant] may technically not have testified for the state," the fact that "he had on several occasions aided in investigations and acted as an informant . . . could have been used to discredit [him] had it been revealed at the time of trial."); *Benn*, 283 F.3d at 1058 ("[U]ndisclosed evidence that an informant had previously participated in a . . . investigation was important impeachment evidence that could have been used to discredit the informant's trial testimony that he had not previously participated in that type of investigation."); *Shaffer*, 789 F.2d at 688-89 (holding that defendant's undisclosed prior involvement in a state investigation contradicts his prior testimony and was material); *United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009) ("*Brady* encompasses impeachment evidence, and evidence that would impeach a central prosecution witness is indisputably favorable to the accused.").

*Brady*'s second requirement is also satisfied. While "inadvertent failure to disclose is enough for a *Brady* violation[,]" *Milke*, 711 F.3d at 1017; *see also Price*, 566 F.3d at 907 ("[t]he term 'suppression' does not describe merely overt or purposeful acts on the part of the prosecutor; sins of omission are equally within *Brady*'s scope"), there was nothing "inadvertent" here. The prosecution did not simply fail to disclose

51

favorable evidence; it affirmatively misled everyone – the court, the defense counsel, and the jury – into believing there was none.  The prosecution's transgressions "not only deprive[d] [Alvarez's] defense of certain evidence, but also ha[d] the effect of representing to the defense that the evidence d[id] not exist." *Bagley*, 473 U.S. at 682.  And, "[i]n reliance on this misleading representation, the defense . . . abandon[ed] lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *Id.*  Further, "[i]t was not incumbent on [Alvarez] to prove these representations false; rather, [Alvarez] was entitled to treat the prosecutors' submissions as truthful." *Banks*, 540 U.S. at 698.  "When the state decides to rely on the testimony of [an informant], it is the state's obligation to turn over all information bearing on that witness's credibility." *Carriger*, 132 F.3d at 480; *see also Silva*, 416 F.3d at 986 (suppression prong "established" where the prosecution's "deal requiring . . . its witness . . . from undergoing a psychiatric evaluation before testifying . . . was never disclosed to the defense."); *Sivak*, 658 F.3d at 910 ("[T]he State suppressed [evidence] because they were not disclosed until the [district court] granted discovery in th[e] habeas matter.").

With respect to the final requirement, "[b]eyond doubt, the newly revealed evidence suffices to undermine confidence in [Alvarez's] conviction." *Wearry*, 136 S. Ct. at 1006. "Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Id.* (citations and quotations omitted). "To prevail on his *Brady* claim," however, Alvarez "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Id.* "He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* "Given this legal standard, [Alvarez] can prevail even if . . . the undisclosed information may not have affected the jury's verdict." *Id.* n. 6.

Gonzales's "testimony was the glue that held the prosecution's case together." *Horton v. Mayle*, 408 F.3d 570, 579 (9th Cir. 2005). "Indeed, without [Gonzales's] testimony, the prosecution's case was entirely circumstantial. No fingerprints, DNA evidence, or eyewitness testimony placed [Alvarez] at the scene." *Id.* (citing *Hayes v. Brown*, 399 F.3d 972, 985, 988 (9th Cir. 2005) (en banc) (holding that evidence of an undisclosed deal was material where the witness's testimony regarding the defendant's confession was undoubtedly the centerpiece

53

of the prosecution's case and almost all of the other evidence against the defendant was circumstantial)); *see also Smith v. Cain*, 565 U.S. 73, 76 (2012) (eyewitness "testimony was the only evidence linking [the petitioner] to the crime", and, therefore, the undisclosed statements contradicting this testimony were "plainly material"); *Agurs*, 427 U.S. at 113, ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.").

"Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case." *Silva*, 416 F.3d at 987; *see also Banks*, 540 U.S. at 701 (holding that suppressed evidence of a witness's role as an informant was material where his testimony was the "centerpiece" of the prosecution's case and noting that had the evidence been disclosed, the jury "might well have distrusted [the informant's] testimony, and, insofar as it was uncorroborated, disregarded it").

"The importance of [Gonzales's] testimony was underscored by the prosecution in its closing argument." *Hayes*, 399 F.3d at 986; *see also Kyles*, 514 U.S. at 444 ("The likely damage is best understood by

54

taking the word of the prosecutor . . . during closing arguments[.]”); *United States v. Sedaghaty*, 728 F.3d 885, 902 (9th Cir. 2013) (“Cabral’s importance is confirmed by her starring role in the government’s closing argument[.]”); *Horton*, 408 F.3d at 580 (“The prosecutor’s emphasis on the importance of McLaurin’s testimony bolsters the conclusion that disclosure of the deal may have significantly damaged the prosecution’s case.”); *Carriger*, 132 F.3d at 482 (“[T]he state’s claim that the undisclosed information made no difference is severely undercut by the prosecutor’s strenuous vouching for Dunbar’s truthfulness in closing argument.”); *Gonzalez*, 667 F.3d at 986 (“The prosecutor spent time during his summations discussing [the informant’s] testimony and countering the attempted impeachment of him, and a court could view this as further support for the proposition that [the informant] was central to the prosecution’s cases.”); *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) (“Evidence matters; closing argument matters; statements from the prosecutor matter a great deal.”).

The prosecution did its best to bolster Gonzales’s credibility. “It wasn’t entitled, at the same time, to hide the evidence that undermined [Gonzales’s] credibility.” *Milke*, 711 F.3d at 1019.

55

"Because [Gonzales's] testimony implicating [Alvarez] was critical to [Alvarez's] conviction, the jury's assessment of [Gonzales] credibility was crucial to the outcome of the trial." *Maxwell*, 628 F.3d at 512; *see also Silva*, 416 F.3d at 986 ("We cannot overemphasize the importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case."). But, the "jury was not permitted to assess whether [Gonzales] had an expectation of favorable treatment that could have affected his testimony because the State affirmatively placed false evidence before the jury that there was no deal." *Hayes*, 399 F.3d at 987; *Napue*, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is such subtle factors as possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."); *Weiler v. United States*, 323 U.S. 606, 608 (1945) ("The touchstone is always credibility; the ultimate measure of testimonial worth is quality and not quantity.").

"Moreover, any juror who found [Gonzales] . . . credible . . . might have thought differently had she learned that [Gonzales] may have been motivated to come forward not by [his failing health] – as the

prosecution had insisted in its closing argument – but by the possibility" of payment and other undisclosed benefits. *Wearry*, 136 S. Ct. at 1007 (citing *Napue*, 360 U.S. at 270 (even though the State had made no binding promises, a witness' attempt to obtain a deal before testifying was material because the jury "might well have concluded that [the witness] had fabricated testimony in order to curry the [prosecution's] favor"). In *Bagley*, the Court held that the mere "possibility of a reward gave [witnesses there] a direct, personal stake in respondent's conviction. The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction." 473 U.S. at 683; *see also Horton*, 408 F.3d at 578-79 ("[T]he state's failure to disclose McLaurin's leniency deal undermines confidence in the outcome of the trial for two reasons. First, McLaurin's testimony was central to the prosecution's case. Second, the deal would have provided powerful and unique impeachment evidence demonstrating that McLaurin had an interest in fabricating his testimony." (internal citations omitted)); *United States v. Curtis*, 380 F.3d 1311, 1316 (11th

Cir. 2004) ("The fact that Bojan did not have an explicit, quid pro quo deal does not undermine, and may have even enhanced, his motivation to please the government.").

Further, "[t]he undisclosed impeachment evidence in this case was substantial and was far more damaging to [Gonzales's] credibility than the impeachment evidence available to the defense at trial." *Benn*, 283 F.3d at 1055. And, "[t]he mere fact that a prosecution witness has a prior record, even when combined with other impeachment evidence that a defendant introduces, does not render otherwise critical impeachment evidence cumulative." *Id.* (citing *United States v. Steinberg*, 99 F.3d 1486, 1489-92 (9th Cir. 1996) (holding that the government's failure to disclose that an informant had been involved in two illegal transactions involving counterfeit currency was material even though the informant had been impeached through questioning about a plea agreement that he had made with the government)); *see also Maxwell*, 628 F.3d at 512 ("Analyzed collectively, the withheld impeachment evidence that Storch had negotiated himself a better deal coupled with the evidence of Storch's undisclosed informant past would not simply have been cumulative of the impeachment evidence

introduced at trial, which included lies about his level of education and number of felony convictions, but would have created substantial doubt as to Storch's credibility for different reasons."); *Carriger*, 132 F.3d at 481 ("The district court erred when it concluded that Carriger had not been prejudiced by the withholding of the information because the jury already knew [the informant] was a burglar testifying with immunity. The telling evidence that remained undisclosed included the length of [the informant's] record . . . , and, more important, his long history of lying to the police and blaming others to cover up his own guilt.").

And, "[i]n [Alvarez's] case, the undisclosed evidence was not duplicative of the impeachment evidence actually presented, but rather was of a different kind. It 'would have provided the defense with a new and different ground of impeachment.'" *Silva*, 416 F.3d at 989; *see also Maxwell*, 628 F.3d at 512 (withheld evidence of witness's deal with prosecutors and informant history was material under *Brady* where it was not similar to other impeaching evidence and would have provided "a novel angle of attack on [the witness's] credibility").

That is, "[t]he fact of the undisclosed deal was not at all cumulative of the impeachment evidence [Alvarez] offered at trial; on

the contrary, the fact of the prosecution's secret deal would have raised new and more powerful doubts about the reliability of [Gonzales's] testimony." *Silva*, 416 F.3d at 990.

Thus, "[t]his is not a case where the impeachment evidence would have been cumulative or marginal." *Sedaghaty*, 728 F.3d at 900. "Rather, as to [Gonzales], the defense was empty handed at trial precisely because the government did not disclose a substantial amount of relevant information." *Id.* (citing *Gonzalez*, 667 F.3d at 982 ("Where the withheld evidence opens up new avenues for impeachment, even if significant impeachment evidence was already introduced it can be argued that it is still material." (internal alterations omitted)).

"In a case such as this one, where guilt rests on witness credibility, key evidence affecting credibility is not merely corroborative or cumulative: by permitting the jury to credit otherwise suspect testimony, it provides a key link in the prosecution's case." *Wood v. Ercole*, 644 F.3d 83, 99 (2nd Cir. 2011).

Moreover, "[i]n cases in which the witness is central to the prosecution's case, the defendant's conviction indicates that in all likelihood the impeachment evidence introduced at trial was insufficient

to persuade a jury that the witness lacked credibility.  Therefore, the suppressed impeachment evidence . . . takes on an even greater importance."  *Benn*, 283 F.3d at 1055; *see also Silva*, 416 F.3d at 989 ("The failure of a defendant's efforts to impeach a witness does not prove that additional impeachment would have been ineffectual, or merely cumulative, any more than it supports the opposite conclusion."); *United States v. Service Deli, Inc.*, 151 F.3d 938, 944 (9th Cir. 1988) ("It makes little sense to argue that because the defendant tried to impeach the witness and failed, any further impeachment evidence would be useless. It is more likely that the defendant may have failed to impeach the witness because the most damning impeachment evidence in fact was withheld by the government.").

"[Gonzales's] testimony is significant not just because of the paucity of other evidence but also because of the content of his testimony.  As [the Ninth Circuit] and the Supreme Court have noted, the importance of 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *Maxwell*, 628 F.3d at 508 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (19911)).

"In light of the 'importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case,' [Alvarez] has established a *Brady* violation that merits a new trial." *Sedaghaty*, 728 F.3d at 903; *see also Silva*, 416 F.3d at 991 ("[B]ecause evidence of the undisclosed deal could well have undermined the credibility of a vital prosecution witness, there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); *Horton*, 408 F.3d at 581 ("[W]here the prosecution fails to disclose . . . the existence of a leniency deal or promise that would be valuable in impeaching a witness whose testimony is central to the prosecution's case, it violates the due process rights of the accused and undermines confidence in the outcome of the trial.").

**Ground Two:  The Prosecution Violated the Due Process Clause of the Fourteenth Amendment by Presenting False Evidence and Failing to Correct it Once Presented ("*Napue* Violation")**

### A.    Governing Law

"[A] *Napue* violation – a presentation to a fact-finder of false testimony knowing it to be false – results in the reversal of a conviction if 'the false testimony could . . . in any reasonable likelihood have

affected the judgment of the jury[.]'" *Dow v. Virga*, 729 F.3d 1041, 1047 (9th Cir. 2013) (ellipses in original) (quoting *Giglio*, 405 U.S. at 153, 154 (quoting *Napue*, 360 U.S. at 271); *see also Hayes*, 399 F.3d at 984 ("[T]he Supreme Court [has] noted the 'well-established rule that 'a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" (citation omitted)).

"Similarly, [the Court] has held that the government is obligated to correct any evidence introduced at trial that it knows to be false, regardless of whether or not the evidence was solicited by it." *Phillips*, 673 F.3d at 1181 (citing *Napue*, 360 U.S. at 269; *Alcorta v. Texas*, 355 U.S. 28 (1957); *Pyle v. Kansas*, 317 U.S. 213 (1942)). Specifically, "*Napue* prohibits the government from knowingly using false evidence to obtain a criminal conviction, while *Alcorta* and *Pyle* obligate the government to correct false evidence thus presented." *Id.* at 1182 n. 7.

"*Napue* . . . make[s] [it] perfectly clear that the constitutional prohibition on the 'knowing' use of perjured testimony applies when *any* of the State's representatives would know the testimony was false."

63

*Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir. 2008) (emphasis original).  "It is [also] 'irrelevant' whether the defense knew about the false testimony and failed to object or cross-examine the witness, because defendants 'cannot waive the freestanding ethical and constitutional obligation of the prosecutor . . . to protect the integrity of the court and the criminal justice system.'" *Sivak*, 658 F.3d at 909.

"A claim under *Napue* will succeed when '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.'" *Jackson*, 513 F.3d at 1071-72 (citation omitted).

With respect to the second element – whether the prosecution knew or should have known that the testimony was false – "[t]he Ninth Circuit has indeed allowed habeas relief based on false testimony regardless of the knowledge of its falsity." *Cowan v. Peery*, 2015 WL 3953656 at *7 (E.D. Cal. 2015) (citing *Maxwell*, 628 F.3d at 499-500; *Killian*, 282 F.3d at 1209); *see also Souliotes v. Grounds*, 2013 WL 875952 at *15 (E.D. Cal. 2013) (same).

With respect to the third element – whether the testimony was material – "courts apply a less demanding materiality standard to *Napue*

64

errors: whether 'there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury.'" *Dow*, 729 F.3d at 1048 (quoting *Agurs*, 427 U.S. at 103 (emphasis in original)); *see also Hayes*, 399 F.3d at 984 ("In assessing materiality under *Napue*, we determine whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury; if so, then the conviction must be set aside.").

"This materiality standard is, in effect, a form of harmless error review, but a far lesser showing of harm is required under *Napue*'s materiality standard than under ordinary harmless error review." *Dow*, 729 F.3d at 1048 (citations omitted). "*Napue* requires us to determine only whether the error *could* have affected the judgment of the jury, whereas ordinary harmless error review requires us to determine whether the error *would* have done so." *Id.* (emphasis in original).

"The materiality analysis proceeds differently for *Brady* and *Napue* claims. Whereas a *Brady* violation is material when 'there is a reasonable probability that the result of the proceeding *would* have been different,' a *Napue* violation requires that the conviction be set aside whenever there is 'any reasonable likelihood that the false testimony

65

*could* have affected the judgment of the jury." *Jackson*, 513 F.3d at 1076 (emphasis in original). "This distinction between *Brady* materiality and *Napue* materiality seems to reflect a sentiment that the prosecution's knowing use of perjured testimony will be more likely to affect our confidence in the jury's decision, and hence more likely to violate due process, than will a failure to disclose evidence favorable to the defendant[,]" and "that every *Napue* claim has an implicit accompanying *Brady* claim: Whenever the prosecution knowingly uses false testimony, it has a *Brady* obligation to disclose that witness's perjury to the defense." *Id.* n. 12.

"Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *Hayes*, 399 F.3d at 978 (citations omitted); *see also Killian*, 282 F.3d at 1208 ("The knowing use of perjured testimony by a prosecutor generally requires that the conviction be set aside." (citing *Agurs*, 427 U.S. at 103); *United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003) ("[T]he prosecution's knowing use of false testimony entails a veritable hair trigger for setting aside the conviction[.]").

## B.    The *Napue* Violation Here

The prosecutorial misconduct that occurred here violated Alvarez's constitutional rights and requires a reversal of his conviction. The prosecution elicited and presented false testimony both at the preliminary hearing and at trial. *See Gudino v. Allison*, 2013 WL 1281620 at *15 (E.D. Cal. 2013) ("A due process violation can result from the prosecution's presentation of false evidence or testimony during preliminary proceedings, as well as during a criminal trial." (citing *Hayes*, 399 F.3d at 979-80 (holding that the prosecution violated petitioner's due process rights by making false representations to the trial judge during the preliminary hearing, in addition to presenting false evidence to the jury during trial)). "In doing so, [the prosecution] violated [its] fundamental obligation to ensure that convictions be obtained in a manner compatible with the 'rudimentary demands of justice.'" *Phillips*, 673 F.3d at 1186 (quoting *Giglio*, 405 U.S. at 153). "Deliberate deception of a judge and jury is 'inconsistent with the rudimentary demands of justice.'" *Hayes*, 399 F.3d at 978 (citation omitted). "The Court has emphasized that the presentation of false evidence involves 'a corruption of the truth-seeking function of the trial

67

process[,]'" *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) (quoting *Agurs*, 427 U.S. at 103), and that our system's legitimacy depends on the "special role played by the American prosecutor in the search for truth in criminal trials," *Strickler*, 527 U.S. at 281.

Indeed, the prosecution's reprehensible conduct here went beyond that which courts have held violates *Napue*. In *Jackson*, the prosecutor "promised McFarland he would write a letter on McFarland's behalf recommending that he be allowed to serve his California prison sentence in Arizona near his family in exchange for his cooperation in Jackson's trial." 513 F.3d at 1070. "At trial, [the prosecutor] asked McFarland, 'And is it true that no one promised you anything in exchange for your testimony against Mr. Jackson?' McFarland answered, 'Yes, that's right.'" *Id.* at 1071. "In light of Marin's promise to help McFarland serve out his sentence closer to his family," the Ninth Circuit held, "this testimony was false." *Id.* "Moreover, [the prosecutor] knew that the testimony was false because he himself had made the promise; nevertheless, he failed to correct the perjury." *Id.*

Similarly, in *Hayes*, the court held that "the State knowingly presented false evidence to the jury and made false representations to the

68

trial judge as to whether the State had agreed not to prosecute James on his pending felony charges." 399 F.3d at 978. "[B]efore the Hayes trial, the State had made a deal with James's attorney for the dismissal of pending felony charges after his testimony[,]" but "represented to the trial judge that there was no such deal[,]" then "elicited sworn testimony from James at trial that there was no such deal, both on direct and re-direct examination[,] and failed to correct the record at trial to reflect the truth." *Id.* at 980. "The State's actions[,]" the court held "violated Hayes's constitutional rights first under *Napue*, by presenting false evidence to the jury and, second, under *Alcorta* and *Pyle*, by failing to correct the record following the presentation of false evidence." *Id.*; *see also Hovey*, 458 F.3d at 919 ("Although a specific deal was not promised to Hughes, the promise of a letter or a phone call, or a vow to use one's best efforts to secure a deal, are sufficient to constitute evidence that was potentially favorable to Hovey, as these promises belie Hughes's testimony that 'no promises' had been made to him.").

"Th[e] standard, which requires us to determine whether 'there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury,' is [also] easily met here." *Dow*, 729 F.3d at

1049 (emphasis in original). Gonzales's testimony was the centerpiece of the prosecution's case as evident by the prosecutor's own statements. *See Horton*, 408 F.3d at 580 ("The prosecutor's emphasis on the importance of McLaurin's testimony bolsters the conclusion that disclosure of the deal may have significantly damaged the prosecution's case."); *Sedaghaty*, 728 F.3d at 902 ("Cabral's importance is confirmed by her starring role in the government's closing argument[.]").

"The prosecutor's actions can [also] speak as loud as his words." *Silva*, 416 F.3d at 990. "'Presumably, the importance to the State's case of [Gonzales's] testimony is what initially led the prosecution to make the secret deal; likewise, the importance to [Gonzales's] credibility of his false testimony . . . is what led the prosecution to endeavor to keep that deal secret.'" *Id.* (citation omitted). And, Gonzales "would have been subject to impeachment – not only on the existence of the favorable deal, but also on the State's attempts to keep the deal from the jury. The State could not have falsely buttressed his credibility before the jury. Thus, the violation of *Napue* was material." *Hayes*, 399 F.3d at 987-88.

"The violation of the State's independent duty under *Alcorta* and *Pyle* was also material, perhaps even more so. To avoid violating

[Gonzales's] due process rights by allowing false evidence to go uncorrected, the State would have been forced to disclose to the jury after [Gonzales] testified that [his] testimony . . . was false; that a secret deal was in place . . .; and that the State had solicited [Gonzales's] testimony to the contrary knowing that he would be providing false evidence.  Such a disclosure would have had a devastating effect on the credibility of the entire prosecution case. "  *Hayes*, 399 F.3d at 988.

"Thus, [Alvarez] has satisfied the *Napue/Alcorta/Agurs* materiality standard, namely, whether there was any reasonable likelihood that the presentation of the false testimony or failure to correct the record once the false evidence was presented 'could have affected the judgment of the jury.'" *Id.*

## VI.    PRAYER FOR RELIEF

WHEREFORE, Petitioner Ramon Alvarez respectfully prays that this Court:

1.    Issue a Writ of Habeas Corpus, vacating the unconstitutional conviction and confinement imposed upon Petitioner and order his release from custody unless he receives a new trial within ninety (90) days after the issuance of the order.

2.      In the alternative, permit Petitioner, an indigent, to proceed without prepayment of costs and fees and grant him authority to obtain subpoenas without fees for witnesses and documents necessary to prove the facts alleged in this Petition;

3.      Grant Petitioner the right to conduct discovery, including the right to take depositions, request admissions, and propound interrogatories, as well as means to preserve the testimony of witnesses;

4.      Order and conduct an evidentiary hearing at which time proof may be offered concerning the allegations in the Petition; and

5.      Grant Petitioner such further relief as is appropriate and just in the interests of justice.

Dated:  September 27, 2019                    Respectfully submitted,

                                              _____/s/_____

                                              Tony Faryar Farmani
                                              Attorney For Petitioner
                                              Ramon Alvarez

## VII.   VERIFICATION OF THE PETITION

I, Tony Faryar Farmani, declare that:

1.     I am an attorney admitted to practice law in state of California, and I am the appointed counsel for Petitioner Ramon Alvarez in the United States District Court, Case No. 15-cv-00987-DMG-KS.

2.     I have prepared and read this Petition for Writ of Habeas Corpus and declare that the facts alleged are true based on my reading of the record and the exhibits submitted in support of the Petition.

3.     I am authorized by Mr. Alvarez to file this Petition for Writ of Habeas Corpus.  I provide this verification because Mr. Alvarez is incarcerated in Santa Ana Jail, which is in a county different than that in which my office is located, and because the truth and accuracy of the facts in the Petition are more within my knowledge.

I declare the foregoing under penalty of perjury under the laws of the United States of America and the State of California that the forgoing is true and correct.

Executed on September 27, 2019, at San Diego, California.

_____/s/_____

Tony Faryar Farmani
Attorney At Law

73

## VIII.  CERTIFICATION OF WORD COUNT

According to the Word Perfect software program, the undersigned counsel hereby certifies under California Rules of Court, Rule 8.204, subdivision (c)(1), that this Petition for Writ of Habeas Corpus contains 13, 594 words (excluding the caption, tables of contents and authorities, and this certificate of word count).

Dated:  September 27, 2019 _____/s/_____

Tony Faryar Farmani
Attorney For Petitioner

## PROOF OF SERVICE

I, Tony Faryar Farmani, declare that I am over 18 years of age, and not a party to the within cause.  My business is P.O. Box 8727, Rancho Santa Fe, CA 92067.  On September 27, 2019, I served a true copy of the attached **PETITION FOR WRIT OF HABEAS CORPUS AND EXHIBITS IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS (VOLUME I, EXHIBITS A-K)** as follows:

Deputy Attorney General Tami Falkenstein Hennick (Via E-Mail at tami.hennick@doj.ca.gov); and

Mr. Ramon Alvarez, Booking No. 1300004105
Santa Ana City Jail M-88
P.O. Box 22003
Santa Ana, CA 92702 (via United States Postal Mail, first class postage prepaid).

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 27, 2019 at San Diego, California

_____/s/_____
Tony Faryar Farmani

75

## INDEX OF EXHIBITS

Exhibit A      Check Number 110000030, dated December 5, 2012, from the City of Santa Ana for $11,000 payable to Craig Danny Gonzales, the jailhouse informant who testified against Petitioner Ramon Alvarez at his preliminary hearing and trial

Exhibit B      Craig Gonzales's supplemental declaration, dated September 15, 2018

Exhibit C      Craig Gonzales's declaration, dated July 25, 2018

Exhibit D      "Interview Report" of Danielle Gonzales

Exhibit E      Department of Justice's "Investigation Report," regarding Check Number 110000030, dated December 5, 2012, from the City of Santa Ana for $11,000 payable to Craig Danny Gonzales

Exhibit F      Department of Justice's "Investigative Report" of Respondent's interview with Detective David Rondou

Exhibit G      Reporter's Transcript of the Deposition of Orange County Deputy District Attorney Mark William Geller With Exhibits at the Deposition

Exhibit H      Declaration from Petitioner Ramon Alvarez's trial counsel, Ronald G. Rubalcava, counsel's discovery requests, and the prosecution's response to the requests

Exhibit I      Nevada Supreme Court's "Order of Affirmance," reflecting that, in 2002, Craig Gonzales had testified as a "jailhouse informant" for the prosecution

Exhibit J          Report of polygraph examination of Petitioner Ramon Alvarez conducted on December 8, 2016.

Exhibit K          Order dated August 30, 2019 from United States District Court, Central District of California





Tony Faryar Farmani (State Bar No. 211101)
tffarmani@aol.com
FARMANI, APLC
PO Box 8727
Rancho Santa Fe, CA 92067
Phone: 310-926-1150
Fax:    619-923-2975
Attorney for *Petitioner*
RAMON ALVAREZ

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| RAMON ALVAREZ,<br><br>                         Petitioner,<br><br>     v.<br><br>ATTORNEY GENERAL,<br><br>                         Respondent. | NO. SACV 15-0987-DMG-KS<br><br>**SUPPLEMENTAL DECLARATION OF CRAIG GONZALES** |

I, Craig Gonzales, hereby declare as follows:

1.    I am 59 years old and live in Riverside County, California. I have personal knowledge of the facts stated in this declaration.

2.    In 2010 and 2012, I testified against Ramon Alvarez, the petitioner in this case, at his preliminary hearing and two trials in the Orange County Superior Court. At that time, I was a state prisoner, and had been in custody since 2003, serving a sentence for 19 years and eight months.

3.    In exchange for testifying against Mr. Alvarez, before the preliminary hearing, Detective David Rondou promised that I would get paid without specifying the amount; and as the case proceeded, Detective Rondou would continue to reassure me that I was going to be paid for my testimony without specifying the amount.

-1-

79

Detective Rondou then instructed that if asked in court whether I was going to receive any benefit for my testimony, that I should say no. Approximately four months after I had testified against Mr. Alvarez, Detective Rondou visited me in prison and handed me a check for $11,000.

4.      In 2002, I testified as a jailhouse informant for the prosecution in a criminal case in Nevada. I told Detective Rondou about my prior testimony as an informant long before Mr. Alvarez's first trial, and Detective Rondou told me that he had verified that I had testified as an informant in the Nevada case. Detective Rondou then instructed that if asked in court whether I had worked as an informant before, that I should avoid the question as much as possible.

5.      Before testifying at Mr. Alvarez's first trial, Detective Rondou took me to the district attorney's office where I met with the deputy district attorney who was prosecuting Mr. Alvarez. That district attorney told me that he had been in contact and spoken with the district attorney in Nevada about my testimony as an informant there.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this *15*th day of September 2018.

Craig Gonzales, Declarant

- 2 -

Tony Faryar Farmani (State Bar No. 211101)
tffarmani@aol.com
FARMANI, APLC
PO Box 8727
Rancho Santa Fe, CA 92067
Phone: 310-926-1150
Fax:    619-923-2975
Attorney for *Petitioner*
RAMON ALVAREZ

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| RAMON ALVAREZ,<br><br>                              Petitioner,<br>v.<br><br>ATTORNEY GENERAL,<br><br>                              Respondent. | NO. SACV 15-0987-DMG-KS<br><br>**DECLARATION OF CRAIG GONZALES** |

I, Craig Gonzales, hereby declare as follows:

1.    I am 59 years old and live in Riverside, California.  I have personal knowledge of the facts stated in this declaration.  If called upon to testify to the matters herein, I could and would competently do so.

2.    In 2010 and 2012, I testified against Ramon Alvarez, the petitioner in this case, at his preliminary hearing and two trials in the Orange County Superior Court. At that time, I was in state prison, serving a sentence for 19 years and eight months.

3.    In exchange for testifying against Mr. Alvarez, Detective David Rondou told me that I would get paid, be moved to any prison that I wanted, and get a reduction on my sentence.  Approximately four months after I had testified against Mr. Alvarez, Detective Rondou visited me in prison and handed me a check for $11,000.

- 1 -

4.    In 2002, I testified as a jailhouse informant for the prosecution in a criminal case in Nevada. I told Detective Rondou about my prior work as an informant long before Mr. Alvarez's first trial, and Detective Rondou told me that he had verified that I had testified as an informant in the Nevada case. The district attorney who was prosecuting Mr. Alvarez also told me that he had spoken with the district attorney in Nevada about my testimony as an informant there.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 25 th day of July 2018.

*Craig Gonzales*

Craig Gonzales, Declarant

- 2 -

82

# INTERVIEW REPORT
## _Confidential Work Product_

DATE:                    December 28, 2018

ATTORNEY:                Tony Faryar Farmani, Esq.

CASE:                    Ramon Alvarez

INTERVIEWED:             Danielle Gonzales

---

## INTRODUCTION

On December 19, 2018 attorney Tony Faryar Farmani and private investigator Jose L. Newman interviewed Danielle Gonzales via telephone. Farmani identified himself as the attorney representing Ramon Alvarez. Newman identified himself as a private investigator working with the above-referenced attorney on behalf of Ramon Alvarez.

Gonzales had been previously identified as the daughter of Craig Gonzales.

## DETAILS OF INTERVIEW

Danielle Gonzales explained that she is Craig Gonzales' only daughter. Danielle is married, has four children and is employed.

Asked about contacts she might have had with Detective Rondou, Gonzales stated, "About five or six years ago, my dad (Craig Gonzales) had given me his (Rondou's) phone number because he told me he was working with him. My dad was in prison in northern California, but he would be traveling to the jail in Santa Ana. Detective Rondou couldn't tell my dad when they were going to be picking him up, but Detective Rondou stayed in contact with me, and informed me within a two-to-three week window when my dad would be coming down. Detective Rondou also told me that he had put me on my dad's books so I could visit him; so I could have visitation with my dad."

Fulcrum Investigations _PI 25803_

P.O. Box 2537, Chula Vista, CA 91912

By Appointment Only 619-600-5950

1

Asked if she had ever called Detective Rondou and asked for money for burial costs for her father, Gonzales stated, "No."

Asked if she had ever received a check from her father, Craig Gonzales, that was endorsed to her, for eleven thousand dollars ($11,000.00), Gonzales stated, "No. I never received anything like that. My dad never endorsed a check to me, or gave me a check for eleven thousand dollars ($11,000.00), or anything like that. I knew my dad had physical issues, like back pain and things like that, but not that he was dying. I never received any check like that."

Gonzales related that the last time she spoke with Detective Rondou "He said he was done with my dad, that he was going back to Solano, and was still trying to get him moved. I called him a couple of times after that, within about a month, to see what the status of my dad being moved was. Detective Rondou said he was working on it, but it never happened."

Gonzales stated, "I had lots of discussions with Detective Rondou about getting my dad moved down here, to be able to see him more often, and not incur as much expenses."

Asked if she (Gonzales) had ever asked Detective Rondou for money for her father's burial, Gonzales stated, "No. I never had any financial discussions whatsoever with Detective Rondou."

Advised that Detective Rondou said that he had endorsed a check to her, Gonzales stated, "I never received a check like that, a check like that was never deposited through my bank. My contacts and communications with Detective Rondou were about visitation with my dad, and having my dad moved down here; never about him (Detective Rondou) paying anything."

Gonzales agreed to future contact by attorney Farmani and/or private investigator Newman. Gonzales was thanked for her time and the interview was concluded.

<u>END OF REPORT</u>

INV: JLN

State of California
Department of Justice
Division of Law Enforcement
BUREAU OF INVESTIGATION
## Investigation Report

| INVESTIGATION TITLE: ALVAREZ HABEAS | | INVESTIGATION NUMBER: BI-LA2018-00025 |
|---|---|---|
| INVESTIGATION REQUESTED BY: DAG KEVIN VIENNA | | TYPE OF REPORT: OPENING REPORT |
| CASE ASSIGNED TO: HOLMES, TROY | PERSON REPORTING: HOLMES, TROY | REPORT NO: 1 |
| TYPE OF CRIME/INCIDENT: PENAL CODE | CASE ASSIGNED SUPERVISOR: ALVARADO, ALFRED | DATE OF REPORT: 09/06/2018 |
| CROSS REFERENCE NO(s): | | |

DETAILS OF THE INVESTIGATION:

On 08/13/2018, Handling Deputy Attorney General (DAG) Kevin Vienna, CA DOJ, Office of the Attorney General (AG), Los Angeles, requested an agent from the California Department of Justice, Bureau of Investigation, Los Angeles Regional Office, Special Investigations Team, be assigned to the captioned matter to provide investigative assistance on a federal habeas matter of a 2010 homicide case that is being appealed.

On 08/16/2018, at approximately 1235 hours, I, Special Agent (SA) Troy Holmes, California Department of Justice, Bureau of Investigation, Los Angeles Regional Office, Special Investigations Team (CA DOJ, BI, LARO, SIT) contacted Commander Eric Paulson with the City of Santa Ana Police Department (SAPD) via telephone. I advised Commander Paulson that CA DOJ needed some further information regarding a check allegedly issued from the City of Santa Ana, number 110000030, dated 12/05/2012, and payable to Craig Danny GONZALES. Commander Paulson stated he would be glad to assist me but would need more time to research my request and get back to me.

On 08/30/2018, at approximately 0943 hours, I received an email response from Commander Paulson. In his response, Commander Paulson stated the check was issued by the City of Santa Ana from the Homicide Reward Fund Account. Commander Paulson further explained the check was authorized at the recommendation of Deputy Chief Harrelson, and Police Chief Carlos Rojas approved payment. Commander Paulson stated that pursuant to a SAPD memo dated 12/05/2012, per Department Order 295, Deputy Chief Harrelson recommended payment to Craig Danny GONZALES in the amount of $11,000 from the Homicide Reward Fund Account for his cooperation regarding the murder of Ruben LEAL.

Commander Paulson also stated according to Deputy Chief Harrelson, GONZALES cooperated with the case agent, and without his coming forward with information regarding this crime, the suspect may not have been convicted. Commander Paulson stated GONZALES testified at trial and provided important testimony to convict the suspect in this case.

I then forwarded Commander Paulson's response to DAG Vienna. This investigation is ongoing.

State of California
Department of Justice
Division of Law Enforcement
BUREAU OF INVESTIGATION

## Investigation Report

PHYSICAL DESCRIPTION:

A.  Subjects:

NONE

B.  Other(s):

Other(s):

1.  ERIC, PAULSON, DOB-UNK,

LOCATION(S): 60 CIVIC CENTER PZ, SANTA ANA, ORANGE COUNTY, CA 92701-0000

PHONE(S): (714) 245-8348 (BUSINESS)

| SIGNATURE: | DATE: 09/06/18 | APPROVAL SIGNATURE: | DATE: 9/6/18 |
|---|---|---|---|
| PRINTED NAME: HOLMES, TROY | | PRINTED NAME: ALVARADO, ALFRED | |
| TITLE: SPECIAL AGENT | | TITLE: SPECIAL AGENT SUPERVISOR | |
| REPORT DISSEMINATION:   DAG Kevin Vienna. | | | |

**State of California**
**Department of Justice**
**Division of Law Enforcement**
**BUREAU OF INVESTIGATION**
## Investigation Report

| INVESTIGATION TITLE:<br>ALVAREZ HABEAS | | INVESTIGATION NUMBER:<br>BI-LA2018-00025 |
|---|---|---|
| INVESTIGATION REQUESTED BY:<br>DAG KEVIN VIENNA | | TYPE OF REPORT:<br>INTERVIEW REPORT |
| CASE ASSIGNED TO:<br>HOLMES, TROY | PERSON REPORTING:<br>HOLMES, TROY | REPORT NO:<br>2 |
| TYPE OF CRIME/INCIDENT:<br>PENAL CODE | CASE ASSIGNED SUPERVISOR:<br>ALVARADO, ALFRED | DATE OF REPORT:<br>09/27/2018 |
| CROSS REFERENCE NO(s): | | |

SUMMARY:

On 09/26/2018, Deputy Attorney General (DAG) Kevin Vienna, and I, Special Agent (SA) Troy Holmes, California Department of Justice, Bureau of Investigation, Los Angeles Regional Office, Special Investigations Team (CA DOJ, BI, LARO, SIT) interviewed retired Detective David RONDOU of the City of Santa Ana Police Department (SAPD) at his residence.

DETAILS OF THE INVESTIGATION:

On 09/26/2018, at approximately 1103 hours, Deputy Attorney General (DAG) Kevin Vienna, and I, Special Agent (SA) Troy Holmes, California Department of Justice, Bureau of Investigation, Los Angeles Regional Office, Special Investigations Team (CA DOJ, BI, LARO, SIT) interviewed retired Detective David RONDOU of the City of Santa Ana Police Department (SAPD) at his residence. Per DAG Vienna's request, RONDOU's residence address is to remain confidential. RONDOU reviewed the first declaration prepared by Craig Danny GONZALES (Attachment 2-1) and provided the following information, in substance:

RONDOU stated the only thing that was truthful in GONZALES' declaration was that he went to an unknown prison and handed GONZALES a check. RONDOU explained the check given to GONZALES was for $11,000.00, and was supposed to cover GONZALES' burial costs because he was allegedly terminally ill.

RONDOU recalled shortly after GONZALES testified, his daughter contacted him and asked if the city of Santa Ana could help her with the burial cost of her father. RONDOU stated the city researched the typical cost of burials and came to the $11,000.00 total. RONDOU stated payment to GONZALES was approved through the Orange County District Attorney's Office (OCDA) and the city of Santa Ana.

RONDOU stated the city wanted to pay GONZALES' daughter directly but was unable to because of laws related to paying informants. RONDOU said the way around this was to issue a check to GONZALES and have him endorse it to his daughter immediately. RONDOU stated when he met with GONZALES in an unknown prison to give him the check, he saw GONZALES endorse the check to his daughter and hand it to a prison guard to mail it immediately.

RONDOU stated he was unaware that GONZALES was a former informant in Nevada. RONDOU stated he never promised GONZALES anything for coming forward and testifying in the homicide trial of

87

**State of California**
**Department of Justice**
**Division of Law Enforcement**
**BUREAU OF INVESTIGATION**
## Investigation Report

Ramon ALVAREZ.  RONDOU stated he never met with GONZALES alone and always had a partner with him per SAPD policy.  RONDOU stated GONZALES told him he was coming forward to testify because he wanted to do some good in his life before dying.  RONDOU stated he spoke with prison doctors and they told him GONZALES' prognosis was not good and was close to death.

RONDOU then reviewed an additional declaration prepared by Craig Danny GONZALES (Attachment 2-2).  RONDOU stated he would have never transported GONZALES from jail to the OCDA's office for a meeting.  RONDOU stated instead he would have the District Attorney come to jail to meet with GONZALES.  RONDOU again stated the check issued to GONZALES was not for his testimony but for burial costs.  RONDOU stated he would have never supported providing payment to GONZALES for his testimony.

We concluded this investigation at approximately 1142 hours.  This investigation is ongoing

ATTACHMENT(S):

2-1: Copy of declaration prepared by GONZALES.
2-2: Copy of declaration prepared by GONZALES.

| SIGNATURE: | DATE: | APPROVAL SIGNATURE: | DATE: |
|---|---|---|---|
| **PRINTED NAME:** HOLMES, TROY | | **PRINTED NAME:** ALVARADO, ALFRED | |
| **TITLE:** SPECIAL AGENT | | **TITLE:** SPECIAL AGENT SUPERVISOR | |
| **REPORT DISSEMINATION:**   DAG Kevin Vienna. | | | |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| RAMON ALVAREZ, | ) REVISED |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) 15-cv-0987-DMG-KS |
| ATTORNEY GENERAL, | ) |
| | ) |
| Respondent. | ) |
| _____ | ) |

DEPOSITION OF

MARK WILLIAM GELLER

ORANGE, CALIFORNIA

THURSDAY, JANUARY 31, 2019

Reported by:
PAULA GOEHLE
No. 13616
No. 19-73826



THE SULLIVAN GROUP OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 855.525.3860 | 323.938.8750

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

RAMON ALVAREZ,                          ) REVISED
                                        )
                Petitioner,             )
                                        )
      v.                                ) Civil Action No.
                                        ) 15-cv-0987-DMG-KS
ATTORNEY GENERAL,                       )
                                        )
                Respondent.             )
_____)

DEPOSITION OF

MARK WILLIAM GELLER

ORANGE, CALIFORNIA

THURSDAY, JANUARY 31, 2019

Reported by:
PAULA GOEHLE
No. 13616
No. 19-73826

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

RAMON ALVAREZ,                     )
                                   )
              Petitioner,          )
                                   )
     v.                            ) Civil Action No.
                                   ) 15-cv-0987-DMG-KS
ATTORNEY GENERAL,                  )
                                   )
              Respondent.          )
_____)

            DEPOSITION OF MARK WILLIAM GELLER, taken

on behalf of Petitioner, at One City Boulevard West,

Suite 500, Orange, California, at 1:15 p.m., Thursday,

January 31, 2019, before PAULA GOEHLE, CSR No. 13616,

pursuant to Notice.

THE SULLIVAN GROUP OF COURT REPORTERS

2

APPEARANCES OF COUNSEL:


For Petitioner:

FARMANI, A PROFESSIONAL LAW CORPORATION
BY:   TONY FARYAR FARMANI
        Attorney at Law
P.O. Box 8727
Rancho Santa Fe, California 92067
(310) 926-1150
tffarmani@aol.com


For Mark William Geller:

LAW OFFICE OF JOHN D. BARNETT
BY:   JOHN DRUMMOND BARNETT
        Attorney at Law
One City Boulevard West
Suite 500
Orange, California 92868
(714) 634-1769
john@barnettbarnett.com


For Respondent:

OFFICE OF THE ATTORNEY GENERAL
BY:   CRAIG H. RUSSELL
        Deputy Attorney General
600 West Broadway
Suite 1800
San Diego, California 92101
(619) 738-9630
craig.russell@doj.ca.gov


Also Present:

Ted Burnett, Assistant District Attorney

Jose Newman, private investigator

Vincent Mazza, videographer

I N D E X

Witness                                    Examination

MARK WILLIAM GELLER

       By Mr. Farmani                         10, 83

       By Mr. Russell                             81


E X H I B I T S

Petitioner's EXHIBITS:                         PAGE

Ex 1 - Deposition Subpoena                        7

Ex 2 - Copy of check to Craig Danny Gonzales     59

Ex 3 - 9-6-18 Investigative report               61

Ex 4 - 9-27-18 Investigative report              62

Ex 5 - 10-22-10 Information Report               34

Ex 6 - Notes by Brian Ruorock                    97

Ex 7 - Discovery requests                        98

Ex 8 - Documents and CD disks under seal        105

ORANGE, CALIFORNIA

THURSDAY, JANUARY 31, 2019

1:15 P.M.


MARK WILLIAM GELLER,

Having been first duly sworn, testified as follows:


THE VIDEOGRAPHER:  Good afternoon.  Here begin Media Number 1 of the deposition of Mark William Geller, Volume I, in the matter of Alvarez versus Attorney General.

This case is in the United States District Court for the Central District of California.  And the case number is 15-cv-0987-DMG-KS.

Today's date is January 31st, 2019.  And the time is 1:15 p.m.  This deposition is taking place at One City Boulevard West, Suite 500, Orange, California, 92868.

The videographer is Vincent Mazza, appearing on behalf of The Sullivan Group of Court Reporters.

Would counsel please identify yourselves and state who you represent.

MR. FARMANI:  My name is Faryar Farmani.  I

represent the Petitioner Ramon Alvarez.  I have here with me the case investigator Jose Newman.

MR. RUSSELL:  My name is Craig Russell.  I represent the Respondent.

MR. BARNETT:  I'm John Barnett.  I represent Mr. Geller.

THE WITNESS:  My name is Mark Geller.

THE VIDEOGRAPHER:  The reporter today is --

MR. BARNETT:  Excuse me.  Mr. Burnett is going to be on the record.  So he should --

MR. BURNETT:  Also present in the room Assistant District Attorney Ted Burnett.

THE VIDEOGRAPHER:  The reporter today is Paula Goehle with The Sullivan Group of Court Reporters.

Would the reporter please swear in the witness

THE REPORTER:  Please raise your right hand. Do you solemnly swear to tell the truth, the whole truth and nothing but the truth, so help you God?

THE WITNESS:  I do.

MR. BURNETT:  One point of order here, folks, I'm getting out of here.  We're just taking care of me and then I'm gone.  I'm not staying for the deposition. So I just want to make sure that we don't launch into the questioning of Mr. Geller.

MR. FARMANI:  No problem.  So, for the record,

Mr. --

MR. BURNETT:  Burnett.

MR. FARMANI:  Mr. Burnett.

MR. BURNETT:  Barnett.  Burnett.

MR. FARMANI:  Mr. Burnett has brought the records that were referenced in the subpoena.

Whey don't we go ahead and make this Petitioner's Exhibit 1, this subpoena itself.

(Whereupon, Exhibit 1 was marked for identification and attached hereto.)

MR. FARMANI:  And I have documents for all counsel.  Here is one for you, Mr. Barnett.  And then you have those documents right there.  There should be one in there.  So here would be --

And then in the subpoena it references the documents that are related to the case People versus Alvarez, Orange County Superior Court case Number 10CF2001.

And Mr. Burnett has brought the records that were related to that case; correct?

MR. BURNETT:  Yes.

MR. FARMANI:  So what we could do is the records, we can make that part of the deposition.  But it seems to be some CD's and just some loose papers there; is that correct?

MR. BURNETT:  What I brought is a group of CD's.  The file is in a box.  It's in my car.  I did not bring the actual file up, because it's kind of loose.  But it's available if for some reason it's necessary.

These CD's are basically everything that's in the files.  The stuff that is in documents disk two confidential I put in a separate envelope, which I explained in this memo that I sent out.

I don't know if everybody got this.

MR. FARMANI:  I did not get that.

MR. BURNETT:  Okay.  I'm sorry.  I did not make copies.

But essentially what I said in here is this stuff I'm not sure we're allowed to give out.  It's Rap Sheets, for example, for people other than Mr. Alvarez.

MR. FARMANI:  Correct.

MR. BURNETT:  So for that reason I put it in a separate envelope.  I'm pretty sure the AG is allowed to look at this stuff.  I just wasn't sure we're allowed to give it to --

MR. FARMANI:  Yeah, sure.

MR. BURNETT -- other attorneys.  I did not seal it.  But I got it here for you gentlemen to figure out how that should best be disseminated or whether you need to talk to a judge about it.  I don't know.  That's why

this is separate and why it's loose.

Other than that, everything is on this with the addition that when I did all of this, I did not make copies of all the e-mail that we received over the time. Mr. Barnett asked us to do that.

So I did. I have loose copies of those. And he wanted them numbered. So I prepared four more disks, which is entitled AG e-mail on the same 10CF2001 case number. And these are numbered. So it's basically these documents numbered.

And that's everything that I have brought with us. And these are the ones that I brought. These I have given to Mr. Barnett, I think, on January 11.

MR. FARMANI: Okay. Fair enough. Why don't we just leave it there then. And we can figure out what t do with it at the end of the deposition.

MR. BARNETT: All right. So I just want to make sure that Mr. Burnett gets to be excused; and that he's identified -- and if there's nothing else to ask him, I think that he's indicated what the --

MR. FARMANI: I don't have any problem with what he said, yeah. You know, obviously I don't have any doubt that he's brought everything that's there. And then we can figure out the issue with respect to what you mentioned about the confidentiality of some of

the documents.  You and I can work it out, Mr. Russell.

MR. RUSSELL:  We'll take a look at them.  Thank you.

MR. FARMANI:  Thank you very much.

MR. BARNETT:  Thank you.

MR. BURNETT:  All right.  Thank you.

(Mr. Burnett leaves the deposition proceedings.)

EXAMINATION

BY MR. FARMANI:

Q    Okay.  So, Mr. Geller, as you know, my name is Tony Farmani.  I represent Mr. Ramon Alvarez.

MR. BARNETT:  Excuse me.  May I interrupt just one --

MR. FARMANI:  Absolutely.

MR. BARNETT:  In reviewing the e-mails that were provided by Mr. Burnett, I observed that they are numbered 1 through 61.  And I, also, observed that there was a document, an e-mail, which was not in that group.  And it looks like it was an attachment sent by the Attorney General of an investigative report of Mr. Rondou.

And so, because I didn't see it in the numbered copies, I made another copy of it.  Although, I'm sure

it's been disseminated already.  I don't have a clean copy.  I have a copy that I got and I put some markings on it.

I want to make sure that we have been responsive to the subpoena.  And so I'll identify the document and I will provide it with the caveat that it's not a clean copy.  I don't have a clean copy.  It's got some markings on it that I made on it.

It's an interview, a report of an interview of Rondou, which I believe you have.  But I want to be responsive to the --

MR. RUSSELL:  I believe that's been lodged in Federal Court.

MR. FARMANI:  Yeah.  We don't have any problem with it.  I understand your point.

MR. BARNETT:  But what I'm saying is when you get this disk that says 1 through 61 and it does not have an e-mail, an attachment to an e-mail, I just want to identify that we know that it's responsive to the subpoena.

And if you have that investigative report, I'm not going to supplement this discovery with my notes.  I just wanted to make that clear.

MR. FARMANI:  Yeah.  Thank you very much --

MR. BARNETT:  All right.

MR. FARMANI:  -- for making that clarification

MR. BARNETT:  Okay.

BY MR. FARMANI:

Q    So before I start I'm just going to go over some ground rules.  Obviously you know you're under oath.  And if there's any questions that I ask that you don't hear me or you need clarifications, please let me know.  Otherwise, I'm going to assume that you understood my questioning.

And your counsel can make objections for the record.  However, unless his objections are based on privileged matters, you would have to answer the question.  And the objection will be noted for the record.

So let me begin by asking you, are you familia with the nature of this deposition, what this deposition is about?

A    I believe so.

Q    Okay.  Have you talked to your counsel about it?

MR. BARNETT:  Objection.  I'm not going to permit him to testify regarding conversations with me. So I'm going to object.

MR. FARMANI:  Absolutely.

MR. BARNETT:  It's attorney-client privilege.

BY MR. FARMANI:

Q    Have you reviewed any documents in preparation for your deposition?

MR. BARNETT:  And except provided by me or my analysis.  And I won't continue this objection.  But I just want to make sure when he's answering the question, it's to the exclusion of documents or conversations with me.  That's okay?

MR. FARMANI:  Absolutely.

MR. BARNETT:  All right.  Thank you.

MR. FARMANI:  Absolutely.

Q    Have you reviewed any particular documents in preparation for your deposition other than the documents that would be privileged matters obviously?

A    When you say in preparation for my deposition, I mean how far back are you going?

Q    Well, let me be more -- let me ask you this: For this deposition, for this one that you are here today, what documents have you reviewed, documents that are case-related documents?

A    Well --

Q    The reason I ask, Mr. Geller, is because I want to make sure I understand what your familiarity with the case is.

A    Sure.

THE SULLIVAN GROUP OF COURT REPORTERS

13

102

Q    So if I'm referencing something, you know, we'll be on the same page, so to speak.

A    I mean I reviewed like the e-mails, the e-mail exchanges that I've had with members of my office, with members of the Attorney General's Office.

At one point in time I went through the file looking at the request of -- I believe it was somebody from my office pursuant to the Attorney General's request looking for audiotape, I believe, of Detective Rondou and Craig Gonzales.

Q    Let me stop you there for a moment.

A    Sure.

Q    Do you have that audiotape?  Is that audiotape that would be the recorded interview between Detective Rondou and Mr. Gonzales, is that part of the record tha you produced here?

A    I don't -- well, you know, I passed on the word to my office with respect to the subpoena, I told them, "Hey, comply with this.  Get everything that they're asking for."

Off the top of my head right now I don't recall whether or not I was successful in finding an audiotape of that interview.  I'm not -- I do not recall whether or not that interview even existed.

I remember looking through the file.  Again,

this is a case that I tried many, many years ago. And so once I closed out the file, that's pretty much it.

Q Let me ask you a few questions. And let's go back to the case. How did you -- now we're talking about the case People versus Ramon Alvarez that you prosecuted Mr. Alvarez. How did you become involved in that case?

A Well, I was working the gang unit at the time. I worked with and was assigned to prosecute gang homicides from Santa Ana, from the City of Santa Ana. So I worked very closely with the gang homicide detectives from the Santa Ana Police Department.

There was a -- I believe there was a -- the Department got a stipend or some funds -- I don't know the source of those -- to basically look at cold cases.

And I believe Detective Rondou was the assigned officer. There may have been another. But certainly Detective Rondou was the one who was assigned to dust those cases off and take another look, take a fresh look at them.

And that's when I first became aware of this case. I know that it started with a colleague of mine. Her name is Allison Gyves, G-y-v-e-s. So it wasn't mine from its inception. She had it before me. But I was the trial lawyer on it. And I did the prelim on the

case.

Q    That's correct.

A    So that's the best of my recollection.

Q    How long have you been with the Orange County District Attorney's Office?

A    23 years.

Q    23.  And before that did you do any kind of work out --

A    No.  My first law job I got sworn in on December 8, 1995.  And I was picking a jury the following Monday.

Q    What's your current position with the Orange County District Attorney's Office?

A    My title is Senior Deputy District Attorney. And I work in the family protection unit out of our Harbor Justice Center.

THE REPORTER:  I'm sorry.  "I work in the" --

THE WITNESS:  I'm sorry.  I'm talking too fast.

I work in the family protection unit out of the Harbor Justice Center.

BY MR. FARMANI:

Q    And before that you worked with the gang unit? Is that what that is?

A    I did gang prosecutions for 13 years, from 2001 to sometime in 2014.

Q    Okay.  So at the time that you prosecuted Mr. Alvarez, you were in the gang unit?

A    That's correct.

Q    Now, during that timeframe from 2001 to 2014, I think you said, did you work with Detective Rondou, David Rondou?

A    I worked very closely with Detective Rondou. We did many cases together.

Q    Did any of those cases involve jailhouse informants?

A    Well, you need to define "jailhouse informant" for me.

Q    Okay.  Well, let me ask you this:  Just to kind of develop your relationship with Detective Rondou, when you say you worked closely with him, did you direct Detective Rondou insofar as investigations that needed to be done?

A    No.  Far from that.  I mean we had a very close working relationship.  But he doesn't take direction from me.  Maybe if there was something that I wanted to see done before I filed the case, then he would take direction from me.

But, you know, they would investigate the case, present it to us, present it to me.  And I would decide whether I wanted to file it or I didn't want to file it

So --

Q     Are you still in communications with Detective Rondou?

A     You know, once he retired, I haven't -- I think we had lunch maybe a couple of years ago.  But I have not been -- specifically I've avoided contact with him once I found out that we had this going on.  I --

Q     So you haven't communicated with him at all?

A     I received a text from him.  And I can't tell you when that was, but it was certainly within the past -- during the pendency of this.  So I guess this started what, probably in August, at least as far as my involvement maybe.

Q     Correct.

A     August or September.  I received a text from him.  And I told him, "Hey, Dave, I'll talk to you when this is all over with."  So I specifically avoided contact with him.

Q     Would you agree with me that you worked with him, you know, on hundreds of cases?

A     No.  That's way too many.

Q     That's too many.  So how many cases would you say you worked with him?

A     That's a hard estimate.  It wouldn't be hundreds.  I mean as far as trials go, we probably

THE SULLIVAN GROUP OF COURT REPORTERS

18

tried -- I wouldn't be surprised if we tried 20 murder trials together or at least 20 where he was involved in the case.  He may not have been the lead detective in the case.

But, you know, the Santa Ana Police Department utilized many detectives, many gang homicide detectives. And so -- and there was always overlaps.  So, for example, if somebody wasn't available at trial, the other guy could testify on their behalf.

So it wouldn't surprise me over the period of time that we -- that I worked Santa Ana gangs, maybe a hundred.  But that could be off by, you know, 30 percent one way or the other.

Q    Sure.  Would you say you have trust and faith in these lawyers?

A    Absolutely.  He's a great cop.

Q    When -- well, when you worked with Detective Rondou on a case, you said that you don't direct the investigations?

A    No.

Q    He does it?

A    You're watching too much TV.

Q    Do you --

MR. BARNETT:  Just answer the question, please.

///

BY MR. FARMANI:

Q    Do you conduct interviews with witnesses with him?

A    No.

Q    So he strictly does the interviews and then he provides summaries to you?  Is that how it goes?

A    Yeah.

Q    Pretty much.  Okay.

A    Yeah.  I mean there will be police reports.

Obviously I will oftentimes review the actual audiotape of, you know, that the police report is generated from --

Q    Sure.

A    -- you know, the actual statement.  Certainly at some point in time in the case I reviewed that. Whether it's prefiling or not -- you know, oftentimes these came in as custody cases.  In other words, we had a finite period of time to file the case.  So, you know, we often had, you know, less than 48 hours to file the case.

Q    And do you happen to know if Detective Rondou had any contact with Craig Gonzales being the informant in this case back in 1998?

A    I don't believe so.  I don't even think Rondou was working for Santa Ana P.D. in '98.  He may have.  H

lateraled from L.A.P.D.  So I don't know when he starte with Santa Ana.

But there is -- my recollection of the case is that he wasn't one of the witnesses from the original case.

Q    "He" being?

A    He, Detective Rondou, wasn't one of the investigating officers from the original case.

Q    Gotcha.

A    I don't know when he started with Santa Ana P.D.  But it's my recollection that he wasn't part of the initial investigation.

Q    Let's talk about Craig Gonzales a little bit.  Did you ever meet Craig Gonzales?  Let me ask you that.

A    Yeah.  I met him when they brought him down fo the preliminary hearing.  That would be the first time that I believe I met Craig Gonzales.

Q    Where did you meet him at?

A    I met him in the D.A.'s Office, probably in one of our conference rooms.  I believe he was in a wheelchair.  That was it.  I mean it was very brief.

I made a habit and custom of not speaking with witnesses for obvious reasons ahead of time.  And so I didn't talk to him.  I mean I probably introduced myself to him and I told him, "thanks for coming and tell the

truth."  That would be my habit and custom with respect to gang witnesses.

Q    This is when he came in, he came in to the District Attorney's Office; correct?

A    Yeah.  I believe that Detective Rondou and probably one of the other detectives, because, again, they do everything in duplicate, brought him to the office on the morning of the preliminary hearing.

Q    On the morning of the preliminary -- so he was physically in your office?

A    Yes.

Q    Okay.  So if Detective Rondou said that he would never bring him to the office, he would be mistaken?

A    I can't tell you whether he was or was not mistaken.  I'm telling you what I recall.

Q    Okay.  I understand.  I just want to make sure.

A    And, for clarification, that would have been a very brief moment.  I mean they had to put him somewhere because he was in custody.

So, you know, my understanding, they probably brought him over from the Santa Ana detention facility.  They may have walked him over or they may have taken him in a van.  But at some point I recall meeting him in a conference room in the D.A.'s Office.  That's my

recollection.

Q    And Detective Rondou, just for clarification purposes, he was the lead detective insofar as The People versus Alvarez trial?

A    Yes, I consider him the lead detective.

Q    And he sat through the court with you through the preliminary hearing, was designated the investigating officer; correct?

A    I presume so.  It will be in the record.  I mean it will be in the prelim transcripts and in the trial.  So I don't recall off the top of my head.  That certainly makes sense, but I don't recall.

Q    Do you know Commander Eric Paulson?

A    I know who he is, sure.  I've done cases when he was simply a detective.  And now he's, you know, hig up there.

Q    Was any -- at some point -- correct me if I'm wrong -- was he Detective Rondou's boss at some point or supervisor perhaps?

A    I think in this relevant period of time they were colleagues.  I don't believe Detective Paulson --

Q    He was a sergeant at the time, according to Detectives Rondou's testimony.

A    Okay.  I'll take your word for it.  I mean they all work together.  So I don't know.

01:38:00

Q    How about Chief -- Deputy Chief Harrelson, do you know who he is?

A    I could pick him out of a lineup, but I don't believe I have even ever spoken with the man.

01:38:10

Q    How about Police Chief Carlos Juarez?

A    I never met him.

Q    You never met him.  Okay.

Now, did it appear to you that Craig Gonzales was a credible witness?

01:38:24

A    In that timeframe?

Q    At the time that he was testifying against Ramon Alvarez.

A    You're talking about a prelim trial?  What?

Q    Throughout.  Throughout.

01:38:36

A    Yeah, I think he -- I believed him, yes.

Q    You believed him?

A    Yes.

Q    He seemed like a credible witness?

A    Yeah.

01:38:42

Q    Now, before you put somebody like -- now, were you aware that Mr. Gonzales -- and this was brought out at trial -- that there were people from the Sacramento District Attorney's Office or the Sacramento authorities were asking him to become an informant, to work as an informant; were you aware of that?

01:39:02

MR. BARNETT:  I'm going to object just for clarification, because the question assumes facts, which I'm not sure this witness knows or whether it's an accurate statement during the trial that this information about the Sacramento D.A. came up, because -- and so I don't want to interfere.

But my objection is I think that it assumes -- that it's compound and it assumes a fact which I'm not sure is accurate.

The trial is -- there's a trial and then there's a motion for new trial.  And when information about the Sacramento D.A. --

MR. FARMANI:  No, that's not what I'm talking about at all.

MR. BARNETT:  No, I know.  But your question says, well, this came up during the trial that the Sacramento D.A. was seeking to use him as an informant. And I'm not sure that that's accurate that it came up during the trial.

I am pretty sure that it came up in post trial new trial motions.  And so I didn't want the question to be addressed --

MR. FARMANI:  Sure.

MR. BARNETT:  -- assuming that it's accurate that during the trial.  And I'm not trying to be a

nitpick.  But I really want to know -- make sure that the question --

MR. FARMANI:  There's two things, though, Mr. Barnett.   There's one at post trial the motion for new trial concerned informant work in Nevada.  It had nothing to do with Sacramento.  It was found in a pleading that was submitted in the Sacramento Superior Court.

But it wasn't -- what I'm talking about is Mr. Gonzales at the time that he's in prison, people ar seeking him out.  And that came out through trial.

MR. BARNETT:  Well, I'm not saying that I have mastered the trial record that people were seeking him. The -- and I have just in looking at the court of appeals opinion regarding that.  So I'm just --

MR. FARMANI:  Sure, I could do that.

MR. BARNETT:  And so I'm just saying if you could maybe break the question down.

MR. FARMANI:  Sure.

MR. BARNETT:  And say do you -- and, honest to God, I'm not trying to tell you how to ask the question.

MR. FARMANI:  No problem at all.

MR. BARNETT:  If you say, "do you recall if that came up during the trial," then he can say yes or no or whatever.

01:41:31

MR. FARMANI:  I'll clarify it.  I understand your concern completely.  I understand.

MR. BARNETT:  And I'll just, you know, the --

MR. FARMANI:  I can reference the page number for the record.

MR. BARNETT:  Sure.

MR. FARMANI:  I can go through it.

MR. BARNETT:  And that would be great.  And I just want to make sure that the witness understands the question and that the -- so that he can either say, I agree or disagree with the characterization.  So that's all I'm asking.

MR. FARMANI:  Understood.

MR. BARNETT:  Thank you very much.

MR. FARMANI:  Absolutely.

Q    Are you familiar with Terry Zlateff?

A    Terry Zlateff.

Q    Zlateff.

A    Yes.

Q    You are familiar.  And that would be Z-l-a-t-e-f-f.

Do you recall at some point during trial where he was being questioned about how the investigative officers from Sacramento, including the DEA, was looking to hire Mr. Gonzales as an informant?

A    I don't have a recollection of that at this point in time.  Remember, keep in mind there were two trials here.  So --

Q    The second trial.

A    Okay.

Q    And the same questions were asked basically in both trials.

And did you -- when you -- did you -- when Mr. Gonzales became a witness in this case, did you do any sort of background check on him?

A    Well, I personally did not.  But I'm confident that we -- well, we certainly provided his record, his Rap Sheet, which was rather extensive, to the defense.

I don't have a recollection whether we supplied police reports in association with any of his prior convictions.  But we did basically what we would do with any witness, you know, provided, you know, his record, his criminal record.

Q    Sure.  But if it is a witness that you're using as an informant, this is just generally speaking in you practice, would it be fair to say that you want to look at their background to see if they're reliable or credible to testify?

A    Sure.  But I'll share with you that I so rarely use informants.  It was a very rare occurrence the

entire time I was in gangs to ever use -- with the exception of -- and I want to distinguish between a codefendant, a criminal codefendant on a case and I guess the way we would call Craig Gonzales an informant.

I don't know if that answered your question.

Q    Well, let me ask you this way:  Would it be fair to say or would you agree with me it would be good practice if you are going to rely on an informant to testify in a murder case to review their background to see if they're reliable and credible?

A    Well, of course.  I mean I have to confirm in my own mind that they are reliable and credible, absolutely.

Q    And would you agree with me that Mr. Gonzales was a very important witness in the prosecution in this matter?

A    Absolutely.

Q    So you would want to find out everything about him; correct?

A    Well, I would want to find out everything that I could about him, anything that I could get my hands on.  I mean obviously I know my Brady obligations.  I got to make sure that I've given everything to the defense.

Q    Let me ask you this:  Were you aware that when

Mr. Alvarez, Ramon Alvarez, when he was being held in county jail that there was another involved -- another informant involved?

A    Is that the Ruorock person you're talking about?

Q    Yes.

A    I was completely unaware of it.  The first time I ever heard of that was in Scott Sanders' motion of the Dekraai case.

Q    And when was that?

A    When was that?

Q    When you became aware of it.

A    Whenever I read Scott Sanders' brief.  So probably --

Q    Do you remember --

A    Probably within a week of the time that he filed it in the Dekraai case.

Q    Okay.  I don't know where that is.  I don't know when that is.  I thought maybe you would.

A    I don't know either.  I mean it was a while ago.  But I don't know.  I mean it's going to be public record.

Q    Do you think that would have been Brady material to turn over, the fact that there was an informant placed in the same cell or near the cell

talking to Mr. Alvarez?

MR. BARNETT: I'm going to object, because it assumes that he knows anything about Ruorock or that he -- or that it's true that Ruorock was placed there or that Brady applies post conviction.

MR. FARMANI: Sure.

MR. BARNETT: So I mean -- so if you could, if you wouldn't mind just breaking it down and --

MR. FARMANI: Absolutely.

MR. BARNETT: Because I do think it assumes facts that he has not said he knows, because he doesn't know anything about it. And I don't know it to be true.

So I don't want him answering a question assuming that another informant was placed next to Mr. Alvarez or what the circumstances are.

MR. FARMANI: Sure.

Q    Let me ask you this -- go ahead.

A    Well, I was going to share with you that I'm assuming you have a copy of the memo that I authored to Senior Assistant District Attorney Scott Zidbeck.

Q    I do not.

MR. BARNETT: Well, you should just answer the question that's posed.

THE WITNESS: All right.

BY MR. FARMANI:

Q    Let me ask you this, Mr. Geller -- you're probably not used to be questioned.  And that's fine.  We can work together on this.

You said you had no recollection -- or do you know Brian?

A    Brian who?

Q    Ruorock.

A    No.  As I've already said, I don't know --

MR. BARNETT:  How about just answer the question no.

THE WITNESS:  You're going to object as non-responsive.  Yes, no, I do not know who that person is.

BY MR. FARMANI:

Q    You have no clue who he is?

A    No.

Q    And you have no clue if Mr. Rondou, Detective Rondou had used Brian Ruorock?

A    I do not know.

Q    Now, is that something that you would expect him to disclose to you if he would have done something like that, if he would have used Brian Ruorock?  If Detective Rondou had used Brian Ruorock to obtain incriminating statements from Ramon Alvarez, is that

something that you would expect Detective Rondou to share with you?

A    If he obtained incriminating statements?

Q    If he attempted to.

A    To use against Mr. Alvarez in the trial that w were prosecuting him on?

Q    Yes, sir.

A    Your question is would I have expected Detective Rondou to share with me that he was using an informant to obtain statements from a criminal defendant?

Q    Yes.

A    Is that your question?

MR. RUSSELL:  But you answer.  I'm going to object to the form of the question.

THE WITNESS:  I don't know.  I don't know.  I never --

BY MR. FARMANI:

Q    Well, you worked with him for a number of years?

A    Sure.

Q    At least for 13 years, correct, or 14 years?

A    No, no, no.  I didn't work with Detective Rondou the entire time.  I mean there was a period of time when I was assigned to the South County Target.  S

I was working at South County Target, which was a gang unit. I was assigned to the Aliso Viejo substation.

Q    You worked with him for two dozen cases?

A    Well, trials.

Q    Trials?

A    Yes.

Q    And with respect to your working relationship, did you have expectations, of any type of expectations from Detective Rondou with respect to disclosure of Brady materials?

A    Of course.  On cases that we had open, of course.

Q    So if Detective Rondou, for instance, had promised anything to a witness, you would expect him to disclose that to you so you, in turn, could disclose it to the defense; correct?

A    Of course.

Q    Making sure.  And let me ask you this:  Do you recall -- I'm going to go ahead and give you this, if I may.  You should have a copy there, Mr. Barnett.  If yo don't, I'll go ahead and can give this to you, sir.

(Whereupon, Exhibit 5 was marked for identification and attached hereto.)

BY MR. FARMANI:

Q    Do you recall that memo at all?

A    I don't.  And I'm not sure I even know who Joh

Kenney is.  I know it says District Attorney

Investigator.

Q    That's what I was going to ask you about.

A    I don't even know who John Kenney is.

Q    Well, let me ask you -- well, this is

interesting, because the memo goes out in October of

2010.  And were you involved in the prosecution at that

point in the -- you know, in the investigation and the

prosecution of Ramon Alvarez?

A    I don't know the answer to that question.  The

gentleman here F. Lee Smith, he was my D.A. Investigator

at the time.  That's the person who is identified on the

memo.

Q    When you say he was your D.A. Investigator, is

that someone that's particularly assigned to you or --

A    Yes.

Q    He was the guy that worked with you on these

cases?

A    Yes.

Q    Okay.  And did he consult with you at all with

respect to that memo before sending that memo out?

A    Well, it doesn't look like Lee Smith authored

this memo.  I don't know who authored this memo.  Oh,

Investigator Lee Smith.  Okay.  So I guess he did.  I

don't recall it.

Q You don't recall this memo at all?

A I don't. And, again, as you point out, I don't even know if I was on -- I just don't have the dates committed to memory. I don't know. You know, you can probably check the record and find out exactly when I made my first experience on it.

Q In December of 2010, which was the preliminary hearing, you were counsel of record at that point?

A Oh, sure.

Q Yeah. This was in October. And I can, also, tell you -- and I'm going to -- we're going to attach that as an exhibit at some point. Not right now, but we'll attach it as an exhibit.

One of the things I was going to ask you is, you know, these -- do you recall receiving these communications from defense counsel?

And what I'm going to be presenting to you is a fax cover sheet that was sent by Mr. Ramon Alvarez's trial counsel at the time Ronaldo or Ronald Rubalcava.

A Roland Rubalcava.

Q Roland. I'm sorry.

A That's okay.

Q Roland Rubalcava. That was authored or sent to you, to your attention.

I'm going to give you one copy, which would be the fax cover sheet. And if you don't mind reading the date off of that for the record, I would appreciate it.

A    Maybe you could invite my attention of where the date is.

Q    Yeah. That's what I -- it should be --

A    I'll give it back to you and you can tell me where it is.

Q    Thank you very much. I know that's -- this one does not have a date. But I can tell you what it is.

I'm going to have you take a look at this one, which is a letter authored to you on October 22nd, 2010.

And I apologize for that, sir. We should have these documents here for you, too. Here you go, sir.

MR. BARNETT:  Thank you.

MR. FARMANI:  Of course.

THE WITNESS:  Do I have a recollection of this?

BY MR. FARMANI:

Q    Yes.

A    No, no independent recollection of that.

Q    No independent recollection of that?

A    No.

Q    But you would agree with me that that is authored or that is sent to you; correct?

A    It says, "Dear Mr. Geller." So yes.

01:53:38

Q    Just making sure.  So that would have been what, October of 2010?

A    Yeah.  It says, October 22nd, 2010.

Q    So this one I found the date, actually.  The

01:53:48

fax cover sheet says, September 9, 2010.

A    Okay.

Q    And if you would take a look at that for me and let me know if you remember that.

A    Okay.  I read it.

01:54:06

Q    Do you recall anything like that?

A    Again, I don't have an independent recollection of either of these documents.

Q    Well, let me ask you then, just maybe you could define for the record, when you take over a case --

01:54:18

A    Yes.

Q    -- when you are assigned D.A., how involved are you with respect to people who are working underneath you, so to speak, you know, people that you delegate work such as your investigator on the case?  I think you

01:54:34

mentioned Lee Smith was your personal investigator.

How involved are you with Mr. Lee Smith on a case?  Does he report to you generally on a daily basis on the case?

A    Well, I would say that we worked as a team.  So

01:54:52

I don't -- wouldn't say that he reports to me per se.

mean the bureau is one side, the bureau of investigation. You know, the attorneys, you know, we work together. So I guess --

Q Let me clarify it. Perhaps this would help. If -- does Mr. Smith, Mr. Lee Smith at the time that he was working with you or for you, whatnot, did he have independent authority to speak on behalf -- on your behalf?

A I don't really follow your -- like speak to whom?

Q To defense counsel. I apologize. I should have made that clear. To defense counsel or to anybody for that matter.

A Yeah, I mean, I will often task my investigator with, you know, complying with discovery requests, if that's what you mean. Like if I get a discovery request from defense counsel, I will say, yeah, "Lee, take care of this, please."

Q So you would give it to Lee and then Lee would take care of it?

A Yes.

Q Would Lee check with you at all or you would just simply go to a file and --

A It depends on the circumstance. If he has a question, sure.

But, I mean, Lee was a very experienced police officer. I think he was a retired lieutenant from Anaheim or maybe just a sergeant. But, I mean, you know, very experienced cop. His second career was a D.A. investigator. So certainly he could have handled things on his own.

Q    Okay. And would you say whatever Lee does at the time, Investigator Lee, that would be sort of speaking on your behalf?

A    Even without my knowledge? I mean, I suppose. I guess what's the point?

Q    Well, let me ask you this: The September 9th fax and the letter that was dated October 22nd, 2010, and the September 9, 2010, fax, these were addressed to you, correct, Mr. Geller?

A    They appear to be, yeah.

Q    And you --- when they were addressed to you, does this mean they came directly to you?

A    No. I mean, you know, like in the mail or, you know, because --

Q    If there was something in your office that was faxed to you.

A    I think historically things get to me eventually. You know, they may go to one office and may get routed to me via our internal pony system. But,

THE SULLIVAN GROUP OF COURT REPORTERS

40

129

01:57:08    yeah, I'm pretty confident that I get my mail

eventually.

    Q    And how would you handle discovery requests

such as the one that I've handed to you, which would be,

01:57:15    you know, that September 9, 2010, and October 22, 2010?

    A    I would probably delegate that to my

investigator and say, "Hey, can you look into this,

please?"

    Q    And then your investigator would do what?

01:57:26        A    I presume look into it.

    Q    And then get back to you?

    A    Sure.

    Q    And then get back to you on the matter;

correct?

01:57:32        A    Sure.

    Q    Would a memo -- I'm going to give you this memo

that you said you don't remember.  When this memo went

out to the defense counsel, was that authorized by you?

Did he speak to you about it?  Would he have spoken to

01:57:46    you about it?

        MR. RUSSELL:  Objection.  Form.

        THE WITNESS:  So I can go ahead and answer

that; right?

        MR. RUSSELL:  Yes.

01:57:54            THE WITNESS:  I don't know.  I really don't

know.  I would like to say maybe via habit and custom,
yes.  But with respect to this particular memo, I don't
know.

And, again, I don't even know who John Kenney
is.  I guess he's a D.A. investigator, because it says
it on the paper here.

BY MR. FARMANI:

Q    Sure.  Thank you very much.

A    Sure.

Q    Now, you can hold on to that.  I'm going to as
you a quick question about it.  You see the first
paragraph there.  Now, it seems to me that this was done
on October 5th, according to that paragraph, but then
authored on October 22nd; correct?

A    Yes.

Q    Is there a reason why it took -- if you know,
why it would take from October 5th to October 22nd to do
a response when there was a request on September 9th,
2010?  Would it take that extra time from October 5th to
October 22nd to do a response?

A    I have no idea.  I mean it's not something that
I had personal knowledge of.

MR. BARNETT:  Just answer the question no.

THE WITNESS:  No.

BY MR. FARMANI:

Q    And then just read that paragraph, if you will, please, for the record.

A    You want me to read the --

Q    Yes, please, the first paragraph.

A    Starting with the one on October 5th, that?

Q    Yes, sir, just that one paragraph.

A    "On October 5, 2010, District Attorney Investigator John Kenney" -- two N's -- "checked law enforcement resources to determine if Craig Gonzales ha a background as an informant in California and other states.  There was none."

Q    Could you explain to me what that means to you?

A    Just what it says.  It's sort of --

Q    Okay.  Let me ask you a question about it. Does that mean that he has no informant, one, in California and, two, in other states; correct?

A    Again, I don't know.  I mean I didn't author this.  I don't know anything about this.  I have no idea.  I don't know what did the District Attorney did.

Q    Let's -- just that paragraph alone itself, does that in your mind indicate that there was no informant background in other states as well as California?

MR. BARNETT:  That this investigator could find?

MR. FARMANI:  Correct.

THE WITNESS:  That's the point of the language of the sentence, sure.

BY MR. FARMANI:

Q    Correct.  I just want to make sure.

A    Yeah.

Q    And would you also agree with me that -- give me one second, if you would, please.  If a question is asked of a witness, "have you ever done any informant work at state level," that means all the states; correct?  That's what that statement would indicate to you; correct?

MR. BARNETT:  Objection.  That calls for speculation and a conclusion about what that question meant to the witness or the context in which that --

MR. FARMANI:  I'll ask it a different way.

MR. BARNETT:  -- statement --

BY MR. FARMANI:

Q    I'll ask it this way:  Were you aware in 2010 or in 2012 -- let me be more specific about that, because I want to make sure the dates are going to be specific.

I have a lot of stuff in front of me.  I apologize.  Just for the timeline purposes, the trial happened -- the preliminary happened December 17, 2010,

THE SULLIVAN GROUP OF COURT REPORTERS

44

02:02:04

and the other first trial, which was in January of 2012

And then you had a subsequent trial which was in June of

2012.

A    Okay.

02:02:13

Q    Now, the sentencing in this case happened on

September 28, 2012.  The judgment was on that date.  Did

you have any knowledge of Mr. Gonzales being a jailhouse

informant in the Nevada case in 2002?

MR. BARNETT:  I'm sorry?  2000- --

02:02:32

MR. FARMANI:  '02.

MR. BARNETT:  '02?

MR. FARMANI:  2002.

THE WITNESS:  I didn't --

MR. BARNETT:  Excuse me.  In 2012 did he know

02:02:40

he was an informant in 2002?

MR. FARMANI:  Yes, sir.

THE WITNESS:  So you're asking me at the time

of -- when in 2012?

BY MR. FARMANI:

02:02:49

Q    Well, what I'm asking you is, from the time

that you got involved in the case, which would have

been -- it could have happened any time before July of

2010, I'm assuming, because that's when the petitioner

gets arrested.  And I'm giving you a timeline.

02:03:02

A    That's helpful.

THE SULLIVAN GROUP OF COURT REPORTERS

45

134

Q    Yes.  And from that period of time, from 2010, you know, July on forward up until the -- we'll use this date for reference, September 20, 2012, did you have any knowledge of Mr. Gonzales being an informant in a prior case?

A    I --

MR. BARNETT:  Just so that we're -- you mean before the conclusion of the trial, not the motion, but before the conclusion of the trial?  Is that what you're meaning, after that time period?

MR. FARMANI:  Yes, sir.  The sentencing happened September 28, 2012.

MR. BARNETT:  Okay.

MR. FARMANI:  That's the date of the sentencing.

Q    So anytime -- we're talking about -- first we're talking about July of 2010, you know --

A    Right.

Q    -- until September 28, 2012, that timeframe, did you have any knowledge of Mr. Gonzales being an informant in any case?

MR. BARNETT:  And, if I'm clear, does that include information learned at the motion for new trial, which I assume was prior to the sentencing?

MR. FARMANI:  It was on the day of sentencing,

but the papers were filed prior to sentencing, correct.

MR. BARNETT:  So not to exclude the information in -- I mean to -- do you mean did he know before it was filed in the moving papers that in a Romero motion the -- there was a claim that he had been an informant, is that -- do you mean before he got that information in the --

MR. FARMANI:  Correct.

MR. BARNETT:  -- motion for new trial, before that?

MR. FARMANI:  That's exactly -- that's exactly right.

MR. BARNETT:  Okay.  Because if he answered the question, did you know up until that time, he would have known at the time of the filing of that motion.

But if your question is, did he know before the defense -- before that was brought and the motion for new trial, then he would know the timeframe.

MR. FARMANI:  Right.

Q    Well, I'm asking him, so you didn't know?

MR. BARNETT:  Before the defense told you about it?

BY MR. FARMANI:

Q    Before the defense disclosed it.

I wanted to ask you first the timeline.  And

your response could have been, yes, I learned from the motion for new trial.

A    That's probably accurate, to the best of my recollection.

Q    So you had no knowledge?

A    You know, the trial transcript would dictate. Certainly the second trial transcript.  Either trial transcript.  You know, whatever was brought out -- I mean we brought out obviously a lot of stuff on Craig Gonzales --

Q    Right.

A    -- as you're aware.  So if that -- I don't recall off the top of my head.  But if that was one of the pieces of evidence that was brought out against Craig Gonzales, in other words, you know, all the other things he had done in his life --

Q    Sure.

A    -- then, yes, I can answer that I would know. But I may have learned that as a result of reading Mr. Rubalcava's new trial motion.  I don't have an independent recollection.

Q    You don't have an independent recollection of whether or not he knew beforehand, before the trial?

A    If I would have known before the trial, it would have been something that would have been brought

out at trial, sure.

Q    Or disclosed to defense?

A    Of course.

Q    So if you knew that Mr. Gonzales had worked as a jailhouse informant in any case, you would have disclosed that to the defense?

A    Before trial?

Q    Yes.

A    Yes.

Q    Or even during trial if you found out about it

A    Yeah.

Q    How about after trial?

MR. BARNETT:    Is the question would he have disclosed information that the witness had previously been an informant after trial?  Is that the question?

MR. FARMANI:    Yes, sir.  If he had learned of it.

MR. BARNETT:    That hadn't already been disclosed?

MR. FARMANI:    Yes, sir.

MR. BARNETT:    And that -- of course Brady doesn't apply to that.  And the question whether or not -- and so if it goes to guilt or innocence, of course, it has to be disclosed.  If it doesn't, then it doesn't matter.

So are you asking him if he knew that the witness had given previous testimony and it also went to guilt and innocence, would he report it or are you asking him if you just had information that he had been a witness post conviction?

So I think that's an important distinction, because the nature of the information governs the responsibilities to disclose.

And so if the question is, if you learned after the trial that he had been a witness in other cases, would he have disclosed that, that is vague, because it depends upon many other factors.

BY MR. FARMANI:

Q    It's very clear.  I'm going to ask you very clearly.  This has nothing to do -- you know, we can have case law that says that it applies to post conviction.  Your attorney disagrees with that.  That's fine.  That's case law.  We can work that out with the Court.

But what I'm asking you is this:  If you had information, if you came across information at any point in time about an informant that you used in trial about their prior work that wasn't disclosed, would you be obligated to disclose that?  Would you have disclosed that to defense?

02:08:58

            MR. RUSSELL:  Objection.  Form.

            THE WITNESS:  And you're talking about post

conviction, post judgment?

BY MR. FARMANI:

02:09:03

    Q    Post conviction.

    A    Okay.  He's been sentenced?

    Q    He's been sentenced.

    A    If it wasn't outcome-determinative, in other

words, if I didn't believe that this -- you know, that

02:09:11

all of a sudden now I've convicted an innocent person -

    Q    Right.

    A    -- probably not.

    Q    Okay.  Well, let me ask you this then:  As a

general matter do you -- when a motion for a new trial

02:09:23

is filed, what do you do?  What do you typically do in

case when a motion for a new trial is filed?

    A    It depends on what the grounds are.  I mean

obviously I write a response brief.

    Q    Is there a reason why you didn't write a

02:09:36

response brief in this case?

    A    I don't remember what grounds he brought it on.

    Q    He brought it on grounds of nondisclosure of

Mr. -- one of the grounds was nondisclosure of

Mr. Gonzalez's prior informant work by the District

02:09:49

Attorney's Office.

A    Probably in this case what I did was the analysis as to -- there was so much --

MR. BARNETT:  Don't guess if you didn't file.

BY MR. FARMANI:

Q    You didn't file?

A    I didn't.

Q    Did you -- if you didn't file -- this is assuming you didn't file -- would you have argued anything on the record?

A    More than likely.  I mean I remember it was in Judge Froberg's court.  And Judge Froberg was -- Judge Froberg was the best judge in the building.  And so I trusted Judge Froberg to do the right thing with respect to the legal analysis.

Q    So you didn't think it was necessary for you t make any arguments is what you're saying?

MR. BARNETT:  I'm going to object, because he doesn't remember if he did.  And the record will speak for itself.

THE WITNESS:  Sure.  I --

MR. BARNETT:  Just answer the question.

BY MR. FARMANI:

Q    If he didn't make any argument -- let's assume -- let's assume for the record -- and the record does speak for itself -- you made absolutely no argumen

whatsoever.

A    Okay.

Q    Is there a reason for that?

A    I don't know.

Q    Is your reasoning that the judge was clever enough to be able to make the right ruling so you didn't think you needed to make an argument?

A    I don't know if clever is the right word.

MR. BARNETT:    And don't guess either.  If you don't remember, say you don't remember.  Don't guess about Judge Froberg or -- just answer the question.

BY MR. FARMANI:

Q    Well, why -- if I told you that you didn't make any argument on the record and you didn't file any papers, would there be any reason for you not to do that, assuming your practice, as you mentioned, is to at least file some sort of a pleading and response?

A    Habit and custom I would have been -- it would have been confidence that the ruling was going to go my way.

Q    Okay.  So did you think it was -- do you remember anything about that new trial motion, motion for new trial?

A    I don't.

Q    If the motion for a new trial had alleged that

the District Attorney's Office had failed to disclose Brady material, would you think that would be important enough for you to address?

A    Again, I don't remember the new trial motion. I'm sorry.

Q    Okay.  Let me have you take a look at this check over here.

A    Okay.

MR. FARMANI:  Mr. Barnett, let me give you a copy.  You can show it to Mr. Barnett.

MR. BARNETT:  Thank you.  I have it.

BY MR. FARMANI:

Q    Do you remember that check?  Does that -- do you know anything about that check?

A    I don't think I've ever -- I'm not sure I've ever seen the check itself.  I mean obviously I remember hearing about it.

Q    When did you hear it?  When did you first find out about the check?

A    I mean it was -- it was -- my recollection it was years later, years later.

Q    Years later they told you?

A    Yes.

Q    And so you -- have you had an opportunity to review the investigative report of Detective Rondou?

02:12:48    A    Yeah.    It was presented to me.    My --

            MR. BARNETT:    Just say yes.

            THE WITNESS:    Yes.

BY MR. FARMANI:

02:12:54    Q    Okay.    And you would say -- you would agree with me Detective Rondou was somebody that you would have trust and faith in?

            A    Yes.

            Q    So if Detective Rondou said that this check was
02:13:06 approved by the Orange County District Attorney's Office, you would agree with that; correct?

            MR. BARNETT:    He doesn't have any --

            THE WITNESS:    I mean --

            MR. BARNETT:    It assumes he has foundation and
02:13:18 would know that.    So I'm objecting to the form of the question that he knew that there was approval or he had any part or knowledge of that.

            MR. FARMANI:    Well, I was going to ask him that next.

02:13:35            Did you want to say something?

            MR. RUSSELL:    No.    I was saying I was just joining in that objection.

BY MR. FARMANI:

            Q    Okay.    Well, let me ask you this then:    Were
02:13:41 you shocked when you found out about the check?

A    I was not --

MR. BARNETT:  Excuse me.  When he found out -- well, first, the first time that somebody told him of the payment, is that the time period that you're asking about?

MR. FARMANI:  Yes, sir.

Q    When did you find out about it?  Let me ask you that.

A    Again, I don't recall.  My recollection, it was years later.

Q    Years later.  After -- after the trial is over?

A    Sure.

Q    After the sentencing is done?

A    Yes.  Extended period of time after whatever date you said in 2012.

Q    Sure.  What date is that check -- if you don't mind reading it for the record, what date is that check issued on?

A    December 5th of 2012.

Q    So that would have been what, about three months after, approximately three months after -- less than three months after sentencing, correct, which was September 28, 2012?

A    Yeah.

Q    Okay.  You didn't know anything about it, abou

02:14:33

that check?

A    On December 5th of 2012?

Q    Or before December 5th.

A    No.

02:14:42

Q    So you're saying if a check -- I just want to clarify this for purposes of the record.  If a check is issued to a witness on a case, you wouldn't know anything about it?

A    Well, this check I didn't know anything about,

02:14:50

I mean if that answers your question.

Q    Now, so if --

MR. BARNETT:  Just so that the record is clear, at the time it was issued, at some later point -- I don't want the answer to be misunderstood.

02:15:12

He didn't know anything about it at the time i was issued.  But he's testified that some years later he learned about it.  So I just want to make sure that that's clear.  He did know about it, but --

MR. FARMANI:  Right.

02:15:22

MR. BARNETT:  -- but years later.

BY MR. FARMANI:

Q    And when you found out about it, what did you do, if anything?

A    I asked Dave why.

02:15:31

Q    "I asked" --

A    Dave Rondou.

Q    Dave Rondou why?

A    Yeah.

Q    Do you remember what he said to you?

A    I don't.

Q    Okay.  And then did he say to you -- well, do you know what a Homicide Reward Fund Account is?

A    I knew that Santa Ana P.D -- yeah.  Yes.

Q    You know what it is.  Okay.  What is that, if you don't mind telling us for the record?

A    I knew Santa Ana P.D. -- I thought Santa Ana P.D. or maybe the City of Santa Ana -- I don't know who got it, but they got some money.  It might have even been an anonymous donor is my recollection; that they got some money, you know, kind of like a We Tip thing, you know, like where people who would, you know, provide information would get, you know, paid for that stuff.

Q    Okay.  So --

A    Solve a crime.

Q    So you would agree then that this check was made out to Mr. Gonzales because of his testimony?

A    I'm sorry?

Q    This check was made out to Mr. Gonzales because of the testimony he gave in People versus Alvarez?

MR. BARNETT:  Hold on.  There's no foundation

that he would know why the City determined to issue thi

check or that it was for testimony.

He can say what information he had from Rondou about the issuance of the check. But he doesn't -- there's no foundation that he has any understanding of how or why this determination was made by the City.

MR. FARMANI: Let's make that as Petitioner's Exhibit Number 2, please.

(Whereupon, Exhibit 2 was marked for identification and attached hereto.)

MR. FARMANI: And, for the record, that's a check that was made out to Craig Gonzales on December 5th, 2012, by the City of Santa Ana.

Q    Let me have you, if you don't mind, Mr. Geller, take a look at this investigative report that's dated Septembers 6, 2018. And it was done by the Attorney General's Office. Now, have you seen that before, Mr. Geller?

A    I believe I saw this. I think so.

Q    And you see that it was done by Commander Paulson; correct?

A    Correct.

Q    Do you remember if Commander Paulson was involved in the Ramon Alvarez prosecution?

A    You mean like whether he was a witness?

Q    No.  Whether if he was involved in the case, meaning in the investigations, in the investigative part of the case.

A    Talking about back in '98?

Q    Back in -- no -- 2010.

A    I don't recall if Eric played any role in that. I really don't.

Q    So let's look at the second paragraph there. Excuse me.  The third paragraph from the top down.

A    Starting with 8-30-2018?

Q    Yes, sir.

A    Okay.

Q    You see it says, "Commander Paulson further explained"?

A    Yeah, I see that.

Q    Okay.  So do you have any independent knowledge of this check being issued to Mr. Gonzales on December 5th, 2002, for his testimony in the prosecution for the murder of Mr. Ruben Leal?

A    Again, the source of my information was what Dave Rondou told me.  And it's my recollection that it was years later.

Q    What were the circumstances of him telling you about this check?

A    I've given that thought.  I don't remember.  I

02:19:26  don't even remember how it came up.  But I remember --
well, I don't remember how it came up.

Q   Did he tell you -- did he give you any
indication why he would be involved in giving that check
02:19:40  out?  Did he say to you that he was involved, because i
says over here, "case agent"?  I'm assuming they're
referring to Detective Rondou, that he cooperated with
case agent, being Mr. Gonzales.  Did he tell you that he
knew about the check in December of 2012?

02:19:58  A   Where is that "case agent"?

Q   It says on the last paragraph, it says,
"cooperated with the case agent."

A   Oh, I see what you're saying.  Okay.  So I'm
sorry.  What was your question, sir?

02:20:13  Q   My question was -- I don't know what my
question was.  We should probably read it back.  No.

But so did Detective Rondou tell you that the
check -- if you recall, when he first brought up the
issue years ago or years after the sentencing that about
02:20:35  this check, did he tell you why the check was issued?

A   I don't recall.  I just don't recall if he told
me.  I know what's been talked about, because the AG
directed me to read Dave's statement.  So I know what he
said.  But I don't recall.

02:20:57  As I think back on that meeting when I found

out about -- the first time I found out about the payment, I don't recall if Dave told me why.

Q    Okay.  You can give that -- that would be Petitioner's Exhibit Number 3.

(Whereupon, Exhibit 3 was marked for identification and attached hereto.)

BY MR. FARMANI:

Q    So you just mentioned right now you've read the investigative report for the -- that was done of the interview with Detective Rondou; correct?

A    Yeah.  I read the summary that was authored, I believe, by Attorney General --

Q    Just to refresh your recollection, sir, this right here (indicating).  Now, you see on there that Detective Rondou is talking about that he made this check out for burial services; correct?

A    I did read that.

Q    Now, is that at all consistent with any recollection you have with respect to talking when Detective Rondou brought up the issue about the payment to Gonzales?

A    Again, I just don't recall.  I do not recall him giving me a reason as to why funds were disbursed.

Q    Okay.  And it doesn't ring a bell, the burial, for him to pay for funeral expenses?

A    Does this refresh my recollection?  No.

Q    Okay.  You can give that.  That would be Petitioner's Exhibit Number 4, please.

(Whereupon, Exhibit 4 was marked for identification and attached hereto.)

///

BY MR. FARMANI:

Q    When did you become aware of Brian -- well, before we get to that, Mr. Geller, I just want to -- for the record, I just want to have you take a look at this please.

This would be the order from the Nevada Supreme Court that was in 2002 -- pardon me -- 2004 referencing Gonzalez's participation as a jailhouse informant.  Have you seen that document before, sir?

A    I don't think so.  Do you want me to read it?

Q    No.  I just want you to take a look at it.  You have never seen it before?

A    I don't believe so.

Q    None of these were ever presented to you by th Attorney General's Office or anybody --

A    You mean --

Q    -- as far as -- no?

A    No, not to my recollection.

Q    Thank you, sir.  I appreciate it.  Have you ha

a chance to review Craig Gonzalez's declarations that were filed in this matter?

A    Yeah.  I read two, I believe.

Q    Okay.

A    Yeah.

Q    Now, I'm going to have you take a look at the second one, which was the supplemental declaration, please.  And you can take a look at it.

A    Okay.  You can ask me the question.

Q    Sure.  Now, did you ever talk to any of the District Attorneys -- anyone from the District Attorney Nevada?

A    No.

Q    No one at all?

A    Not to my recollection, no.

Q    So you're saying what Mr. Gonzales is saying here is inaccurate?

A    Well, I mean --

Q    The part about "the District Attorney told me that he has been in contact and spoken with the Distric Attorney Nevada about my testimony as an informant."

A    Yeah, that's an inaccurate statement.

Q    You never talked to him about that at all?

A    My recollection, no, I never spoke with any District Attorney in the state of Nevada about

Mr. Gonzales.

Q    If you knew that Mr. Gonzales had been an involved informant in Nevada, for instance, would you have talked to the District Attorney then if you knew?

A    If I found -- like if I found out post verdict or --

Q    No.  If you found out at the time that you were prosecuting this matter --

A    Okay.

Q    -- the Ramon Alvarez matter, if you found out that Craig Gonzales had been an informant in another matter, would you have spoken to the D.A. on that case?

A    The D.A. handling like the case that he was getting consideration on or something like that?

Q    Yes, sir.

A    Probably not.

Q    Probably not?

A    Yeah.

Q    You don't think it would be good practice -- I mean I'm just asking you --

A    I understand.

Q    You don't think it would be good practice for you to investigate the credibility of Mr. Gonzales?

MR. BARNETT:  Objection.  That assumes that that task would accomplish what you suggest, that is

that calling a D.A. on another case would be required o

even important in determining the credibility in this

case of the witness.

MR. FARMANI:  Sure.

Q     Let me ask you -- well, I thought we already

talked about it.  But I'll go over it, through it again.

You would consider Mr. Gonzales to be an important

witness in this case, correct, in the case of People

versus Ramon Alvarez?

A     Yeah.  It was only because Mr. Gonzales agreed

to testify that we were able to go forward on the case.

Q     Correct.  That's my understanding, as well.  So

it would be important -- his credibility in front of the

jury would be important?

A     Yes.

Q     And you would -- if he had informed in another

case, it would be important for you to know about it to

determine whether or not he was a credible informant or

some guy who just goes around and, you know, makes up

stuff?

A     If I had known about that, sure.

Q     Okay.  So if you had known about him being an

informant in another case, you would want to investigate

it?

A     I would want the information, sure.  And if it

was pretrial, I would be disclosing that to the defense absolutely.

Q    And then would that be something if Mr. Rondou or Detective Rondou had done, would that be something that you would want him to disclose to you?

A    If Rondou had known that Gonzales had testified in a different jurisdiction?

Q    Yes.

A    Yeah.

Q    You would want him to talk to you about it?

A    Of course.

Q    Now, you would agree with me that the Orange County District Attorney's Office and the officers who are working for the Orange County District Attorney's Office --

A    The investigators?

Q    The investigators and the police department for that matter.

A    Well, they don't work for us.

Q    Well, let me ask you this, though:  When you'r working on a case --

A    Yes.

Q    -- okay -- do you expect if an officer, if any officer in the Santa Ana Police Department had information, would you expect that officer to disclose

that information related to your case?

MR. RUSSELL:  I'm going to object to the form of the question.

THE WITNESS:  Maybe ask a more pointed question.

BY MR. FARMANI:

Q   Sure.  If anyone that was prosecuting this matter or associated with the prosecution of this matter, including the Santa Ana Police Department --

A   You're talking about the matter we're talking about now?

Q   Correct.

A   Okay.

Q   The Ramon Alvarez matter.

A   Okay.

Q   People versus Ramon Alvarez.

A   Okay.

Q   If they had information, okay, would you expect them to disclose that information to you?

A   What kind of information?

MR. BARNETT:  And I don't want to interrupt you.  But if it was relevant information --

MR. FARMANI:  Right.  Information related to the case, yes.

THE WITNESS:  Yeah, I would want to know

everything about my case.

BY MR. FARMANI:

Q    You would want to know everything?

A    Yes.

Q    Now, when -- I mean, this goes back to what I asked you earlier, which is if you want to know everything about your case, which I would expect a D.A. to want to know everything about his case or her case, what reaction did you have when Detective Rondou tells you about this check all of a sudden?

A    I was annoyed.

Q    So you were upset about it probably?

A    Not probably.  Yes.

Q    Did you -- you didn't do anything about it?

A    What do you mean did I do anything about it?

Q    Did you go to an authority and say, "hey," you know, to someone higher up perhaps in the office and say, "Look, there's a check out to a witness on a case"?

A    No.  There was nothing I could do.  They already made the payment years earlier.  What am I supposed to do at that point in time?

And the reason I was upset is because, you know, he didn't deserve it.  I mean, you know, this guy was a -- this guy is a scumbag.  He's a career criminal, you know.  I mean why are we giving him money?  He said

-- you know, I mean that's it.

Q    I want to know, too, probably.

Let's see.  Mr. Barnett, by the way, if you ever want to take a break, go off the record, that's fine, too.

MR. BARNETT:  Thanks.

MR. FARMANI:  Just let us know.

MR. BARNETT:  Okay.

MR. FARMANI:  Pardon me one second, Mr. Geller.

THE WITNESS:  Yeah.  I can't go anywhere.

BY MR. FARMANI:

Q    You don't know -- do you know any District Attorney by the name of Rebecca Carol Druckman?  Rebecca Carol Druckman.  Druckman, that's D-r-u-c-k-m-a-n.

A    I never heard of that name.  What D.A.'s Office?

Q    This would be in Nevada.

A    No.

Q    Reno.

A    Don't know the name.

Q    But they're also admitted here.  How about Robert Bruce?

A    No.

Q    Deputy District Attorney Robert Bruce?

A    No.

02:30:18

Q    So let's go back to Brian Ruorock for a moment Ruorock.  When did you become aware of Ruorock's activities with Ramon Alvarez?  Meaning activities -- let me make it more clear to you.  So we have evidence obviously that was later disclosed that Ruorock tried t obtain incriminating information from Mr. Alvarez while he was being held in county jail for this offense, prosecuted.

You said you found out about that when you read the materials in Scott Sanders' brief?  Is that what that was?

A    In the Dekraai motion, correct.

Q    In the Dekraai motion.  And when you found out about that, you know, were you surprised?

A    When I read it in his brief?

Q    Right.

A    Well, I mean, there was -- was I -- what do you mean by surprised?

Q    Well, was that the first time you ever found out about something like that?

A    First time I ever heard the guy's name.  I mean I wasn't part of the Dekraai case.  I never even heard Ruorock.  And then all of a sudden it's being alleged in his brief that, you know, I knew him, you know, yeah.

Q    If you knew at the time of the trial -- and

we're going to go back to the trial, the time period that we specified, July of 2010 up until, you know, sentencing, September 28, the -- September 28, 2012 -- if you knew about Ruorock's activities, trying to get incriminating statements and, in fact, getting some statements from Mr. Alvarez on the matter that you were prosecuting, would you have expected that to be disclosed?  Would you have disclosed that to the defense?

A    If I was given a statement obtained by a jailhouse informant --

Q    Right.

A    -- against the guy that I was going to trial on?

Q    Right.

A    Yeah.

Q    And you would have disclosed it?

A    Yes.

Q    So you're saying all these activities, just so I understand this clearly for the record, the activitie going on with Craig Gonzales, it being the memo that was issued -- and this would be Petitioner Exhibit Number 4 or Number 5, I should say.  I apologize.  This would be the October memo that was sent out October 22nd, I believe it was, 2010, where they're talking about --

where they're responding to the discovery request.

A    Right.

Q    Right.  You said you weren't involved in that?

MR. BARNETT:  He didn't say that.

THE WITNESS:  The memo?

MR. BARNETT:  No.  He said, "I don't recall it."  He doesn't recall the memo itself.  He didn't say he wasn't involved in it, an investigator --

MR. FARMANI:  Right.

MR. BARNETT:  -- from his office.  So I mean - and I don't want to nitpick.  He didn't say he wasn't involved in it.  He said, "I don't recall this memo."

BY MR. FARMANI:

Q    But, just so I understand the chain of command, if a discovery request would come to you, you would delegate it over to your investigator?

A    Of course.  I mean or sometimes if I could handle it -- if it was easy and I could handle it myself, I would do it myself.

Q    You would ask him, "go ahead and take a look a this"; right?

A    Sure.

Q    "And respond to it"?

A    That's my habit and custom, yeah.

Q    And you would expect an investigator to look a

everything, to look at all the resources available to you to respond to the information; correct?

A    I would expect them to do their job, yes.

Q    And you would agree with me if something like this, "this" being Ruorock's attempts to get informatio from Mr. Alvarez, that that's something that should have been disclosed if you knew about it?

A    If I had knowledge of this before trial?

Q    Right.

A    Of course, yes.

Q    What about you not having independent knowledge, but your people who were working with you or for you such as your investigator?

A    If it's part of the prosecution team?

Q    Right.

A    Well, I mean we all know what Brady stands for.

Q    Right.

A    I mean, you know.  But I can't -- yeah, it could be used against the case.  But I mean I can't -- if I never know about it, what am I supposed to do?

Q    Right.  Well, let me you ask this, though: when you found out about this one when you were reading the --

A    Ruorock?

Q    -- the motions, the Ruorock --

A    Yes.

Q    -- what did you do then --

A    Nothing.

Q    -- if anything?

A    Nothing.  I mean I wrote a -- again, I --

MR. BARNETT:  That assumes that he understood that the allegations made in the brief were accurate. And so I don't think that when you say, what did you do about this, what did you do about the allegation or what did you do, did you assume that it was true --

MR. FARMANI:  Right.  Let me present it to him.

Q    Go ahead.  Let me hand you this.  These are the handwritten notes by -- these were produced in discovery by the D.A.'s Office.

A    Who was the author of these handwritten notes?

Q    Ruorock.

A    Oh, okay.

Q    Yeah.

A    I have never seen this before.

Q    You have never seen those?

A    No.

Q    Okay.  Well, let me have you take a look at Number 37.  You see Bates stamp 37 there?

A    Sure.  Yes.

Q    It says on there, "Found a similar type rifle

at the house and they were thinking it could be the murder weapon on Paya's case."

A    Where are you looking?

Q    At the last four lines.

A    Okay.

Q    Now, we have a statement from Mr. Alvarez apparently, don't we, according at least to Ruorock?

A    That's what I'm reading, yes.

Q    Okay.  And that would be something that should have been disclosed to the defense, according to Brady and California law, California law being 1054, Penal Code 1054; right?

A    I mean it's a statement of the defendant.

Q    Right.  So and this was -- just so you know for time purposes, this would have been December of 2010 that this statement was taken from -- that Ruorock wrote this, Brian Ruorock.

A    Okay.

Q    So this would have been -- now, you don't know anything about this at all?

A    No.  Like I said, this is the first time I've ever seen this document.  And, again, my -- well, yes.

        MR. BARNETT:  Just answer the question, please.

BY MR. FARMANI:

Q    So this in that same letter if you look in tha

02:37:00

same page it's talking about how they want to wire him, wire his cell, Alvarez's case -- Alvarez's cell.

A    On that same page?  Tell me where you want me to look.

02:37:15

Q    I'm going to tell you right now.  I apologize. I had it here, but -- it talks about -- hold on one second for me, please.  I want to see where he's talking about something here.

Now, while I'm looking for this, just so the

02:38:13

record is clear, you didn't even know about the Defendant's statement in that report there?  You also didn't know about the check, the check that was issued December 5th, 2012; correct?

A    At the time it was --

02:38:26

Q    Right.

A    Yeah.  I already answered that.

Q    And then -- I just want to make sure for the record.

A    Sure.

02:38:31

Q    You, also, didn't know about Mr. Gonzalez's prior informant work in Nevada?

A    Yeah.

Q    Before trial?

A    Yeah.

02:38:41

Q    Before jury trial?

02:38:42

A    Yeah.

Q    You didn't know that?

A    Correct.

Q    Okay.  So do you know Larsen, Detective Larsen?

02:39:18

A    Larsen?

Q    Yes.

A    No.  What agency does he work for?

Q    For the Santa Ana Police Department.

A    No, I don't know a Larsen.

02:39:32

Q    Okay.  The reason I ask, if you look at page 38 -- and I apologize for taking your time -- it says on there, the first one, it says, ten, it says, "Paya is very cautious."

Now, for the record, do you know who Paya is?

02:39:47

A    I think his name was Payaso.

Q    Payaso, yeah.  That's it.  That would be Ramon Alvarez's nickname; right?

A    Moniker, right.

Q    Do you see that he's talking about mic'ing him

02:40:04

up?

A    Uh-huh.  Yes.

Q    Okay.  You would expect someone, if they want to do, they would ask you, correct, if you are the D.A. On the case?  If you are the lead D.A. on the case, if

02:40:19

they are going to mic a cell up to get information,

02:40:24

would you expect that information to be disclosed or shared with you?

A    Yeah, of course.

Q    So when you get involved in a case, my

02:40:34

understanding -- I could be wrong, you know, just from watching stuff.  The D.A. is usually involved, at least from the Federal side, the U.S. Attorney's Office is involved from the very getgo even with respect to getting a warrant?

02:40:47

Is that your understanding, as well?  With you duties as a D.A. on the case where you were involved, were you authorizing warrants, getting statements in support of a search warrant, affidavit?

A    Well, if the cops present a search warrant or,

02:40:57

you know, if I'm reading something and we're thinking about filing it, I may suggest they go get a warrant or something like that.  And then I'll review the warrant.  And if the judge signs it, great.  And, you know, I don't authorize warrants.

02:41:14

Q    And now you may have answered this question, but I probably don't have it in my mind.  You said that -- do you ever conduct interviews with witnesses?

A    No.

Q    You never do that at all?

02:41:28

A    No.

THE SULLIVAN GROUP OF COURT REPORTERS

79

Q    Now, did you know -- do you know a case People versus Guzman, Eduardo Guzman?

A    Sounds familiar.  But can you give me some facts?

Q    Sure.  This was a murder case where --

A    Was I the trial lawyer?

Q    Yes, where it involved Detective Rondou and you on the case.  And Detective Rondou was asking the jail staffers to go ahead and put -- plant an informant in the cell --

A    Okay.

Q    -- to get information.

A    Give me Guzman's factual scenario, if you know it.

Q    Well, I know -- I know that the -- that in Guzman, for example, do you know Efren Macarro?

A    That name doesn't sound familiar.

Q    Now, Efren Macarro, just so you know as a background, was an informant in that case.  And he testified that Rondou, Detective Rondou directed him to get information from the defendant, the defendant being Eduardo Guzman.  This was a murder trial.

A    Efren Macarro testified and I was the D.A. that put on Efren Macarro?

Q    You were the D.A.  Do you know Efren Macarro?

A    No.  That's why I am surprised.  The name doesn't even sound familiar.

Now, Guzman -- but, again, you know, it's a common Hispanic surname.  So I don't know -- are you confident that I was the trial lawyer on that?

Q    I'm pretty confident.

A    All right.  I'll take your word for it.  I did a lot of murder trials back then.

Q    That's right.

A    I'll stop volunteering.  Sorry.

MR. FARMANI:  I'm going to take a break.

If you have any questions, Mr. Russell, you can ask questions.  And then I'll be back.

THE VIDEOGRAPHER:  If you do, can you guys maybe switch and you can sit here and use the microphone?  I don't think the microphone reaches him.

MR. FARMANI:  It reaches him.

MR. RUSSELL:  I just have a few, just for my own edification.

EXAMINATION

BY MR. RUSSELL:

Q    Is your District Attorney's Office in the same building as the courtroom where you did the preliminary hearing on the Ramon Alvarez case?

A    No.  At that time my office probably was in what we call the 401 building, which is, you know, a couple of blocks away from the courthouse.

Q    I guess where I'm going with this, is it at all unusual to have a testifying informant come to the District Attorney's Office before the hearing?

MR. BARNETT:  Can I just clarify that?  The D.A.'s Office has offices in the building where the preliminary examination would have occurred. Mr. Geller's office wasn't there.  But they have an office on the same floor that the preliminary examination would have been held.

And so I don't want there to be a miscommunication.  The --

MR. RUSSELL:  Me neither.  Thanks.

MR. BARNETT:  So Mr. Geller's office was in the 401 building.  But the D.A.'s Office and the people who are putting preliminary examinations on in that building have a floor of offices on the same floor where the preliminary examination would have been.

BY MR. RUSSELL:

Q    This may be a better way to ask it:  Is that conference room where you met briefly with Craig Gonzales in the same building where the hearing would have been held?

A    Yes.

Q    Other than that brief meeting, were you ever present during any other meetings between Detective Rondou and Craig Gonzales?

A    May have had that same brief meeting right before I put him on at the jury trial like, "Hey, thanks again for coming down and tell the truth."

MR. RUSSELL:  You know, that's all I'm going to have for now.  I may have a few more at the end.  But that's just the one thing I wanted to clarify for now.

THE WITNESS:  Sure.

MR. FARMANI:  Do you have any questions?

MR. BARNETT:  No.

MR. FARMANI:  You know --

MR. BARNETT:  Thanks for asking.

FURTHER EXAMINATION

BY MR. FARMANI:

Q    The one thing I wanted to clarify for myself -- forgive me, you know.  Just trying to figure this out for myself.  With respect to the -- and, you know, we have the statement from Detective Rondou saying that the check was authorized, a check that was issued to Mr. Gonzales was authorized from the Orange County District Attorney's Office.

THE SULLIVAN GROUP OF COURT REPORTERS

83

172

Let's assume for a moment that to be the case. Okay. If that, in fact, was the case, how would that go in the chain of command, if you know?

A    I don't know. I --

MR. BARNETT: He doesn't know.

And please don't speculate. And I'm sure that counsel isn't asking you to speculate since you didn't know about it.

MR. FARMANI: Yeah.

MR. BARNETT: And so --

MR. FARMANI: If he didn't know about it, that's fine.

Q    I guess what I'm wondering is, if the Orange County District Attorney's Office has authorized a payment, has that ever in your experience happened, the have authorized a payment to a witness?

A    I don't know.

Q    When you are a prosecutor on a case --

A    Yes.

Q    -- has there ever been an instance where as a prosecuting attorney a witness from that prosecution -- from that prosecution that you were the main prosecutor has been offered any money or given any money?

A    In exchange for their testimony?

Q    In exchange for their testimony or for their

02:47:46    various services or whatever.

MR. BARNETT:  Well, hold on.  It's compound.
If the question -- he can answer the question is he
aware of any case that he was involved with or any case
02:48:00    where a witness was given money to testify, that's one
thing.  That's one part of the question you asked.

The other part is was he subsequently aware
that somebody made the decision to give the informant in
this case money for burial services.

02:48:20    So that's a long objection to a compound
question.  And I just want clarification so that --

MR. FARMANI:  Sure.  Absolutely.

MR. BARNETT:  -- Mr. Geller can answer whether
or not -- can answer accurately whether he's aware of
02:48:37    witnesses being given money.

BY MR. FARMANI:

Q    Well, let me ask you:  Has in your experience
being a District Attorney has there been a case where a
witness was given money for any reason, was given a
02:48:58    check?

A    Any case in the 23 years that I've been a
D.A. --

Q    Yes.

A    -- that I know that somebody got a check other
02:49:04    than obviously this one here where --

Q    Other than this one.  Other than this one.

A    Nothing is coming to mind.

Q    If they were to do that --

A    If who were to --

Q    If they were to write a check --

A    Who?  The D.A.'s Office?

Q    Right, the District Attorney's Office.  Not the District Attorney writing a check, but the District Attorney authorizing.

We're assuming what Detective Rondou is saying is true.  He's saying that that check was authorized, according to the investigative report, that check was authorized by the Orange County District Attorney.

A    I read that in the statement, yeah.

Q    We assume that to be true for a moment.  If that's the case, if the Orange County -- how does that happen, if you know?  How does it happen?

A    I don't know.

Q    You don't know?

A    I don't know.

Q    So -- okay.  So you've never been -- I assume say part of that question would be you've never been consulted before, "Hey, we're going to go ahead and write a check to somebody, you know, what do you think," if you were the prosecuting attorney on the case?

A     No, with the exception of like victim witness.

Q     Right.

A     Victim witnesses, you know, they're different people.

Q     Right.

A     And they -- people get money from victim witness like for relocation or, you know, things of that nature.

Q     When --

A     And I've been made aware of that, you know.

Q     Why would you become aware of that?  Why?  Like how would they -- how would that -- why is that even --

A     Probably the advocate, you know, the gang victim advocate would have said something to me.  You know, I mean, I don't know.  I mean, again, I don't authorize it.  I don't say, "Hey, yeah, go ahead and pay them."

Q     Right.  But the -- I guess the question I have is, if it's something what you just mentioned and they would come and ask you, at least talk to you about it; correct?

A     No, I don't think they -- no.  It's not like I authorize it or anything like that.  I don't have that power.

Q     No one said you authorize it.  The question is

the Victim's Fund account that you talked about, the victim --

MR. BARNETT: I'm sorry. I just want there to be clarification. What Mr. Geller was talking about in terms of victim witness, that's a separate entity. And what he spoke about before, which was a We Tip Fund that apparently Santa Ana P.D., they're not the same. And so I just want to make sure --

MR. FARMANI: Absolutely.

MR. BARNETT: -- that when he's talking about one fund or another, one which is Victim Witness, Crime Victims or that they are relocated, that's one thing. And this We Tip program is another.

I just want to make sure that you're talking about the same thing. Because if the question is, is h aware that a witness was relocated and that's money and somebody told him that, that's one thing. I'm not sure that that gets to the -- that that's the question that you're asking.

BY MR. FARMANI:

Q   Well, the Homicide Reward Fund Account, is that the same thing as when we were talking about the Victim?

A   No.

Q   They're two different things?

A   The Homicide, that was run by Santa Ana either

City or P.D.

I'm talking about, I think it's -- I think it's CSP.  I don't even know what that stands for.  We have -- there are victim witness advocates that are separately -- a separate company entirely.  I don't kno where their funding is.

Q    Okay.

A    It might be State funding.  I don't know.

Q    And then they talk to you about that?

A    Do the victim witness folks?

Q    Yes.  When they are about to issue a check to somebody.

A    Again, I don't know if they -- I don't believe they issue checks.  I think they reimburse for like --

MR. BARNETT:  Can I maybe --

MR. FARMANI:  Sure.

MR. BARNETT:  Because there are -- in almost every single plea or sentencing there is a check that's issued to victims or others which the defendant must pay into.

And that's -- that is to -- checks are made to victim witness.  And uniformly the District Attorney and the defense lawyers and the Court are made aware.  And sometimes the prosecutors say call victim witness or victim witness -- so I don't want there to be confusion

because Mr. Geller gets exposed to these items which ar

daily events in terms of monies being cut to victims or

to others which are paid.

I'm not -- and I don't mean to be presumptuous

about the question you're asking.  But he's answering a

question about the general question about dispersals.

And I am not sure that that is what you're

asking him about, which is whether witnesses on his case

or he's aware of witnesses prior to testifying being

given money for the testimony.

And, see, I sense some confusion over that,

because there is money paid.  And he would be aware of

that.  But I don't think that that's really the question

that you're asking.  I could be wrong.

BY MR. FARMANI:

Q    The question I'm asking is, according to
Detective Rondou, this check was authorized by the
Orange County District Attorney's Office.

A    Like I said, I read that, yeah.

Q    And the question I have is, and I think it's a
fairly valid question, which is, if you assume that to
be true for a moment, would the Orange County District
Attorney's Office consult with you before issuing that
check?

A    I can't even assume it's true.  And no -- I

mean --

MR. BARNETT:  I mean he can't speculate about that.  And I don't know what Rondou meant when he said "authorized."

Does that mean they okayed it, they okayed it afterwards or they did it before?  He doesn't -- "he," Mr. Geller didn't know about it, doesn't know about the authorization and can't speak to what would have happened if what Rondou said is accurate.

MR. FARMANI:  Right.

MR. BARNETT:  So he doesn't know.

BY MR. FARMANI:

Q    Okay.  And then same question, let me ask you with respect to the Santa Ana Police Department.  Okay?

A    Okay.

Q    The Santa Ana Police Department authorizes a check to a witness on your case.  Okay?  They approve and authorize it and the check is issued.

A    You're talking about this case again?

Q    This case.  Any case.  But this case in particular we're talking about.

A    Sure.

Q    Do they consult you with it?  Do you have any -- do they ever talk to you about it?

A    I never was talked to about any disbursement

from Santa Ana, you know, to a witness on my case.

Q    Okay.

A    Not that I recall.

Q    Okay.

MR. BARNETT:  With the exception of learning two years or years later.

///

BY MR. FARMANI:

Q    We're talking about now if you had known about that, if you had known that they were going to authoriz payment to Mr. Gonzales, okay --

A    Yes.

Q    -- what would you have done?

MR. BARNETT:  You mean at --

BY MR. FARMANI:

Q    And I'm just talking at the trial at the time.

MR. RUSSELL:  I'm going to object to the form of the question.

MR. FARMANI:  Do you want me to put a timeframe on it, Mr. Barnett?  I would be happy to do that.

MR. BARNETT:  That's right.

MR. FARMANI:  Absolutely, sir.

Q    And your understanding of the California system, okay, the Court of Appeal and the Trial Court, do you have any understanding of the Court of Appeal

system?

      MR. BARNETT:  I don't know what you mean.

BY MR. FARMANI:

    Q   Well, do you have -- is it your understanding that when a case -- after sentencing, the case is over?

    A   The case at my level is over.  I know every felony gets appealed, yeah.

    Q   Okay.  Well, if a case gets appealed --

    A   Yes.

    Q   -- is it your understanding that under California law that the case is not final unless it's confirmed or is affirmed by the California Supreme Court or if denied on a petition for review?  Is that your understanding or no?  I just want to know.

      The finality of the case, I'll give you an example.

    A   Sure.

    Q   In Federal Court a District judge's order is final.  It's final.  It doesn't matter if it's appealed.

    A   Like at sentencing you're saying?

    Q   Anything.

    A   Okay.

    Q   If -- the issuing order of the District judge is final.  If you appeal it, you have to stay the order. The order automatically gets stayed.

A    Okay.

Q    Okay.  In State court in California in particular it's different.  In California if you have a judgment, that judgment is not final until it goes through the appellate system.

A    I'll take your word for it.  I don't --

Q    Let's assume that for the moment to be true.  Okay?  Did you have any -- I just want to ask you about this particular case.

A    Okay.

Q    When the case was done and sentencing -- after sentencing, after a motion for a new trial gets denied and the case is done, your involvement in the case for all practical purposes was over?

A    Yes.

Q    So if you had information that came to light after that sentencing, you would consider yourself having no obligation to turn it over to the defense?

A    Well, no.  My obligation --

MR. BARNETT:  Objection, because it's vague.  It depends on what the information is and what obligation you're talking about.

MR. FARMANI:  Right.  I was going to refer to the information.  The information being the check.

MR. BARNETT:  And I think that it -- that

THE SULLIVAN GROUP OF COURT REPORTERS

94

what's the -- it's still vague. Because if the questio is if you found out two years later while the case is on appeal that a check was given to a witness and was told that he wasn't promised anything and that this was for burial or something like that, in other words, that the witness was not given that money or was promised that money prior to trial, but this was a post verdict decision, that's one set of circumstances on what would you do.

And it's different if you were told or had information that the witness was paid money or promised money before he testified as opposed to being told he was given money afterwards and was not promised that before.

So I think it's important to clarify when he's being asked the question what would you do if and what do you think your responsibilities are if, because it's different.

If he's told post facto the We Tip community gave a compassionate amount because this guy is dying and it didn't have anything to do with his testimony versus being told, we paid him because we promised to pay him.

BY MR. FARMANI:

Q    The -- at trial you were very clear about

making sure that Mr. Gonzales had received nothing for his work?

A    Yes.

Q    And you believe that to be true?

A    Yes.

Q    There was nothing indicating that he was being paid for anything, nothing of that sort whatsoever?

A    Nothing.

Q    And if you had known about it, you would have mentioned something?

A    Of course.

MR. FARMANI:  Do you have any questions?

MR. RUSSELL:  (Shakes head.)

MR. FARMANI:  I don't want to have come back here as much as I like coming back here.

MR. RUSSELL:  Do you need to take a break for a minute?

MR. FARMANI:  Sure.

MR. BARNETT:  How much time do you need?

MR. FARMANI:  Five-minute break.

MR. BARNETT:  Sure.

THE VIDEOGRAPHER:  We're now going off the record.  The time is 2:59 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We're now going back on the

record.  The time is 3:22 p.m.

MR. FARMANI:  Thank you.

I wanted to thank you for your cooperation for coming out here.  We really appreciate it.  I know you were in the middle of a trial.  And I want to thank you attorney for hosting this.  We really appreciate it.

I wanted to just go ahead and mark some exhibits, you know.  You had a chance to take a look at this.

First, for the record, we're going to go ahead and mark as an exhibit to the deposition the records that were produced by the District Attorney's Office in response to the Subpoena.

One of those records -- part of those records which is in that envelope, that is a sealed record that won't be disclosed for the time being until the parties have had an opportunity to look at it and sort out any part that can't be disclosed.

The next item that we have would be Petitioner's Exhibit Number 6.  And this would be the notes by Brian Ruorock.

(Whereupon, Exhibit 6 was marked for

identification and attached hereto.)

MR. FARMANI:  So the other ones that we reference would be Exhibit Number 7.  This would be the

discovery requests from defense counsel to the District Attorney's Office.

(Whereupon, Exhibit 7 was marked for identification and attached hereto.)

MR. FARMANI:  For the record, one would be dated September 9th, 2010, discovery request, and the other one, October 22nd, 2010.  This will be one Exhibit, Petitioner Exhibit Number 8, correct, or 7?

THE REPORTER:  This one is 7.

MR. FARMANI:  Seven?

THE REPORTER:  Seven.  Wait.  Is this 6, the sealed one 6?

MR. FARMANI:  Well, this wouldn't be a Petitioner's exhibit.  I thought it would just be an exhibit to the deposition.  I thought this would be -- you could put it as a Petitioner's exhibit.  It really doesn't make much of a difference.

THE REPORTER:  It doesn't need to be numbered?

MR. FARMANI:  Pardon me?

THE REPORTER:  No number for it?

MR. FARMANI:  Yeah, you can put a number on it, you know, or you can put just the 00 or 10.  I mean it doesn't really matter at this point, to be honest with you.  It won't matter.

Can I see that for a moment?  You got the

check.  You got everything.  You got the investigator's report.

Q    Do you recognize Mr. Gonzalez's signature on there?

A    No.

MR. FARMANI:  I think we've covered everything here.  The declarations are already part of the record.  So those are all part of the -- most of everything we have is part of the record.

MR. RUSSELL:  Tony, one stipulation I propose with respect to those Rap Sheets, I'm just concerned about some third-party privacy issues that might be reflected in those.  Can we reach a stipulation that if we are going to look at them, we agree to do it at the same time and that nothing is disclosed until we both have a chance to do that at a mutually agreed time simultaneously so that way we're maintaining that --

MR. FARMANI:  So stipulated.  Absolutely.

MR. RUSSELL:  All right.

BY MR. FARMANI:

Q    Now, Mr. Geller, I'm just going to go over some final remarks here just to make sure that we've covered everything.  And then we'll do a final stipulation.

You've understood all the questions that I asked to the extent that you responded to them; right?

THE SULLIVAN GROUP OF COURT REPORTERS

99

188

03:28:27

A    Yeah, other than the ones I asked you to clarify.

Q    Right.  And then you answered them truthfully, obviously?

03:28:33

A    Yes.

Q    Is there anything that you want to change, anything you want to add to the answers you've given?

A    No.

Q    None.  Okay.  So now you're going to have an

03:28:44

opportunity to take a look at this deposition transcrip after it's done -- I don't know if you know about -- but to make changes and whatnot to it.  But those changes, if you do make them, they can be commented on at a subsequent proceeding or a hearing.

03:29:03

You know, I don't have any other questions for him, for Mr. Geller.  If you don't have any questions, we can end it at this point.

MR. RUSSELL:  I don't have any.

MR. BARNETT:  What do you wish us to do with

03:29:19

the documents that were provided by Mr. Burnett?

MR. RUSSELL:  Are you talking about the disks?

MR. BARNETT:  I'm talking about the disks.

MR. FARMANI:  They're going to be part of the

-- oh, the additional disks?  Oh, these you're talking

03:29:30

about?  I apologize.  These are the witness interviews.

MR. BARNETT:  Well --

MR. RUSSELL:  I guess the case file.

MR. BARNETT:  These items in this stack one is the list of e-mails, which -- a disk of e-mails in the D.A.'s Office.  There is a series of disks which are th D.A.'s file.  There is the memo, which is dated January 11th, which identifies what was provided.  And then there is --

MR. FARMANI:  The e-mails.

MR. BARNETT:  -- the e-mails which are not Bates stamped.

So that is this pile.  Okay?

MR. FARMANI:  Okay.  Gotcha.

MR. BARNETT:  Now, I have -- I'm giving each, Mr. Russell and you --

MR. FARMANI:  Yes.

MR. BARNETT:  -- these are what I believe to be copies of the disks which are the D.A.'s file.  They do not include the e-mails, which I'm giving you --

MR. FARMANI:  Paper format.

MR. BARNETT:  No.  The e-mails are in paper form here without Bates stamps.

MR. FARMANI:  Yes, sir.

MR. BARNETT:  I requested -- you'll see in the e-mails I requested that they Bates stamp them.

MR. FARMANI:  Right.

MR. BARNETT:  So in the second CD it's listed AG e-mails.  And so that is the e-mails that are Bates stamped.

And I'll give each of you a copy of that disk.

MR. FARMANI:  Okay.

MR. RUSSELL:  Thank you.

MR. BARNETT:  But the -- I don't want to say the originals, but what were provided by Mr. Burnett is this stack of items which you can designate however you wish to designate them.

MR. FARMANI:  Why don't we make that part of the exhibits then.  She takes it and makes it part of the record.

MR. BARNETT:  However you want to do it.

MR. FARMANI:  Are you okay with that?  We have a copy of it.

MR. RUSSELL:  Let me take a look at the memo.

MR. FARMANI:  Yeah.

MR. RUSSELL:  Okay.

MR. FARMANI:  Just for consistency purposes, why don't we make this and that, that whole thing, okay, with the understanding this is sealed, as the next one in Petitioner's exhibits.  This whole thing right here, I'm going to mark it like that.

03:32:27

Do we need to do any concluding stipulations? We're done.

THE REPORTER: A regular deposition, sign under penalty of perjury, do you do that?

03:32:49

MR. FARMANI: Do I? Do I sign it?

THE REPORTER: Do you say, he signs under penalty of perjury and relieve me of my duties? Do you do that? I don't know.

MR. FARMANI: Well --

03:32:49

MR. BARNETT: That's what the civil lawyers --

MR. FARMANI: Right.

MR. BARNETT: That's what the civil lawyers do. But we're not doing that.

THE REPORTER: Okay.

03:32:54

MR. FARMANI: Well, he's going to -- he's goin to have a chance -- I think his attorney would want him to look at the transcript to make any changes. Is that correct, Mr. Barnett?

MR. BARNETT: Well, I believe that the parties

03:33:08

will either stipulate or not stipulate to use of the original or not.

You know, it will be submitted to Mr. Geller, I assume, to review it. And he can sign it --

MR. FARMANI: Right.

03:33:33

MR. BARNETT: -- and make corrections.

MR. FARMANI:  Right.  Right.  That's basically -- sometimes they don't do that.  Sometimes, you know, they just say, we don't want to do that.  But that's something you want to do; correct?

MR. BARNETT:  Well, I don't want to do anything.  If somebody -- I'm not -- I'm just saying that you guys agree to whatever you agree to.  And I'm not soliciting --

MR. FARMANI:  Sure.

MR. BARNETT:  -- or agreeing or anything.  You know, you guys decide what you want to do.

MR. RUSSELL:  I would propose that --

MR. BARNETT:  I'm not participating in that.

MR. RUSSELL:  I would propose --

MR. BARNETT:  You are the parties.

MR. RUSSELL:  I would propose that the transcript is provided to Mr. Geller through his counsel of record when it's prepared and then within 30 days review and make any corrections that he deems are necessary.

MR. BARNETT:  That's a stipulation that you guys can -- I mean you guys are the parties.

MR. FARMANI:  Sure.

MR. BARNETT:  He's a witness.  And --

MR. FARMANI:  He can waive that.  That's what

I'm asking, if he can waive.  He doesn't have to do that.

MR. BARNETT:  Do what?

MR. FARMANI:  Look at it.  He doesn't have to review it.  If he wants to, he can.

MR. BARNETT:  Well, we would request a copy of the --

MR. FARMANI:  Of course, absolutely.

MR. BARNETT:  -- of the deposition.

MR. FARMANI:  Right.  So what I think what he' saying is they want to take a look at it, review it and then --

MR. BARNETT:  We'll do what's appropriate.

MR. FARMANI:  Yeah.  Okay.  Anything else that we need to cover?  No?  No final remarks; right?

All right.  That's it then.  Off the record.

THE VIDEOGRAPHER:  This concludes today's deposition of Mark William Geller.  We're off the record at 3:33 p.m.

(Whereupon, Exhibit 8 was marked for
identification and is under seal.)

(Whereupon, the deposition of MARK WILLIAM GELLER concluded at 3:33 p.m.)

* * * * *


I do solemnly declare under penalty of perjury under the laws of the State of California that the foregoing is my deposition under oath; are the questions asked of me and my answers thereto; that I have read same and have made the necessary corrections, additions or changes to my answers that I deem necessary.

In witness thereof, I hereby subscribe my name this _____ day of _____, 2019.


_____

MARK WILLIAM GELLER

DEPONENT'S CHANGES OR CORRECTIONS

NOTE:  If you are adding to your testimony, print the exact words you want to add.  If you are deleting from your testimony, print the exact words you want to delete.  Specify "Add" or "Delete" before each entry.

DEPOSITION OF:       MARK WILLIAM GELLER

CASE:                ALVAREZ VS. ATTORNEY GENERAL

DATE OF DEPOSITION:  JANUARY 31, 2019

PAGE      LINE       CHANGE/ADD/DELETE          REASON

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

Signature _____ Date _____

DEPONENT'S CHANGES OR CORRECTIONS

NOTE:  If you are adding to your testimony, print the exact words you want to add.  If you are deleting from your testimony, print the exact words you want to delete.  Specify "Add" or "Delete" before each entry.

DEPOSITION OF:      MARK WILLIAM GELLER

CASE:               ALVAREZ VS. ATTORNEY GENERAL

DATE OF DEPOSITION:  JANUARY 31, 2019

PAGE      LINE      CHANGE/ADD/DELETE        REASON

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

_____    _____    _____    _____

Signature _____ Date _____

THE SULLIVAN GROUP OF COURT REPORTERS

108

CERTIFICATION

OF

CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter of the State of California does hereby:

I, Paula Goehle, CSR No. 13616, Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

In witness whereof, I have subscribed my name this date: April 1, 2019.

_____
Paula Goehle, CSR
Certificate No. 13616

## Exhibits

**Exhibit 1**
4:11 7:8,9

**Exhibit 2**
4:12 59:8,9

**Exhibit 3**
4:13 62:4,5

**Exhibit 4**
4:14 63:3,4 72:22,23

**Exhibit 5**
4:15 34:22

**Exhibit 6**
4:16 97:20,22

**Exhibit 7**
4:17 97:25 98:3

**Exhibit 8**
4:18 98:8 105:21

## 0

**00**
98:22

**02**
45:10,11

## 1

**1**
5:11 7:8,9 10:19 11:17

**10**
98:22

**1054**
76:11,12

**10CF2001**
7:18 9:8

**11**
9:13

**11th**
101:7

**13**
16:24 33:22

**14**
33:22

**15-cv-0987-dmg-ks**
5:16

**17**
44:25

**1995**
16:10

**1998**
20:23

**1:15**
5:3,18

## 2

**2**
59:8,9

**20**
19:1,2 46:3

**2000-**
45:9

**2001**
16:24 17:4

**2002**
45:8,12,15 60:18 63:13

**2004**
63:13

**2010**
35:8 36:8 37:12 38:2,3,
5 40:13,14 41:5 42:19
43:8 44:19,25 45:23
46:1,17 60:5 72:2,25
76:15 98:6,7

**2012**
44:20 45:1,3,6,14,18
46:3,12,19 56:15,19,23
57:2 59:13 61:9 72:3
77:13

**2014**
16:25 17:4

**2018**
59:16

**2019**
5:2,17

**22**
41:5

**22nd**
37:12 38:3 40:13 42:14,
17,20 72:24 98:7

**23**
16:6,7 85:21

**28**
45:6 46:12,19 56:23
72:3

**2:59**
96:23

## 3

**3**
62:4,5

**30**
19:12 104:18

**31**
5:2

**31st**
5:17

**37**
75:23

**38**
78:11

**3:22**
97:1

**3:33**
105:19,25

## 4

**4**
63:3,4 72:23

**401**
82:2,17

**48**
20:19

## 5

**5**
34:22 43:8 72:23

**500**
5:19

**5th**
42:13,17,19 43:6 56:19
57:2,3 59:13 60:18
77:13

## 6

**6**
59:16 97:20,22 98:11,
12

**61**
10:19 11:17

## 7

**7**
97:25 98:3,8,9

## 8

**8**
16:10 98:8 105:21

**8-30-2018**
60:10

## 9

**9**
38:5 40:14 41:5

**92868**
5:20

**98**
20:25 60:4

**9th**
40:12 42:18 98:6

## A

**abou**
56:25

**absolutely**
10:16 12:24 13:9,11
19:16 27:15 29:13,17
31:9 52:25 67:2 85:12
88:9 92:22 99:18 105:8

**accomplish**
65:25

**account**
58:7 88:1,21

**accurate**
25:4,9,18,24 48:3 75:7
91:9

**accurately**

85:14

**activitie**
72:20

**activities**
71:3 72:4,19

**actual**
8:3 20:10,14

**add**
100:7

**addition**
9:3

**additional**
100:24

**address**
54:3

**addressed**
25:22 40:14,17

**admitted**
70:21

**advocate**
87:13,14

**advocates**
89:4

**affidavit**
79:13

**affirmed**
93:12

**afternoon**
5:10

**AG**
8:18 9:8 61:22 102:3

**agency**
78:7

**agent**
61:6,8,10,12

**agree**
18:19 27:11 29:7,14
37:23 44:7 55:5,11
58:20 67:12 74:4 99:14
104:7

**agreed**
66:10 99:16

**agreeing**
104:10

**ahead**
7:7 21:23 31:17 34:19,
21 41:22 73:20 75:12
80:9 86:23 87:16 97:7,
10

**Aliso**
34:2

**allegation**
75:9

**allegations**
75:7

**alleged**
53:25 71:23

**Allison**
15:23

**allowed**
8:14,18,19

**Alvarez**
5:12 6:1 7:17 8:15
10:13 15:5,6 17:2 23:4
24:12 30:1 31:1,15
32:25 33:5 35:10 58:24
59:24 65:10 66:9 68:14,
16 71:3,6 72:6 74:6
76:6 81:25

**Alvarez's**
36:19 77:2 78:17

**amount**
95:20

**Ana**
15:10,12 19:5,11 20:25
21:2,10 22:22 58:8,11,
12 59:13 67:24 68:9
78:8 88:7,25 91:14,16
92:1

**Anaheim**
40:3

**analysis**
13:5 52:2,14

**annoyed**
69:11

**anonymous**
58:14

**answering**
13:6 31:13 90:5

**answers**
57:10 100:7

**anytime**
46:16

**apologize**
37:13 39:11 44:24
72:23 77:5 78:11
100:25

**apparently**
76:7 88:7

**appeal**
92:24,25 93:24 95:3

**appealed**
93:7,8,19

**appeals**
26:15

**appearing**
5:21

**appellate**
94:5

**applies**
31:5 50:16

**apply**
49:22

**approval**
55:16

**approve**
91:17

**approved**
55:10

**approximately**
56:21

**ar**
26:10 90:1

**argued**
52:8

**argumen**
52:25

**argument**
52:23 53:7,14

**arguments**
52:16

**arrested**
45:24

**assigned**
15:9,16,18 33:25 34:2
35:16 38:16

**Assistant**
6:12 31:20

**association**
28:15

**assume**
12:8 46:24 52:24 75:10
84:1 86:15,21 90:21,25
94:7 103:23

**assumes**
25:2,7,8 31:3,10 55:14
65:24 75:6

**assuming**
25:24 31:14,19 45:23
52:8 53:16 61:6 86:10

**attach**
36:12,14

**attached**
7:10 34:23 59:10 62:6
63:5 97:23 98:4

**attachment**
10:21 11:18

**attempted**
33:4

**attempts**
74:5

**attention**
36:25 37:4

**attorney**
5:12 6:12 10:22 14:5,8
16:14 31:20 35:2 43:8,
20 50:17 59:16 62:12
63:21 64:11,19,21,25
65:4 70:13,24 84:21
85:18 86:8,9,13,25
89:22 97:6 103:16

**Attorney's**
16:5,13 22:4 24:23
51:25 54:1 55:10 67:13,
14 79:7 81:23 82:6
83:25 84:14 86:7 90:18,
23 97:12 98:2

**attorney-client**
12:25

**attorneys**
8:22 39:2 64:11

**audiotape**
14:9,13,22 20:11

THE SULLIVAN GROUP OF COURT REPORTERS

**August**
18:12,15

**author**
43:18 75:15

**authored**
31:19 35:23,24 36:24
37:12,24 42:14 62:11

**authorities**
24:23

**authority**
39:7 69:16

**authoriz**
92:10

**authorization**
91:8

**authorize**
79:19 87:16,23,25
91:18

**authorized**
41:18 83:23,24 84:14,
16 86:11,13 90:17 91:4

**authorizes**
91:16

**authorizing**
79:12 86:9

**automatically**
93:25

**avoided**
18:6,17

**aware**
15:21 24:21,25 29:25
30:12 44:19 48:12 63:8
71:2 85:4,7,14 87:10,11
88:16 89:23 90:9,12

---

**B**

**back**
13:16 15:4 20:23 37:7
41:11,13 60:4,5 61:16,
25 69:5 71:1 72:1 81:8,
13 96:14,15,25

**background**
28:10,22 29:9 43:11,23
80:19

**Barnett**
6:5,9 7:4,12 9:5,13,17

10:5,14,17 11:16,25
12:2,21,25 13:4,10
19:24 25:1,15,24 26:4,
12,17,20,23 27:3,6,8,14
31:2,7,10,22 32:10
34:20 37:15 42:23
43:24 44:13,17 45:9,11,
14 46:7,13,22 47:2,9,
13,21 49:13,18,21 52:3,
17,21 53:9 54:9,10,11
55:2,12,14 56:2 57:12,
20 58:25 65:24 68:21
70:3,6,8 73:4,6,10 75:6
76:23 82:7,16 83:13,15
84:5,10 85:2,13 88:3,10
89:15,17 91:2,11 92:5,
14,20,21 93:2 94:20,25
96:19,21 100:19,22
101:1,3,10,14,17,21,24
102:2,8,15 103:10,12,
18,19,25 104:5,10,13,
15,21,24 105:3,6,9,13

**based**
12:11

**basically**
8:5 9:9 15:15 28:6,16
104:2

**basis**
38:22

**Bates**
75:23 101:11,22,25
102:3

**begin**
5:10 12:15

**behalf**
5:22 19:9 39:7,8 40:9

**believed**
24:15,16

**bell**
62:24

**bit**
21:13

**blocks**
82:3

**boss**
23:18

**Boulevard**
5:19

**box**
8:2

**Brady**
29:22 30:23 31:5 34:10
49:21 54:2 74:16 76:10

**break**
26:18 70:4 81:11 96:16,
20

**breaking**
31:8

**Brian**
32:6,7,19,23,24 63:8
71:1 76:17 97:21

**briefly**
82:23

**bring**
8:3 22:13

**brought**
7:5,19 8:1 9:11,12,23
21:15 22:7,22 24:21
47:17 48:8,9,14,25
51:21,22 61:18 62:20

**Bruce**
70:22,24

**building**
52:12 81:24 82:2,8,17,
18,24

**bureau**
39:1

**burial**
62:16,24 85:9 95:5

**Burnett**
6:9,11,12,20 7:2,3,4,5,
19,21 8:1,11,17,22 9:18
10:6,7,18 100:20 102:9

---

**C**

**California**
5:1,15,19 43:11,17,23
76:11 92:23 93:11,12
94:2,3

**call**
29:4 82:2 89:24

**calling**
66:1

**calls**

44:13

**car**
8:2

**care**
6:21 39:17,20

**career**
40:4 69:24

**Carlos**
24:5

**Carol**
70:13,14

**case**
5:14,16 6:2 7:16,17,20
9:8 13:24 15:1,4,5,7,22
16:1 17:21,23 19:3,4,18
20:15,18,20,23 21:3,5,8
28:9 29:3,9 30:9,17
38:14,19,22,23 45:5,8,
21 46:5,21 49:5 50:16,
18 51:16,20 52:1 57:7
60:1,3 61:6,8,10,12
65:12,13 66:1,3,8,11,
17,23 67:21 68:1,24
69:1,7,8,18 71:22 74:19
76:2 77:2 78:24 79:4,11
80:1,5,8,19 81:25 84:1,
2,18 85:4,9,18,21
86:16,25 90:8 91:17,19,
20 92:1 93:5,6,8,11,15
94:9,11,13 95:2 101:2

**case-related**
13:20

**cases**
15:15,19 17:8,9 18:20,
22 20:17 23:14 34:3,11
35:19 50:10

**cautious**
78:13

**caveat**
11:6

**CD**
102:2

**CD's**
7:24 8:2,5

**cell**
30:25 77:2 78:25 80:10

**Center**
16:16,20

---

THE SULLIVAN GROUP OF COURT REPORTERS

Index: August–Center

Central
5:15

chain
73:14 84:3

chance
64:1 97:8 99:16 103:16

change
100:6

characterization
27:11

check
28:10 36:6 39:22 54:7,
13,14,16,19 55:9,25
56:16,17 57:1,5,6,9
58:20,23 59:2,4,12
60:17,24 61:4,9,18,20
62:16 69:10,18 77:12
83:23 85:20,24 86:5,8,
11,12,24 89:11,18
90:17,24 91:17,18
94:24 95:3 99:1

checked
43:9

checks
89:14,21

Chief
24:1,5

circumstance
39:24

circumstances
31:15 60:23 95:8

City
5:19 15:10 58:12 59:1,
6,13 89:1

civil
103:10,12

claim
47:5

clarification
12:1 22:18 23:2 25:2
85:11 88:4

clarifications
12:7

clarify
27:1 39:4 57:6 82:7
83:10,19 95:15 100:2

clean
11:1,7

clear
11:23 39:12 46:22
50:14 57:12,18 71:4
77:10 95:25

clever
53:5,8

close
17:18

closed
15:2

closely
15:11 17:7,15

clue
32:16,18

Code
76:12

codefendant
29:3

cold
15:15

colleague
15:22

colleagues
23:21

command
73:14 84:3

Commander
23:13 59:20,23 60:13

commented
100:13

committed
36:5

common
81:4

communicated
18:8

communications
18:2 36:17

community
95:19

company
89:5

compassionate
95:20

completely
27:2 30:7

comply
14:19

complying
39:15

compound
25:8 85:2,10

concern
27:2

concerned
26:5 99:11

concluded
105:25

concludes
105:17

concluding
103:1

conclusion
44:14 46:8,9

conduct
20:2 79:22

conference
21:20 22:25 82:23

confidence
53:19

confident
28:11 41:1 81:5,6

confidential
8:7

confidentiality
9:25

confirm
29:11

confirmed
93:12

confusion
89:25 90:11

consideration
65:14

consistency
102:21

consistent
62:18

consult
35:21 90:23 91:23

consulted
86:23

contact
18:6,18 20:22 64:20

context
44:15

continue
13:5

conversations
12:22 13:7

convicted
51:10

conviction
31:5 50:5,17 51:3,5

convictions
28:16

cooperated
61:7,12

cooperation
97:3

cop
19:16 40:4

copies
8:12 9:4,6 10:25 101:18

cops
79:14

copy
10:25 11:2,7 31:19
34:20 37:1 54:10 102:5,
17 105:6

correct
7:20,25 8:16 16:2 17:3
18:14 22:4 23:8,17
29:19 33:22 34:16
37:24 40:15 41:14
42:14 43:17 44:1,5,11,
12 47:1,8 55:11 56:22
59:21,22 62:10,16 66:8,
12 68:12 71:12 74:2
77:13 78:3,23 87:21
98:8 103:18 104:4

corrections

THE SULLIVAN GROUP OF COURT REPORTERS
Index: Central–corrections

103:25 104:19

**counsel**
5:23 7:12 12:10,19
36:9,17,20 39:11,12,17
41:18 84:7 98:1 104:17

**county**
7:17 16:4,13 30:2 33:25
34:1 55:10 67:13,14
71:7 83:24 84:14 86:13,
16 90:18,22

**couple**
18:5 82:3

**court**
5:15,22 6:14 7:17 11:13
23:6 26:8,14 50:19
52:11 63:13 89:23
92:24,25 93:12,18 94:2

**courthouse**
82:3

**courtroom**
81:24

**cover**
36:19 37:2 38:5 105:15

**covered**
99:6,22

**Craig**
6:3 14:10 20:22 21:13,
14,17 24:8 29:4 43:10
48:9,15 59:12 64:1
65:11 72:21 82:23 83:4

**credibility**
65:23 66:2,13

**credible**
24:9,18 28:23 29:10,12
66:18

**crime**
58:19 88:11

**criminal**
28:18 29:3 33:10 69:24

**CSP**
89:3

**current**
16:12

**custody**
20:17 22:20

**custom**

21:22 22:1 42:1 53:18
73:24

**cut**
90:2

---

**D**

**D-R-U-C-K-M-A-N**
70:14

**D.A.**
25:5,12,17 35:12,15
38:16 40:5 42:5 65:12,
13 66:1 69:7 78:23,24
79:6,11 80:23,25 85:22

**D.a.'s**
21:19 22:25 70:15
75:14 82:8,17 86:6
101:5,6,18

**daily**
38:22 90:2

**date**
5:17 37:3,5,10 38:4
45:6 46:3,14 56:15,16,
17

**dated**
40:13 59:15 98:6 101:6

**dates**
36:4 44:21

**Dave**
18:16 57:24 58:1,2
60:21 62:2

**Dave's**
61:23

**David**
17:6

**day**
46:25

**days**
104:18

**DEA**
27:24

**Dear**
37:25

**December**
16:10 36:8 44:25 56:19
57:2,3 59:12 60:17 61:9
76:15 77:13

**decide**
17:24 104:11

**decision**
85:8 95:8

**declaration**
64:7

**declarations**
64:1 99:7

**deems**
104:19

**defendant**
33:11 76:13 80:21
89:19

**Defendant's**
77:11

**defense**
28:13 29:24 34:16
36:17 39:11,12,17
41:18 47:17,21,24 49:2,
6 50:25 67:1 72:9 76:10
89:23 94:18 98:1

**define**
17:11 38:14

**Dekraai**
30:9,17 71:12,13,22

**delegate**
38:18 41:6 73:16

**denied**
93:13 94:12

**department**
15:12,14 19:5 67:17,24
68:9 78:8 91:14,16

**depends**
39:24 50:12 51:17
94:21

**deposition**
5:11,18 6:22 7:23 9:16
10:7 12:16 13:3,13,15,
18 97:11 98:15 100:10
103:3 105:9,18,24

**Deputy**
16:14 24:1 70:24

**deserve**
69:23

**designate**
102:10,11

**designated**
23:7

**detective**
14:9,14 15:16,18 17:5,
7,14,16 18:2 19:3,17
20:21 21:7 22:5,12
23:2,3,5,15,18,21
32:18,24 33:1,9,23
34:9,13 54:25 55:6,9
61:7,17 62:10,15,20
67:4 69:9 78:4 80:7,8,
20 83:3,22 86:10 90:17

**detectives**
15:12 19:6 22:6 23:23

**detention**
22:22

**determination**
59:6

**determine**
43:10 66:18

**determined**
59:1

**determining**
66:2

**develop**
17:14

**dictate**
48:6

**difference**
98:17

**direct**
17:15 19:18

**directed**
61:23 80:20

**direction**
17:19,22

**directly**
40:18

**disagree**
27:11

**disagrees**
50:17

**disbursed**
62:23

**disbursement**
91:25

THE SULLIVAN GROUP OF COURT REPORTERS

Index: counsel–disbursement

**disclose**
32:22 34:15 50:8,24
54:1 67:5,25 68:19

**disclosed**
47:24 49:2,6,14,19,24
50:11,23,24 71:5 72:8,
17 74:7 76:10 79:1
97:16,18 99:15

**disclosing**
67:1

**disclosure**
34:9

**discovery**
11:22 39:15,16 41:3
73:1,15 75:13 98:1,6

**disk**
8:6 11:17 101:4 102:5

**disks**
9:7 100:21,22,24 101:5,
18

**dispersals**
90:6

**disseminated**
8:24 11:1

**distinction**
50:6

**distinguish**
29:2

**Distric**
64:20

**District**
5:14,15 6:12 16:5,13,14
22:4 24:23 31:20 35:2
43:8,20 51:24 54:1
55:10 64:11,19,25 65:4
67:13,14 70:12,24
81:23 82:6 83:25 84:14
85:18 86:7,8,13 89:22
90:18,22 93:18,23
97:12 98:1

**document**
10:20 11:6 63:15 76:22

**documents**
7:11,13,16 8:6 9:10
10:1 13:2,7,12,13,19,20
37:14 38:12 100:20

**donor**

**58:14**

**doubt**
9:23

**dozen**
34:3

**Druckman**
70:13,14

**duly**
5:7

**duplicate**
22:7

**dust**
15:18

**duties**
79:11 103:7

**dying**
95:20

---

### E

**e-mail**
9:4,8 10:20 11:18 14:3

**e-mails**
10:17 14:3 101:4,9,10,
19,21,25 102:3

**earlier**
69:6,20

**easy**
73:18

**edification**
81:19

**Eduardo**
80:2,22

**Efren**
80:16,18,23,24,25

**end**
9:16 83:9 100:17

**enforcement**
43:10

**entire**
29:1 33:24

**entitled**
9:8

**entity**
88:5

**envelope**
8:7,18 97:15

**Eric**
23:13 60:6

**essentially**
8:13

**estimate**
18:24

**events**
90:2

**eventually**
40:24 41:2

**evidence**
48:14 71:4

**examination**
10:10 81:21 82:9,12,20
83:17

**examinations**
82:18

**exception**
29:2 87:1 92:5

**exchange**
84:24,25

**exchanges**
14:4

**exclude**
47:2

**exclusion**
13:7

**Excuse**
6:9 10:14 45:14 56:2
60:9

**excused**
9:18

**exhibit**
7:8,9 34:22 36:13,14
59:8,9 62:4,5 63:3,4
72:22 97:11,20,22,25
98:3,8,14,15,16 105:21

**exhibits**
97:8 102:13,24

**existed**
14:24

**expect**
32:21 33:1 34:14 67:23,

**25** 68:18 69:7 73:25
74:3 78:22 79:1

**expectations**
34:8

**expected**
33:8 72:7

**expenses**
62:25

**experience**
36:7 84:15 85:17

**experienced**
40:1,4

**explain**
43:13

**explained**
8:8 60:14

**exposed**
90:1

**Extended**
56:14

**extensive**
28:13

**extent**
99:25

**extra**
42:19

---

### F

**facility**
22:22

**fact**
25:8 30:24 72:5 84:2

**facto**
95:19

**factors**
50:12

**facts**
25:2 31:11 80:4

**factual**
80:13

**failed**
54:1

**fair**
9:14 28:21 29:7

**fairly**
90:21

**faith**
19:14 55:7

**familia**
12:15

**familiar**
27:16,20 80:3,17 81:2

**familiarity**
13:23

**family**
16:15,19

**Farmani**
5:25 6:25 7:3,5,11,22
8:10,16,21 9:14,21
10:4,11,13,16 11:14,24
12:1,3,24 13:1,9,11
16:21 20:1 25:13,23
26:3,16,19,22 27:1,4,7,
13,15 31:6,9,16 32:1,15
33:18 34:24 37:16,18
42:7 43:1 44:1,4,16,18
45:10,12,16,19 46:11,
14,25 47:8,11,19,23
49:16,20 50:13 51:4
52:4,22 53:12 54:9,12
55:4,18,23 56:6 57:19,
21 59:7,11 62:7 63:7
66:4 68:6,23 69:2 70:7,
9,11 73:9,13 75:11
76:24 81:11,17 83:12,
14,18 84:9,11 85:12,16
88:9,20 89:16 90:15
91:10,12 92:8,15,19,22
93:3 94:23 95:24 96:12,
14,18,20 97:2,24 98:5,
10,13,19,21 99:6,18,20
100:23 101:9,13,16,20,
23 102:1,6,12,16,19,21
103:5,9,11,15,24 104:1,
9,23,25 105:4,8,10,14

**Faryar**
5:25

**fast**
16:18

**fax**
36:19 37:2 38:5 40:13,
14

**faxed**
40:22

**Federal**
11:13 79:7 93:18

**felony**
93:7

**figure**
8:23 9:15,24 83:20

**file**
8:2,3 14:6,25 15:2
17:25 20:18,19 39:23
52:3,5,7,8 53:14,17
101:2,6,18

**filed**
17:21 30:17 47:1,4
51:15,16 64:2

**files**
8:6

**filing**
47:15 79:16

**final**
93:11,19,24 94:4 99:22,
23 105:15

**finality**
93:15

**find**
29:18,20 36:6 43:25
54:18 56:7

**finding**
14:22

**fine**
32:3 50:18 70:5 84:12

**finite**
20:18

**Five-minute**
96:20

**floor**
82:11,19

**fo**
21:15

**folks**
6:20 89:10

**follow**
39:9

**forgive**
83:20

**form**

33:15 41:21 51:1 55:15
68:2 92:17 101:22

**format**
101:20

**forward**
46:2 66:11

**found**
18:7 26:6 38:4 49:10
55:25 56:2 57:22 61:25
62:1 65:5,7,10 71:9,13,
19 74:22 75:25 95:2

**foundation**
55:14 58:25 59:5

**fresh**
15:19

**Froberg**
52:11,12,13 53:11

**Froberg's**
52:11

**front**
44:23 66:13

**fund**
58:7 88:1,6,11,21

**funding**
89:6,8

**funds**
15:14 62:23

**funeral**
62:25

---

### G

**G-Y-V-E-S**
15:23

**gang**
15:8,9,11 16:22,24 17:2
19:6 22:2 34:1 87:13

**gangs**
19:11 29:1

**gave**
58:24 95:20

**Geller**
5:6,11 6:6,7,24 10:12
13:22 32:2 37:25 40:15
59:14,18 63:9 70:9
85:13 88:4 90:1 91:7
99:21 100:16 103:22

104:17 105:18,25

**Geller's**
82:10,16

**general**
5:13 10:22 51:14 62:12
90:6

**General's**
14:5,8 59:17 63:21

**generally**
28:20 38:22

**generated**
20:12

**gentleman**
35:12

**gentlemen**
8:23

**getgo**
79:8

**give**
8:14,20 34:19,21 37:1,7
39:19 41:16 44:7 54:9
61:3 62:3 63:2 80:3,13
85:8 93:15 102:5

**giving**
45:24 61:4 62:23 69:25
101:14,19

**God**
6:18 26:21

**Goehle**
6:14

**goin**
103:15

**Gonzales**
14:10,15 20:22 21:13,
14,17 24:8,21 26:10
27:25 28:9 29:4,14
43:10 45:7 46:4,20
48:10,15 49:4 58:21,23
59:12 60:17 61:8 62:21
64:16 65:1,2,11,23
66:7,10 67:6 72:21
82:24 83:4,24 92:11
96:1

**Gonzalez's**
51:24 63:14 64:1 77:20
99:3

good
5:10 29:7 65:19,22

Gotcha
21:9 101:13

governs
50:7

great
19:16 27:8 79:18

ground
12:5

grounds
51:17,21,22,23

group
5:22 6:14 8:1 10:20

guess
18:11 29:4 35:25 39:3 40:11 42:5 52:3 53:9,10 82:4 84:13 87:18 101:2

guilt
49:23 50:3

guy
19:9 35:18 66:19 69:23, 24 72:13 95:20

guy's
71:21

guys
81:14 104:7,11,22

Guzman
80:2,16,22 81:3

Guzman's
80:13

Gyves
15:23

H

ha
43:10 63:25

habit
21:22 22:1 42:1 53:18 73:24

hand
6:16 75:12

handed
41:4

handle
41:3 73:18

handled
40:5

handling
65:13

hands
29:21

handwritten
75:13,15

happen
20:21 86:17

happened
44:25 45:5,22 46:12 84:15 91:9

happy
92:20

Harbor
16:16,20

hard
18:24

Harrelson
24:1

he'
105:10

head
14:21 23:11 48:13 96:13

hear
12:7 54:18

heard
30:8 70:15 71:21,22

hearing
21:16 22:8 23:7 36:9 54:17 81:25 82:6,24 100:14

held
30:1 71:7 82:12,25

helpful
45:25

hereto
7:10 34:23 59:10 62:6 63:5 97:23 98:4

hey
14:19 18:16 41:7 69:16

83:6 86:23 87:16

hig
23:15

higher
69:17

hire
27:25

Hispanic
81:4

historically
40:23

hold
42:10 58:25 77:6 85:2

homicide
15:11 19:6 58:7 88:21, 25

homicides
15:10

honest
26:20 98:23

hosting
97:6

hours
20:19

house
76:1

hundred
19:12

hundreds
18:20,25

I

idea
42:21 43:20

identification
7:10 34:23 59:10 62:6 63:5 97:23 98:4 105:22

identified
9:19 35:13

identifies
101:7

identify
5:23 11:5,19

important

29:15 50:6 54:2 66:2,7, 13,14,17 95:15

inaccurate
64:17,22

inception
15:24

include
46:23 101:19

including
27:24 68:9

incriminating
32:25 33:3 71:6 72:5

independent
37:20,21 38:11 39:7 48:21,22 60:16 74:11

indicating
62:14 96:6

indication
61:4

informant
17:11 20:22 24:24,25 25:17 26:5 27:25 28:20 29:4,8 30:3,25 31:14 33:10 43:11,16,22 44:9 45:8,15 46:4,21 47:6 49:5,15 50:22 51:24 63:14 64:21 65:3,11 66:18,23 72:11 77:21 80:9,19 82:5 85:8

informants
17:10 28:25

informatio
74:5

information
25:5,11 46:23 47:3,7 49:14 50:4,7,21 58:17 59:3 60:20 66:25 67:25 68:1,18,19,20,22,23 71:6 74:2 78:25 79:1 80:12,21 94:16,21,24 95:11

informed
66:16

initial
21:12

innocence
49:23 50:3

innocent
51:10

instance
34:13 65:3 84:20

interesting
35:7

interfere
25:6

internal
40:25

interrupt
10:14 68:21

interview
11:9 14:14,23,24 62:10

interviews
20:2,5 79:22 100:25

introduced
21:24

investigate
17:23 65:23 66:23

investigating
21:8 23:8

investigation
21:12 35:9 39:2

investigations
17:16 19:19 60:2

investigative
10:22 11:21 27:23 54:25 59:15 60:2 62:9 86:12

investigator
6:2 35:3,12,15,25 38:19,20 39:14 40:5,8 41:7,9 42:5 43:9,24 73:8,16,25 74:13

investigator's
99:1

investigators
67:16,17

invite
37:4

involve
17:9

involved
15:6 19:2 30:2,3 35:8

38:16,21 45:21 59:24 60:1 61:4,5 65:3 73:3,8, 12 79:4,6,8,11 80:7 85:4

involvement
18:13 94:13

issuance
59:4

issue
9:24 59:1 61:19 62:20 89:11,14

issued
56:18 57:7,13,16 60:17 61:20 72:22 77:12 83:23 89:19 91:18

issues
99:12

issuing
90:23 93:23

item
97:19

items
90:1 101:3 102:10

**J**

jail
30:2 71:7 80:8

jailhouse
17:9,11 45:7 49:5 63:14 72:11

January
5:2,17 9:13 45:1 101:6

job
16:9 74:3

Joh
35:1

John
6:5 35:5 42:4 43:9

joining
55:22

Jose
6:2

Juarez
24:5

judge

8:25 52:11,12,13 53:5, 11 79:18 93:23

judge's
93:18

judgment
45:6 51:3 94:4

July
45:22 46:2,17 72:2

June
45:2

jurisdiction
67:7

jury
16:10 66:14 77:25 83:6

Justice
16:16,20

**K**

Kenney
35:2,5 42:4 43:9

kind
8:3 16:7 17:13 58:15 68:20

knew
48:23 49:4 50:1 55:16 58:8,11 61:9 65:2,4 71:24,25 72:4 74:7

kno
89:5

knowledge
40:10 42:22 45:7 46:4, 20 48:5 55:17 60:16 74:8,12

**L**

L.A.P.D.
21:1

language
44:2

Larsen
78:4,5,9

lateraled
21:1

launch
6:23

law
16:9 43:9 50:16,18 76:11 93:11

lawyer
15:25 80:6 81:5

lawyers
19:15 89:23 103:10,12

lead
19:3 23:3,5 78:24

Leal
60:19

learned
46:23 48:1,19 49:16 50:9 57:17

learning
92:5

leave
9:15

leaves
10:7

Lee
35:12,23,25 38:20,21 39:5,17,19,22 40:1,7,8

legal
52:14

letter
37:12 40:13 76:25

level
44:10 93:6

lieutenant
40:2

life
48:16

light
94:16

lines
76:4

lineup
24:3

list
101:4

listed
102:2

lodged
11:12

THE SULLIVAN GROUP OF COURT REPORTERS

**long**
16:4 85:10

**loose**
7:24 8:3 9:1,6

**lot**
44:23 48:9 81:8

**lunch**
18:5

---

**M**

**Macarro**
80:16,18,23,24,25

**made**
10:25 11:8 21:22 36:7
39:12 52:25 58:21,23
59:6,12 62:15 69:20
75:7 85:8 87:10 89:21,
23

**mail**
40:19 41:1

**main**
84:22

**maintaining**
99:17

**make**
6:23 7:7,23 8:11 9:3,18
11:4,23 12:10 13:6,23
22:17 26:1 27:9 29:23
44:5,21 52:16,23 53:6,
7,13 57:17 59:7 71:4
77:17 88:8,14 98:17
99:22 100:12,13
102:12,22 103:17,25
104:19

**makes**
23:12 66:19 102:13

**making**
12:1 34:18 38:1 96:1

**man**
24:4

**mark**
5:6,11 6:7 97:7,11
102:25 105:18,24

**marked**
7:9 34:22 59:9 62:5
63:4 97:22 98:3 105:21

**markings**
11:2,8

**mastered**
26:13

**material**
30:24 54:2

**materials**
34:10 71:10

**matter**
5:12 29:16 39:13 41:13
49:25 51:14 64:2 65:8,
10,12 67:18 68:8,9,10,
14 72:6 93:19 98:23,24

**matters**
12:12 13:14

**Mazza**
5:21

**meaning**
46:10 60:2 71:3

**means**
43:13 44:10

**meant**
44:15 91:3

**Media**
5:11

**meet**
21:14,18

**meeting**
22:24 61:25 83:2,5

**meetings**
83:3

**members**
14:4,5

**memo**
8:8 31:19 34:25 35:7,
14,22,24 36:2 41:16,17
42:2 72:21,24 73:5,7,12
101:6 102:18

**memory**
36:5

**mentioned**
9:25 38:20 53:16 62:8
87:19 96:10

**met**
21:15,17,19 24:6,7
82:23

**mic**
78:25

**mic'ing**
78:19

**microphone**
81:16

**middle**
97:5

**mind**
28:2 29:12 31:8 37:2
43:22 56:17 58:10
59:14 79:21 86:2

**mine**
15:22,23

**minute**
96:17

**miscommunication**
82:14

**mistaken**
22:14,16

**misunderstood**
57:14

**moment**
14:11 22:19 71:1 84:1
86:15 90:22 94:7 98:25

**Monday**
16:11

**money**
58:13,15 69:25 84:23
85:5,9,15,19 87:6 88:16
90:10,12 95:6,7,11,12,
13

**monies**
90:2

**Moniker**
78:18

**months**
56:21,22

**morning**
22:8,9

**motion**
25:11 26:4 30:8 46:8,23
47:5,9,15,17 48:2,20
51:14,16 53:22,25 54:4
71:12,13 94:12

**motions**
25:21 74:25

**moving**
47:4

**murder**
19:1 29:9 60:19 76:2
80:5,22 81:8

**mutually**
99:16

---

**N**

**N's**
43:9

**nature**
12:16 50:7 87:8

**needed**
17:16 53:7

**Nevada**
26:5 45:8 63:12 64:12,
21,25 65:3 70:17 77:21

**Newman**
6:2

**nickname**
78:17

**nitpick**
26:1 73:11

**non-responsive**
32:13

**nondisclosure**
51:22,23

**noted**
12:13

**notes**
11:22 75:13,15 97:21

**number**
5:11,16 7:17 9:9 27:4
33:19 59:8 62:4 63:3
72:22,23 75:23 97:20,
25 98:8,20,21

**numbered**
9:7,9,10 10:19,24 98:18

---

**O**

**oath**
12:6

THE SULLIVAN GROUP OF COURT REPORTERS

Index: long–oath

**object**
12:23 25:1 31:2 32:12 33:15 52:17 68:2 92:17

**objecting**
55:15

**objection**
12:13,21 13:5 25:7 41:21 44:13 51:1 55:22 65:24 85:10 94:20

**objections**
12:10,11

**obligated**
50:24

**obligation**
94:18,19,22

**obligations**
29:22

**observed**
10:18,19

**obtain**
32:24 33:10 71:6

**obtained**
33:3 72:10

**obvious**
21:23

**occurred**
82:9

**occurrence**
28:25

**October**
35:7 36:11 37:12 38:2,3 40:13 41:5 42:13,14,17, 19,20 43:6,8 72:24 98:7

**offense**
71:7

**offered**
84:23

**office**
14:4,5,8,18 16:5,13 21:19 22:4,8,10,13,25 24:23 40:21,24 51:25 54:1 55:11 59:17 63:21 67:13,15 69:17 70:16 73:10 75:14 79:7 81:23 82:1,6,8,10,11,16,17 83:25 84:14 86:6,7 90:18,23 97:12 98:2

101:5

**officer**
15:17 23:8 40:2 67:23, 24,25

**officers**
21:8 27:24 67:13

**offices**
82:8,19

**oftentimes**
20:10,16

**okayed**
91:5

**open**
34:11

**opinion**
26:15

**opportunity**
54:24 97:17 100:10

**opposed**
95:12

**Orange**
5:1,19 7:17 16:4,12 55:10 67:12,14 83:24 84:13 86:13,16 90:18, 22

**order**
6:20 63:12 93:18,23,24, 25

**original**
21:4,8 103:21

**originals**
102:9

**outcome-determinative**
51:8

**overlaps**
19:7

---

**P**

**P.d**
58:8

**P.D.**
20:25 21:11 58:11,12 88:7 89:1

**p.m.**

5:3,18 96:23 97:1 105:19,25

**paid**
58:17 90:3,12 95:11,22 96:7

**paper**
42:6 101:20,21

**papers**
7:24 47:1,4 53:15

**paragraph**
42:12,13 43:2,5,7,21 60:8,9 61:11

**pardon**
63:13 70:9 98:19

**part**
7:23 14:15 21:11 55:17 60:2 64:19 71:22 74:14 85:6,7 86:22 97:14,18 99:7,8,9 100:23 102:12, 13

**participating**
104:13

**participation**
63:14

**parties**
97:16 103:19 104:15,22

**passed**
14:17

**past**
18:11

**Paula**
6:13

**Paulson**
23:13,21 59:21,23 60:13

**pay**
62:25 87:16 89:19 95:23

**Paya**
78:12,14

**Paya's**
76:2

**Payaso**
78:15,16

**payment**
56:4 62:2,20 69:20

84:15,16 92:11

**Penal**
76:11

**penalty**
103:4,7

**pendency**
18:11

**people**
7:16 8:15 15:5 23:4 24:22 26:10,13 38:17, 18 58:16,24 66:8 68:16 74:12 80:1 82:17 87:4,6

**percent**
19:12

**period**
19:10 20:18 23:20 33:24 46:1,10 56:4,14 72:1

**perjury**
103:4,7

**permit**
12:22

**person**
30:4 32:13 35:13 51:10

**personal**
38:20 42:22

**personally**
28:11

**petition**
93:13

**petitioner**
6:1 45:23 72:22 98:8

**Petitioner's**
7:8 59:7 62:4 63:3 97:20 98:14,16 102:24

**physically**
22:10

**pick**
24:3

**picking**
16:10

**pieces**
48:14

**pile**
101:12

Index: object–pile

place
5:18

plant
80:9

played
60:6

plea
89:18

pleading
26:7 53:17

point
6:20 11:15 14:6 20:15
22:24 23:17,18 27:22
28:2 35:9 36:3,9,13
40:11 44:2 50:21 57:13
69:21 98:23 100:17

pointed
68:4

police
15:12 19:5 20:9,11 24:5
28:15 40:1 67:17,24
68:9 78:8 91:14,16

pony
40:25

posed
31:23

position
16:12

post
25:20 26:4 31:5 50:5,16
51:2,3,5 65:5 95:7,19

power
87:24

practical
94:14

practice
28:21 29:8 53:16 65:19,
22

prefiling
20:16

prelim
15:25 23:10 24:13

preliminary
21:16 22:8,9 23:7 36:8
44:25 81:24 82:9,11,18,
20

preparation
13:2,13,15

prepared
9:7 104:18

present
6:11 17:24 75:11 79:14
83:3

presented
55:1 63:20

presenting
36:18

presume
23:9 41:10

presumptuous
90:4

pretrial
67:1

pretty
8:18 15:2 20:8 25:20
41:1 81:6

previous
50:2

previously
49:14

prior
28:15 46:4,24 47:1
50:23 51:24 77:21 90:9
95:7

prison
26:10

privacy
99:12

privilege
12:25

privileged
12:12 13:14

problem
6:25 9:21 11:14 26:22

proceeding
100:14

proceedings
10:8

produced
14:16 75:13 97:12

program
88:13

promised
34:14 95:4,6,11,13,22

propose
99:10 104:12,14,16

prosecute
15:9

prosecuted
15:6 17:1 71:8

prosecuting
33:6 65:8 68:7 72:7
84:21 86:25

prosecution
29:15 35:8,10 59:24
60:18 68:8 74:14 84:21,
22

prosecutions
16:24

prosecutor
84:18,22

prosecutors
89:24

protection
16:15,19

provide
11:6 58:16

provided
10:18 13:4 28:12,17
100:20 101:7 102:9
104:17

public
30:21

purposes
23:3 44:24 57:6 76:15
94:14 102:21

pursuant
14:8

put
8:7,17 11:2 22:19 24:20
80:9,24 83:6 92:19
98:16,21,22

putting
82:18

**Q**

questio
95:1

question
12:13 13:6 19:24 25:2,
15,21 26:2,18,21 27:10
29:5 31:13,23 32:11
33:8,13,15 35:11 39:25
42:11,23 43:15 44:8,14
47:14,16 49:13,15,22
50:9 52:21 53:11 55:16
57:10 61:14,15,16 64:9
68:3,5 76:23 79:20
85:3,6,11 86:22 87:18,
25 88:15,18 90:5,6,13,
16,20,21 91:13 92:18
95:16

questioned
27:23 32:3

questioning
6:24 12:9

questions
12:6 15:3 28:6 81:12,13
83:12 96:12 99:24
100:15,16

quick
42:11

**R**

raise
6:16

Ramon
6:1 10:13 15:5 24:12
30:1 32:25 35:10 36:19
59:24 65:10 66:9 68:14,
16 71:3 78:16 81:25

Rap
8:14 28:13 99:11

rare
28:25

rarely
28:24

reach
99:13

reaches
81:16,17

THE SULLIVAN GROUP OF COURT REPORTERS

**reaction**
69:9

**read**
30:13 38:9 43:2,4
61:16,23 62:8,11,17
63:16 64:3 71:9,15
86:14 90:19

**reading**
37:2 48:19 56:17 74:22
76:8 79:15

**reason**
8:4,17 13:22 42:16
51:19 53:3,15 62:23
69:22 78:10 85:19

**reasoning**
53:5

**reasons**
21:23

**Rebecca**
70:13

**recall**
14:21,23 22:16,24
23:11,12 26:23 27:22
34:19,25 36:1,2,16
38:10 48:13 56:9 60:6
61:18,21,24 62:2,22
73:6,7,12 92:3

**received**
9:4 18:9,15 96:1

**receiving**
36:16

**recess**
96:24

**recognize**
99:3

**recollection**
16:3 21:3,11 23:1 28:1,
14 32:5 37:17,20,21
38:11 48:4,21,22 54:20
56:9 58:14 60:21 62:13,
19 63:1,24 64:15,24

**record**
6:10,25 12:11,14 14:15
23:9 26:13 27:5 28:12,
17,18 30:22 36:6,9 37:3
38:14 43:3 52:9,18,24
53:14 56:17 57:6,12
58:10 59:11 63:10 70:4
72:20 77:10,18 78:14

96:23 97:1,10,15 98:5
99:7,9 102:14 104:18
105:16,18

**recorded**
14:14

**records**
7:6,19,23 97:11,14

**refer**
94:23

**reference**
27:4 46:3 97:25

**referenced**
7:6

**references**
7:15

**referencing**
14:1 63:13

**referring**
61:7

**reflected**
99:13

**refresh**
62:13 63:1

**regular**
103:3

**reimburse**
89:14

**related**
7:16,20 68:1,23

**relationship**
17:14,19 34:7

**relevant**
23:20 68:22

**reliable**
28:22 29:10,12

**relieve**
103:7

**relocated**
88:12,16

**relocation**
87:7

**rely**
29:8

**remarks**

99:22 105:15

**remember**
14:25 28:2 30:15 38:8
41:17 51:21 52:10,18
53:10,22 54:4,13,16
58:4 59:23 60:25 61:1,2

**Reno**
70:19

**report**
10:22 11:9,21 20:11
38:22 50:3 54:25 59:15
62:9 77:11 86:12 99:2

**reporter**
6:8,13,15,16 16:17
98:9,11,18,20 103:3,6,
14

**Reporters**
5:22 6:14

**reports**
20:9 28:15 38:25

**represent**
5:24 6:1,4,5 10:13

**request**
14:7,9 39:16 42:18
73:1,15 98:6 105:6

**requested**
101:24,25

**requests**
39:15 41:3 98:1

**required**
66:1

**resources**
43:10 74:1

**respect**
9:24 14:18 22:1 34:7,9
35:22 38:17 42:2 52:13
62:19 79:8 83:21 91:14
99:11

**respond**
73:23 74:2

**responded**
99:25

**Respondent**
6:4

**responding**
73:1

**response**
42:18,20 48:1 51:18,20
53:17 97:13

**responsibilities**
50:8 95:17

**responsive**
11:5,11,19

**result**
48:19

**retired**
18:4 40:2

**review**
20:10 29:9 54:25 64:1
79:17 93:13 103:23
104:19 105:5,11

**reviewed**
13:2,12,19 14:3 20:15

**reviewing**
10:17

**Reward**
58:7 88:21

**rifle**
75:25

**ring**
62:24

**Robert**
70:22,24

**Roland**
36:21,22,24

**role**
60:6

**Romero**
47:5

**Ronald**
36:20

**Ronaldo**
36:20

**Rondou**
10:23 11:10 14:10,15
15:16,18 17:5,6,7,14,16
18:3 19:18 20:21,24
21:7 22:5,12 23:2
32:18,19,24 33:1,9,24
34:9,13 54:25 55:6,9
58:1,2 59:3 60:21 61:7,
17 62:10,15,20 67:3,4,6

THE SULLIVAN GROUP OF COURT REPORTERS

Index: reaction–Rondou

69:9 80:7,8,20 83:4,22
86:10 90:17 91:3,9

**Rondou's**
23:18,23

**room**
6:11 22:25 82:23

**rooms**
21:20

**routed**
40:25

**Rubalcava**
36:20,21,24

**Rubalcava's**
48:20

**Ruben**
60:19

**rules**
12:5

**ruling**
53:6,19

**run**
88:25

**Ruorock**
30:4 31:3,4 32:8,19,23,
24 71:1,2,5,23 74:24,25
75:16 76:7,16,17 97:21

**Ruorock's**
71:2 72:4 74:5

**Russell**
6:3 10:1,2 11:12 33:14
41:21,24 51:1 55:21
68:2 81:12,18,22 82:15,
21 83:8 92:17 96:13,16
99:10,19 100:18,21
101:2,15 102:7,18,20
104:12,14,16

---

**S**

**Sacramento**
24:22,23 25:5,12,17
26:6,7 27:24

**Sanders'**
30:8,13 71:10

**Santa**
15:10,12 19:5,11 20:25
21:2,10 22:22 58:8,11,

12 59:13 67:24 68:9
78:8 88:7,25 91:14,16
92:1

**sat**
23:6

**scenario**
80:13

**Scott**
30:8,13 31:20 71:10

**scumbag**
69:24

**seal**
8:22 105:22

**sealed**
97:15 98:12 102:23

**search**
79:13,14

**seeking**
25:17 26:11,13

**sending**
35:22

**Senior**
16:14 31:20

**sense**
23:12 90:11

**sentence**
44:3

**sentenced**
51:6,7

**sentencing**
45:5 46:11,15,24,25
47:1 56:13,22 61:19
72:3 89:18 93:5,20
94:11,12,17

**separate**
8:7,18 9:1 88:5 89:5

**separately**
89:5

**September**
18:15 38:5 40:12,14
41:5 42:18 45:6 46:3,
12,19 56:23 72:3 98:6

**Septembers**
59:16

**sergeant**

23:22 40:3

**series**
101:5

**services**
62:16 85:1,9

**set**
95:8

**shakes**
96:13

**share**
28:24 31:18 33:2,9

**shared**
79:2

**sheet**
28:13 36:19 37:2 38:5

**Sheets**
8:15 99:11

**shocked**
55:25

**show**
54:10

**side**
39:1 79:7

**sign**
103:3,5,23

**signature**
99:3

**signs**
79:18 103:6

**similar**
75:25

**simply**
23:15 39:23

**simultaneously**
99:17

**single**
89:18

**sir**
33:7 34:21 37:13,14
43:7 45:16 46:11 49:16,
20 56:6 60:11 61:14
62:13 63:15,25 65:15
92:22 101:23

**sit**
81:15

**Smith**
35:12,23,25 38:20,21
39:5

**solemnly**
6:17

**soliciting**
104:8

**Solve**
58:19

**sort**
28:10 40:8 43:14 53:17
96:7 97:17

**sound**
80:17 81:2

**Sounds**
80:3

**source**
15:15 60:20

**South**
33:25 34:1

**speak**
14:2 38:18 39:7,9 41:19
52:18,25 91:8

**speaking**
21:22 28:20 40:9

**specific**
44:20,22

**specifically**
18:6,17

**speculate**
84:6,7 91:2

**speculation**
44:14

**spoke**
64:24 88:6

**spoken**
24:4 41:19 64:20 65:12

**stack**
101:3 102:10

**staffers**
80:9

**stamp**
75:23 101:25

**stamped**
101:11 102:4

stamps
101:22

stands
74:16 89:3

start
12:4

starte
21:1

started
15:22 18:12 21:10

Starting
43:6 60:10

state
5:24 44:10 64:25 89:8
94:2

statement
20:14 25:4 44:11,17
61:23 64:22 72:10 76:6,
13,16 77:11 83:22
86:14

statements
32:25 33:3,10 72:5,6
79:12

states
5:14 43:12,17,23 44:10

stay
93:24

stayed
93:25

staying
6:22

stipend
15:14

stipulate
103:20

stipulated
99:18

stipulation
99:10,13,23 104:21

stipulations
103:1

stop
14:11 81:10

strictly
20:5

stuff
8:6,14,19 44:23 48:9
58:17 66:20 79:6

submitted
26:7 103:22

subpoena
7:6,8,15 11:5,20 14:18
97:13

subsequent
45:2 100:14

subsequently
85:7

substation
34:2

successful
14:22

sudden
51:10 69:10 71:23

suggest
65:25 79:16

Suite
5:19

Sullivan
5:22 6:14

summaries
20:6

summary
62:11

Superior
7:17 26:7

supervisor
23:19

supplement
11:22

supplemental
64:7

supplied
28:14

support
79:13

suppose
40:10

supposed
69:21 74:20

Supreme
63:12 93:12

surname
81:4

surprise
19:10

surprised
19:1 71:14,18 81:1

swear
6:15,17

switch
81:15

sworn
5:7 16:9

system
40:25 92:24 93:1 94:5

---

**T**

takes
102:13

taking
5:18 6:21 78:11

talk
8:25 18:16 21:13,24
64:10 67:10 87:20 89:9
91:24

talked
12:19 61:22 64:23 65:4
66:6 88:1 91:25

talking
15:4 16:18 24:13 25:13
26:9 30:4 31:1 46:16,17
51:2 60:4 62:15,19
68:10 72:25 77:1,7
78:19 88:4,10,14,22
89:2 91:19,21 92:9,16
94:22 100:21,22,24

talks
77:6

Target
33:25 34:1

task
39:14 65:25

team
38:24 74:14

Ted
6:12

telling
22:16 58:10 60:23

tells
69:9

ten
78:12

terms
88:5 90:2

Terry
27:16,17

testified
5:7 57:16 67:6 80:20,23
95:12

testify
12:22 19:9 28:23 29:9
66:11 85:5

testifying
24:11 82:5 90:9

testimony
23:23 50:2 58:21,24
59:2 60:18 64:21 84:24,
25 90:10 95:21

text
18:9,15

tha
14:15 76:25

thi
59:1

thing
52:13 58:15 83:10,19
85:6 88:12,15,17,22
102:22,24

things
26:3 36:15 40:6,23
48:16 87:7 88:24

thinking
76:1 79:15

third-party
99:12

thought
30:19 58:11 60:25 66:5
98:14,15

THURSDAY
5:2

THE SULLIVAN GROUP OF COURT REPORTERS

Index: stamps–THURSDAY

**time**
5:18 9:4 14:6 15:8 17:1
19:11 20:15,18 21:16,
23 23:20,22 24:11
26:10 28:2 29:1 30:7,16
33:24,25 35:13 36:20
39:5 40:8 42:19 45:17,
20,22 46:1,10 47:14,15
50:22 56:3,4,14 57:13,
15 62:1 65:7 69:21
71:19,21,25 72:1 76:15,
21 77:14 78:11 82:1
92:16 96:19,23 97:1,16
99:15,16

**timeframe**
17:4 24:10 46:19 47:18
92:19

**timeline**
44:24 45:24 47:25

**Tip**
58:15 88:6,13 95:19

**title**
16:14

**today**
6:8,13 13:19

**today's**
5:17 105:17

**told**
14:18 18:16 21:25
47:21 53:13 54:22 56:3
60:21 61:21 62:2 64:19
88:17 95:3,10,12,19,22

**Tony**
10:13 99:10

**top**
14:21 23:11 48:13 60:9

**transcrip**
100:10

**transcript**
48:6,7,8 103:17 104:17

**transcripts**
23:10

**trial**
15:25 19:8 23:4,11
24:13,22 25:4,10,11,16,
19,20,21,25 26:4,5,11,
13,24 27:22 28:4 33:5
36:20 44:24 45:1,2
46:8,9,23 47:9,18 48:2,

6,7,20,23,24 49:1,7,10,
12,15 50:10,22 51:14,
16 53:22,23,25 54:4
56:11 71:25 72:1,13
74:8 77:23,25 80:6,22
81:5 83:6 92:16,24
94:12 95:7,25 97:5

**trials**
18:25 19:2 28:3,7 34:4,
5 81:8

**true**
31:4,12 75:10 86:11,15
90:22,25 94:7 96:4

**trust**
19:14 55:7

**trusted**
52:13

**truth**
6:17,18 22:1 83:7

**truthfully**
100:3

**turn**
30:24 34:15 94:18

**TV**
19:22

**type**
34:8 75:25

**typically**
51:15

---

**U**

**U.S.**
79:7

**Uh-huh**
78:21

**unaware**
30:7

**underneath**
38:17

**understand**
11:15 13:23 22:17 27:1,
2 65:21 72:20 73:14

**understanding**
22:21 59:5 66:12 79:5,
10 92:23,25 93:4,10,14
102:23

**understands**
27:9

**understood**
12:9 27:13 75:6 99:24

**uniformly**
89:22

**unit**
15:8 16:15,19,22 17:2
34:2

**United**
5:14

**unusual**
82:5

**upset**
69:12,22

**utilized**
19:6

---

**V**

**vague**
50:11 94:20 95:1

**valid**
90:21

**van**
22:24

**verdict**
65:5 95:7

**versus**
5:12 7:16 15:5 23:4
58:24 66:9 68:16 80:2
95:22

**victim**
87:1,3,6,14 88:2,5,11,
22 89:4,10,22,24,25

**Victim's**
88:1

**victims**
88:12 89:19 90:2

**Viejo**
34:2

**Vincent**
5:21

**Volume**
5:12

**volunteering**
81:10

---

**W**

**Wait**
98:11

**waive**
104:25 105:1

**walked**
22:23

**wanted**
9:7 11:23 17:20,25
47:25 83:10,19 97:3,7

**warrant**
79:9,13,14,16,17

**warrants**
79:12,19

**watching**
19:22 79:6

**weapon**
76:2

**week**
30:16

**West**
5:19

**whatnot**
39:6 100:12

**whatsoever**
53:1 96:7

**wheelchair**
21:21

**Whey**
7:7

**William**
5:6,11 105:18,24

**wire**
77:1,2

**witnesses**
20:2 21:4,23 22:2 79:22
85:15 87:3 90:8,9

**wondering**
84:13

**word**
14:17 23:24 53:8 81:7
94:6

**words**
20:17 48:15 51:9 95:5

**work**
10:1 16:8,15,17,19 17:5
23:25 24:24 26:5 32:4
33:23 38:19 39:3 44:10
50:18,23 51:24 67:19
77:21 78:7 96:2

**worked**
15:9,11 16:22 17:7,15
18:19,23 19:11,17
33:19 34:3 35:18 38:24
49:4

**working**
15:8 17:19 20:25 34:1,7
38:17 39:6 67:14,21
74:12

**write**
51:18,19 86:5,24

**writing**
86:8

**wrong**
23:18 79:5 90:14

**wrote**
75:5 76:16

---

**Y**

**years**
15:1 16:6,24 18:5
33:20,22 54:21,22
56:10,11 57:16,20
60:22 61:19 69:20
85:21 92:6 95:2

**yo**
34:20

**you'r**
67:20

---

**Z**

**Z-L-A-T-E-F-F**
27:21

**Zidbeck**
31:20

**Zlateff**
27:16,17,18

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Central District of California   ▾

| | |
|---|---|
| Ramon Alvarez | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   15-cv-0987-DMG-KS |
| Attorney General | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                        Mark William Geller

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Law Office of John D. Barnett<br>1 City Blvd. W., Suite 500<br>Orange, CA 92868 | Date and Time:<br><br>01/31/2019 1:00 pm |
|---|---|

The deposition will be recorded by this method:   audio-video recording

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: All items in your possession, custody or control relating to the matter of People v. Alvarez, Orange County Superior Court Case No. 10CF2001. The foregoing items include, but are not limited to, all documents, records, notes, memoranda, electronic files, and emails regarding People v. Alvarez, Case No. 10CF2001.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      01/06/2019

*CLERK OF COURT*

OR

_____           /s/Tony Faryar Farmani
*Signature of Clerk or Deputy Clerk*           *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*      Petitioner
_____ , who issues or requests this subpoena, are:
Tony Faryar Farmani, Esq., P.O. Box 8727, Rancho Santa Fe, CA 92067; tffarmani@aol.com or
farmani211101@gmail.com; (310) 926-1150

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

216

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 15-cv-0987-DMG-KS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* Mark William Geller

on *(date)* _____01/06/2019_____ .

☑ I served the subpoena by delivering a copy to the named individual as follows: _____

Via email to john@barnettbarnett.com (Attorney for Mark William Geller)

_____ on *(date)* ___01/06/2019___ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____0.00_____ .

My fees are $ ____0.00____ for travel and $ ____0.00____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____01/06/2019_____

_____/s/ Tony Faryar Farmani_____
*Server's signature*

Tony Faryar Farmani, Attorney At Law
_____
*Printed name and title*
Farmani, APLC
P.O. Box 8727
Rancho Santa Fe, CA 92067

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Δ(π)EXHIBIT 2
Deponent Geller
1-31-19
Date _____ Rptr
WWW.DEPOBOOK.COM

THERMO GUARD™ RESPONDS TO WARMTH. HOLD RED IMAGES BETWEEN THUMB AND FOREFINGER OR BREATHE ON IT. THE IMAGE WILL FADE AND REAPPEAR

City Of Santa Ana

PAYEE IDENTIFICATION    36

PAY TO THE ORDER OF
CRAIG DANNY GONZALES

DATE    December 5, 2012

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com
90-7162/3222

EXACTLY********11,000 DOLLARS AND 00* CENTS
$ ********11,000.00*

110000030

VOID IF NOT PRESENTED FOR PAYMENT WITHIN 6 MONTHS FROM DATE OF ISSUE

⑂ 935309500⑂

⑈100000030⑈ ⑆322271627⑆

**State of California**
**Department of Justice**
**Division of Law Enforcement**
**BUREAU OF INVESTIGATION**
## Investigation Report



Δ𝜋 EXHIBIT 3
Deponent Geller
1-31-19
Date_____ Rptr.
WWW.DEPOBOOK.COM

| INVESTIGATION TITLE: ALVAREZ HABEAS | | INVESTIGATION NUMBER: BI-LA2018-00025 |
|---|---|---|
| INVESTIGATION REQUESTED BY: DAG KEVIN VIENNA | | TYPE OF REPORT: OPENING REPORT |
| CASE ASSIGNED TO: HOLMES, TROY | PERSON REPORTING: HOLMES, TROY | REPORT NO: 1 |
| TYPE OF CRIME/INCIDENT: PENAL CODE | CASE ASSIGNED SUPERVISOR: ALVARADO, ALFRED | DATE OF REPORT: 09/06/2018 |
| CROSS REFERENCE NO(s): | | |

DETAILS OF THE INVESTIGATION:

On 08/13/2018, Handling Deputy Attorney General (DAG) Kevin Vienna, CA DOJ, Office of the Attorney General (AG), Los Angeles, requested an agent from the California Department of Justice, Bureau of Investigation, Los Angeles Regional Office, Special Investigations Team, be assigned to the captioned matter to provide investigative assistance on a federal habeas matter of a 2010 homicide case that is being appealed.

On 08/16/2018, at approximately 1235 hours, I, Special Agent (SA) Troy Holmes, California Department of Justice, Bureau of Investigation, Los Angeles Regional Office, Special Investigations Team (CA DOJ, BI, LARO, SIT) contacted Commander Eric Paulson with the City of Santa Ana Police Department (SAPD) via telephone. I advised Commander Paulson that CA DOJ needed some further information regarding a check allegedly issued from the City of Santa Ana, number 110000030, dated 12/05/2012, and payable to Craig Danny GONZALES. Commander Paulson stated he would be glad to assist me but would need more time to research my request and get back to me.

On 08/30/2018, at approximately 0943 hours, I received an email response from Commander Paulson. In his response, Commander Paulson stated the check was issued by the City of Santa Ana from the Homicide Reward Fund Account. Commander Paulson further explained the check was authorized at the recommendation of Deputy Chief Harrelson, and Police Chief Carlos Rojas approved payment. Commander Paulson stated that pursuant to a SAPD memo dated 12/05/2012, per Department Order 295, Deputy Chief Harrelson recommended payment to Craig Danny GONZALES in the amount of $11,000 from the Homicide Reward Fund Account for his cooperation regarding the murder of Ruben LEAL.

Commander Paulson also stated according to Deputy Chief Harrelson, GONZALES cooperated with the case agent, and without his coming forward with information regarding this crime, the suspect may not have been convicted. Commander Paulson stated GONZALES testified at trial and provided important testimony to convict the suspect in this case.

I then forwarded Commander Paulson's response to DAG Vienna. This investigation is ongoing.

State of California
Department of Justice
Division of Law Enforcement
BUREAU OF INVESTIGATION
## Investigation Report

PHYSICAL DESCRIPTION:

A. Subjects:

NONE

B. Other(s):

Other(s):

1.  ERIC, PAULSON, DOB-UNK,

    LOCATION(S): 60 CIVIC CENTER PZ, SANTA ANA, ORANGE COUNTY, CA 92701-0000

    PHONE(S): (714) 245-8348 (BUSINESS)

| SIGNATURE: DATE: 09/06/18 | APPROVAL SIGNATURE: DATE: 9/6/18 |
|---|---|
| PRINTED NAME: HOLMES, TROY | PRINTED NAME: ALVARADO, ALFRED |
| TITLE: SPECIAL AGENT | TITLE: SPECIAL AGENT SUPERVISOR |
| REPORT DISSEMINATION: DAG Kevin Vienna. | |

A/SAC

INVESTIGATION NO: BI-LA2018-00025

Page No: 2 of 2

State of California
Department of Justice
Division of Law Enforcement
BUREAU OF INVESTIGATION
**Investigation Report**



| INVESTIGATION TITLE: ALVAREZ HABEAS | | INVESTIGATION NUMBER: BI-LA2018-00025 |
|---|---|---|
| INVESTIGATION REQUESTED BY: DAG KEVIN VIENNA | | TYPE OF REPORT: INTERVIEW REPORT |
| CASE ASSIGNED TO: HOLMES, TROY | PERSON REPORTING: HOLMES, TROY | REPORT NO: 2 |
| TYPE OF CRIME/INCIDENT: PENAL CODE | CASE ASSIGNED SUPERVISOR: ALVARADO, ALFRED | DATE OF REPORT: 09/27/2018 |
| CROSS REFERENCE NO(s): | | |

SUMMARY:

On 09/26/2018, Deputy Attorney General (DAG) Kevin Vienna, and I, Special Agent (SA) Troy Holmes, California Department of Justice, Bureau of Investigation, Los Angeles Regional Office, Special Investigations Team (CA DOJ, BI, LARO, SIT) interviewed retired Detective David RONDOU of the City of Santa Ana Police Department (SAPD) at his residence.

DETAILS OF THE INVESTIGATION:

On 09/26/2018, at approximately 1103 hours, Deputy Attorney General (DAG) Kevin Vienna, and I, Special Agent (SA) Troy Holmes, California Department of Justice, Bureau of Investigation, Los Angeles Regional Office, Special Investigations Team (CA DOJ, BI, LARO, SIT) interviewed retired Detective David RONDOU of the City of Santa Ana Police Department (SAPD) at his residence. Per DAG Vienna's request, RONDOU's residence address is to remain confidential. RONDOU reviewed the first declaration prepared by Craig Danny GONZALES (Attachment 2-1) and provided the following information, in substance:

RONDOU stated the only thing that was truthful in GONZALES' declaration was that he went to an unknown prison and handed GONZALES a check. RONDOU explained the check given to GONZALES was for $11,000.00, and was supposed to cover GONZALES' burial costs because he was allegedly terminally ill.

RONDOU recalled shortly after GONZALES testified, his daughter contacted him and asked if the city of Santa Ana could help her with the burial cost of her father. RONDOU stated the city researched the typical cost of burials and came to the $11,000.00 total. RONDOU stated payment to GONZALES was approved through the Orange County District Attorney's Office (OCDA) and the city of Santa Ana.

RONDOU stated the city wanted to pay GONZALES' daughter directly but was unable to because of laws related to paying informants. RONDOU said the way around this was to issue a check to GONZALES and have him endorse it to his daughter immediately. RONDOU stated when he met with GONZALES in an unknown prison to give him the check, he saw GONZALES endorse the check to his daughter and hand it to a prison guard to mail it immediately.

RONDOU stated he was unaware that GONZALES was a former informant in Nevada. RONDOU stated he never promised GONZALES anything for coming forward and testifying in the homicide trial of

223

**State of California**
**Department of Justice**
**Division of Law Enforcement**
**BUREAU OF INVESTIGATION**
## Investigation Report

Ramon ALVAREZ. RONDOU stated he never met with GONZALES alone and always had a partner with him per SAPD policy. RONDOU stated GONZALES told him he was coming forward to testify because he wanted to do some good in his life before dying. RONDOU stated he spoke with prison doctors and they told him GONZALES' prognosis was not good and was close to death.

RONDOU then reviewed an additional declaration prepared by Craig Danny GONZALES (Attachment 2-2). RONDOU stated he would have never transported GONZALES from jail to the OCDA's office for a meeting. RONDOU stated instead he would have the District Attorney come to jail to meet with GONZALES. RONDOU again stated the check issued to GONZALES was not for his testimony but for burial costs. RONDOU stated he would have never supported providing payment to GONZALES for his testimony.

We concluded this investigation at approximately 1142 hours. This investigation is ongoing


ATTACHMENT(S):

2-1: Copy of declaration prepared by GONZALES.
2-2: Copy of declaration prepared by GONZALES.


| SIGNATURE:                DATE: | APPROVAL SIGNATURE:          DATE: |
|---|---|
| PRINTED NAME: HOLMES, TROY | PRINTED NAME: ALVARADO, ALFRED |
| TITLE: SPECIAL AGENT | TITLE: SPECIAL AGENT SUPERVISOR |
| REPORT DISSEMINATION:   DAG Kevin Vienna. | |

INVESTIGATION NO: BI-LA2018-00025

Page No:  2 of 2

Case 8:15-cv-00987-DMG-KS   Document 9-2   Filed 08/28/15   Page 108 of 256   Page ID

OR,   ᴏᴇ COUNTY DISTRICT ATTORNE   ɔ OFFICE
BUREAU OF INVESTIGATION          DA 10F14331

## INFORMATION REPORT

AᴄᴛᴜEXHIBIT__5
Deponent_Geller
Date__3-19_Rptr._
WWW.DEPOBOOK.COM

CASE NAME:        ROMAN ALVAREZ

CLASSIFICATION:   187 (A) MURDER

                  F. LEE SMITH, INVESTIGATOR
         BY:      ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

DATE AND TIME:    OCTOBER 22, 2010              1400

LOCATION:     401 CIVIC CENTER DRIVE WEST

---

On October 5, 2010, District Attorney Investigator John Kenney checked law enforcement resources to determine if CRAIG GONZALES had a background as an informant in California and other states there was none.

CRAIG GONZALES has no history as an informant in Orange County per the Orange County District Attorney's Office.

Exhibit A

000430

| Investigator: Lee Smith | Approved By: |
|---|---|
| Date of Report: OCTOBER 26, 2010 | Date: |

402



4

REASON I WANT BENITO GARCIA GONE IS BECAUSE ISLAS & REIL ARE SPOOKED BY HIM - PAYA & GARCIA HATE EACH OTHER (ALVAREZ IS MARRIED TO GARCIAS EX-WIFE) - AND ALVAREZ THINKS HE IS AN INFORMANT & TOLD ISLAS THIS - UPON ARRIVAL, GARCIAS FIRST WORDS TO ISLAS WERE ABOUT "BIG JOE" (CASTEJON) & HE ASKED ABOUT HIS CASE - GARCIA SAID HE IS LOOKING @ 63 to LIFE (THATS THE EXACT # THAT ISLAS IS LOOKING AT - COINCIDENCE? IT SPOOKED HIM) ALVAREZ'S WHOLE CASE IS A JAIL HOUSE INFORMANT WHO SAYS HE ADMITTED TO THE 187 - I'VE PERSONALLY BEEN TO THE HOUSE ON HALLADAY WHERE THE 187 OCCURED WITH TIGER (F.TROOP) & HAVE KNOWLEDGE ABOUT HIS CASE BECAUSE OF BEING PRESENT WHEN PATTY (LIVES @ HOUSE ON HALLADAY WHERE IT OCCURED) WAS TELLING TIGER IN FRONT OF ME, THAT SAPD HAD RE-INTERVIEWED OR TRIED TO INTERVIEW HER WHEN PAYA GOT BUSTED THIS TIME - SHE SAID THE VICTIMS NAME WAS LIL OSO (F.TROOP) AND PAYA SHOT HIM WITH AN ASSAULT RIFLE IN THE HEAD - CHINO (BATT) WAS DATING PATTY WHEN TIGER & I WENT OVER THERE, THIS WAS APPROX. NOV. OF LAST YEAR - WE HAD WENT OVER TO GIVE HER A WILA TO TAKE TO CHINO (VISIT TO HIT GIZMO & SN (MARQUEZ) - TIGER SAT THERE & WROTE 2 PAGES OF VARIOUS INSTRUCTIONS TO CHINO & I CHATTED WITH PATTY WHILE WE WAITED FOR HIM TO FINISH WRITING - WHEN CHINO WAS ARRESTED THIS TIME, I GUESS SAPD FOUND A SIMILAR TYPE SSAULT RIFLE AT THE HOUSE & THEY WERE THINKING IT COULD BE THE MURDER WEAPON ON PAYAS CASE (HE SAYS ITS NOT THE SAME ONE) - HOW WOULD HE KNOW IF HE DIDNT DO IT? I - - THIS IS WHEN GIZMO WAS

CIMemphis-000037

226

- 5 -

10. PAYA IS VERY CAUTIOUS, DUE TO BEING STUNG BY AN ALLEGED INFORMANT ALREADY ONCE - I ASKED LARSON IF YOU CAN MIC UP HIS CELL ALSO - IT HELPS THAT HE KNOWS IM FAIRLY WELL CONNECTED WITH ALOT OF HIS HOMEBOYS & THE FELLAS AS WELL - HE TOLD ME "EVERYBODY KNOWS ME IT SEEMS LIKE" - SO HE DOES LET HIS GUARD DOWN AROUND ME - THE MORE WE TALK, THE MORE RELAXED HE IS GETTING - HE USED TO DATE MY GIRL VANESSA'S AUNT GINA, SO WE ALSO KNOW ALOT OF THE SAME PEOPLE - I WOULDNT MIND DAYROOMING WITH HIM TO GET HIM ON THE REC YARD & SEE IF HE'LL TALK MORE - IDEALLY I WOULD REALLY LIKE MYSELF, HIM & AMAYA TO PROGRAM TO GETHER - FRENCH TOLD HIM SHE WAS GONNA DAY-ROOM HIM WITH ISLAS & REN (THEY'RE ALL GP) BUT IF POSS. PUT THE BRAKES ON THAT UNTIL I GET A CHANCE TO WORK MY ANGLE -

11. NEW POLICY *APPROVED BY STREETS* ON VARRIO GREEN LIGHTS ONLY - (ORANGE BANDS WILL NOT BE TOUCHED! - PAYA GOT THIS APPROVED BY LIL BOGART ( GUESS & ALREADY SENT WORD OUT BEFORE HE LEFT - REASON BEING THAT MOST OF US EARNED THE BAND BY "PUTTING IN WORK" & HAVE THAT COMING (ACCORDING TO PAYA) - THIS INCLUDES @ COURT & ON HOUSING UNIT - THE 2ND REASON IS THAT HISTORICALLY ORANGE BAND RUNS THE COUNTY & THEY DONT WANT ANY ADDED ATTENTION OR HEAT BROUGHT TO HEAD QUARTERS BY UNNESSARY FIGHTING OR "TAXING" A HOMIE FOR A VARRIO G/L - THIS DOES NOT INCLUDE PERSONAL G/L, B/B OR H/C OBVIOUSLY - I MENTION THIS

CIMemphis-000038

227

CELL #2 NEEDS TO GO ASAP (51/50) — SPITTING ON PEOPLES WINDOWS & DISRESPECTING THE WHOLE POD — ("L" MOD CANDIDATE!)

2. I WOULD LIKE TO BOUNCE LEON (J5·8) TO LACY IF POSSIBLE - THE REASON IS THAT HE IS ON NAJERA TOUGH NOT TO DISCUSS HIS CASE$ LIL BOGART WITH ANYONE — IM MAKING POSITIVE PROGRESS WITH HIM & FEEL IT WILL BE WRAPPED UP BEFORE I GO, BUT THIS IS SLOWING IT DOWN — HE'S ALREADY TALKING TO ME

3. SAME APPLYS TO ALVAREZ — HE IS TRIPPIN ON NAJERA AS WELL — NAJERA MENTIONED LIL BOGART AND SUZI (OJEDAS WIFE) AND HE FLIPPED OUT — ALVAREZ TOLD ME TO SMASH HIM IF HE USES ANY NAMES AGAIN (WHICH OBVIOUSLY ISNT GONNA HAPPEN — BUT ITS HARD TO TALK 2 HIM AT MY DOOR WITHOUT ALVAREZ HEARING) — ALVAREZ WONT VERBALLY DISCUSS HIS CASE DUE TO PRIOR INFORMANT TESTIFYM AGAINST HIM — HE'S VERY CAUTIOUS & TIGHT LIPPED — HIS PRIOR CELLY (ACOSTA) ASKED HIM IF HE'S EVER SEEN A DEAD BODY - - & HE IS CONVINCED HE WAS A PLANT & VERY AWARE OF WHAT HE SAYS — I ALREADY GOT THE H/C W HIS HANDWRITING (AND DNA/FINGERPRINTS) WHICH IS CONSPIRACY TO COMMIT MURDER IF HE BEATS HIS 187 — I THINK SHOOTING HIM BACK TO LOV →

CIMemphis-000047

Case 8:15-cv-00987-DMG-KS    Document 23-1    Filed 10/25/16    Page 3 of 5    Page ID #:2310



# Fax Cover Sheet



Roland G. Rubalcava
Law Offices of Roland G. Rubalcava
2070 N. Tustin Avenue
Santa Ana, California 92705
Phone (714) 543-8552
Fax   (714) 543-7845
rubalcavalaw@hotmail.com

| | |
|---|---|
| Recipient's Name | District Attorney Office |
| Attention | Mark Geller, D.D.A. |
| Fax Number | (714) 347-8600 |
| Date | September 09, 2010 |
| Subject | RE: Ramon Alvarez |
| Case No.: | 10CF2001 |

Total Number of Pages (Including Cover Sheet) 1

☐ Urgent      ☐ Reply ASAP      ☐ Please Comment      ☐ For your Records

## Comments:

Dear Mr. Geller,

I need the infomant file from the police department to include all cases that he's worked as an Informant. Also the agency that the informant has been involved in, and all the cases that he has been Involved with as an informant.

I also need all housing records in the jail that show that the informant was in the same cell as my client. Please provide this information to my office as soon as possible.

Your cooperation is appreciated.

Sincerely,

Roland G. Rubalcava, Esq.

PRIVACY NOTICE
The information contained in this fax message is intended only for the use of the individual or entity to which it is addressed. Such information may be privileged, confidential or exempt from disclosure under applicable state or federal law. Copying, dissemination, distribution or disclosure of this information is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original to us at the

Exhibit A - 002

Case 8:15-cv-00987-DMG-KS   Document 23-1   Filed 10/25/16   Page 4 of 5   Page ID #:2311



**Roland G. Rubalcava**

Attorney at Law

2070 N. Tustin Avenue
Santa Ana, California 92705-7827


(714) 543-8552
FAX (714) 543-7845


COPY

October 22, 2010

<u>Sent Via Facsimile (714) 347-8600 & US Mail</u>

District Attorney Office
Mark Geller, D.D.A.
401 Civic Center Drive West
Santa Ana, CA 92701

> RE:   People v. Ramon Alvarez
>        Case No.: 10CF2001

Dear Mr. Geller

I have not yet received a copy of the recorded statement of the informant Craig Gonzalez or any other supplemental interviews mentioned in the police report. I also need the Federal Rap Sheet from 1992 or 1993 from Fort Worth Texas Federal Medical Center of Craig Gonzalez and the informant packet which agencies are mentioned in the police report.

I need the information for the Examination set for October 29, 2010 and any other relevant information that may be relevant to this proceeding.

Your cooperation is needed in this matter.

Sincerely,

LAW OFFICES OF ROLAND G. RUBALCAVA

Roland G. Rubalcava
Attorney at Law
RGR: rgf

cc: client

Exhibit A - 003

Case 8:15-cv-00987-DMG-KS    Document 101-3    Filed 11/24/20    Page 232 of 246
Page ID #:3856
Case 8:15-cv-00987-DMG-KS   Document 23-1   Filed 10/25/16   Page 2 of 5   Page ID #:2309

## DECLARATION OF ROLAND G. RUBALCAVA

I, Roland G. Rubalcava, hereby declare that the following is true and correct to the best of my knowledge:

1.  I am an attorney licensed to practice law in the State of California. Beginning in 2010, I represented Ramon Alvarez in the Orange County Superior Court case entitled The People of the State of California v. Ramon Alvarez, 10CF2001.

2.  On or about September 9, 2010, and October 22, 2010, I faxed the attached discovery requests (attached as pages 2 and 3, respectively) to the Orange County District Attorney's Office, to the attention of Deputy District Attorney Mark Geller, at Fax No. (714) 347-8600.

3.  On or about October 22, 2010, I received the Information Report (attached as page 4) from F. Lee Smith, Investigator at the Orange County District Attorney's Office.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Santa Ana, California.

DATE:  October 18, 2016          By _Roland G. Rubalcava_____

Roland G. Rubalcava, Esq.  (SBN 67362)

Exhibit A - 001

231

Case 8:15-cv-00987-DMG-KS    Document 101-3    Filed 11/24/20    Page 233 of 246
Page ID #:3857
Case 8:15-cv-00987-DMG-KS   Document 23-1   Filed 10/25/16   Page 3 of 5   Page ID #:2310



# Fax Cover Sheet

### Roland G. Rubalcava
### Law Offices of Roland G. Rubalcava
2070 N. Tustin Avenue
Santa Ana, California 92705
Phone (714) 543-8552
Fax    (714) 543-7845
rubalcavalaw@hotmail.com

| | |
|---|---|
| Recipient's Name | District Attorney Office |
| Attention | Mark Geller, D.D.A. |
| Fax Number | (714) 347-8600 |
| Date | September 09, 2010 |
| Subject | RE: Ramon Alvarez |
| Case No.: | 10CF2001 |

Total Number of Pages (Including Cover Sheet) 1

☐ Urgent      ☐ Reply ASAP      ☐ Please Comment      ☐ For your Records

## Comments:

Dear Mr. Geller,

I need the infomant file from the police department to include all cases that he's worked as an Informant. Also the agency that the informant has been involved in, and all the cases that he has been Involved with as an informant.

I also need all housing records in the jail that show that the informant was in the same cell as my client. Please provide this information to my office as soon as possible.

Your cooperation is appreciated.

Sincerely,

Roland G. Rubalcava, Esq.

PRIVACY NOTICE

The information contained in this fax message is intended only for the use of the individual or entity to which it is addressed. Such information may be privileged, confidential or exempt from disclosure under applicable state or federal law. Copying, dissemination, distribution or disclosure of this information is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original to us at the

Exhibit A - 002

Case 8:15-cv-00987-DMG-KS    Document 101-3    Filed 11/24/20    Page 234 of 246
Page ID #:3858
Case 8:15-cv-00987-DMG-KS    Document 23-1    Filed 10/25/16    Page 4 of 5    Page ID #:2311



**Roland G. Rubalcava**

Attorney at Law

2070 N. Tustin Avenue
Santa Ana, California 92705-7827

(714) 543-8552
FAX (714) 543-7845



October 22, 2010

<u>Sent Via Facsimile (714) 347-8600 & US Mail</u>

District Attorney Office
Mark Geller, D.D.A.
401 Civic Center Drive West
Santa Ana, CA 92701

RE:     People v. Ramon Alvarez
          Case No.: 10CF2001

Dear Mr. Geller

I have not yet received a copy of the recorded statement of the informant Craig Gonzalez or any other supplemental interviews mentioned in the police report. I also need the Federal Rap Sheet from 1992 or 1993 from Fort Worth Texas Federal Medical Center of Craig Gonzalez and the informant packet which agencies are mentioned in the police report.

I need the information for the Examination set for October 29, 2010 and any other relevant information that may be relevant to this proceeding.

Your cooperation is needed in this matter.

Sincerely,

LAW OFFICES OF ROLAND G. RUBALCAVA

Roland G. Rubalcava
Attorney at Law
RGR: rgf

cc: client

Exhibit A - 003

233

Case 8:15-cv-00987-DMG-KS    Document 101-3    Filed 11/24/20    Page 235 of 246
Page ID #:3859
Case 8:15-cv-00987-DMG-KS    Document 23-1    Filed 10/25/16    Page 5 of 5    Page ID #:2312



## ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF INVESTIGATION

DA 10F14331

### INFORMATION REPORT

CASE NAME:    ROMAN ALVAREZ

CLASSIFICATION:    187 (A) MURDER

COPY

F. LEE SMITH, INVESTIGATOR
BY:    ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

DATE AND TIME:    OCTOBER 22, 2010        1400

LOCATION:    401 CIVIC CENTER DRIVE WEST

On October 5, 2010, District Attorney Investigator John Kenney checked law enforcement resources to determine if CRAIG GONZALES had a background as an informant in California and other states there was none.

CRAIG GONZALES has no history as an informant in Orange County per the Orange County District Attorney's Office.

000130

| Investigator: Lee Smith | Approved By: |
|---|---|
| Date of Report: OCTOBER 26, 2010 | Date: |

Exhibit A - 004

234

## IN THE SUPREME COURT OF THE STATE OF NEVADA

GORDON EDWARD WEAVER,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 40761

FILED

APR 0 8 2004

JANETTE M. BLOOM
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

### ORDER OF AFFIRMANCE

This is an appeal from a judgment of conviction, pursuant to a jury verdict, of one count of battery with intent to commit sexual assault (count I), one count of gross misdemeanor false imprisonment (count II), and three counts of sexual assault (counts III-V). The district court sentenced appellant Gordon Edward Weaver to serve a prison term of 72 to 180 months for count I, a concurrent jail term of 1 year for count II, and two consecutive prison terms and one concurrent prison term of life with parole eligibility in 10 years for counts III-V.

Weaver contends that the district court erred in admitting jailhouse informant Craig Gonzales's testimony that Weaver had attempted to hire him to kill the trial witnesses. Weaver contends that Gonzales's testimony was irrelevant and unduly prejudicial because Weaver knew Gonzales would not be released from prison before trial and, therefore, Weaver's request did not show consciousness of guilt, but instead only showed his "thoughts about what he would do to the witnesses after he beat the case." We conclude that Weaver's contention lacks merit.

SUPREME COURT
OF
NEVADA

(O) 1947A

04-06473

235

The district court has considerable discretion in determining the relevance and admissibility of evidence.[1] Threats to witnesses "made after the commission of the crime which indicate consciousness of guilt, or are inconsistent with innocence, or tend to establish intent may be admissible."[2]  In this case, after conducting a Petrocelli[3] hearing, the district court admitted Gonzales's testimony that Weaver attempted to hire him to harm the trial witnesses because it found that the evidence was both relevant to show consciousness of guilt and not unduly prejudicial pursuant to NRS 48.035.  After reviewing the record on appeal, we conclude that the district court did abuse its discretion in admitting Gonzales's testimony.

Weaver next contends that Police Officer Terry Miller impermissibly vouched for the veracity of the victim-witness.  Relying upon two Alaska cases, Weaver contends that the improper vouching in this case was particularly prejudicial, thereby warranting reversal of his conviction, because the witness doing the vouching was a police officer.[4] We conclude that Weaver's contention lacks merit.

At trial, the prosecutor asked Officer Miller:  "Now, based on giving [the victim] a [preliminary breath test] did you come to some opinion as to her ability to communicate with you about the use of alcohol that she consumed."  Officer Miller responded:

---

[1]See Sterling v. State, 108 Nev. 391, 395, 834 P.2d 400, 403 (1992).

[2]Abram v. State, 95 Nev. 352, 356-57, 594 P.2d 1143, 1145 (1979).

[3]Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985).

[4]Sakeagak v. State, 952 P.2d 278 (Alaska Ct. App. 1998); Flynn v. State, 847 P.2d 1073 (Alaska Ct. App. 1993).

SUPREME COURT
OF
NEVADA

(O) 1947A

2

> The information she was giving me, like I said, it was very confusing and I was trying my hardest to piece it together. I did believe that she had been sexually assaulted somehow and also that there had been a battery domestic that had occurred there. The time frames she was giving me . . . I am not positive that was the sequence of events. But, by the things that she was stating, I believe there was a sexual assault that had been committed.

Defense counsel did not object to Officer Miller's testimony.

This court has previously held that "it is improper for one witness to vouch for the testimony of another."[5] The error, however, is subject to a harmless error analysis.[6] Even assuming Officer Miller improperly vouched for the victim, we conclude that the error was harmless beyond a reasonable doubt in light of the fact that trial counsel did not object, the testimony was unsolicited, and there was overwhelming evidence of Weaver's guilt, including eyewitness testimony and circumstantial evidence.

Finally, Weaver contends that the prosecutor engaged in prejudicial misconduct in her closing argument by vouching for Gonzales. In particular, Weaver notes that the prosecutor argued that Gonzales was "telling the truth" and that his testimony was "reliable."

As a preliminary matter, we note that Weaver failed to object to the alleged instance of prosecutorial misconduct. As a general rule, the failure to object to prosecutorial misconduct precludes appellate review

---

[5]Marvelle v. State, 114 Nev. 921, 931, 966 P.2d 151, 157 (1998), overruled on other grounds by Koerschner v. State, 116 Nev. 1111, 13 P.3d 451 (2000).

[6]See Townsend v. State, 103 Nev. 113, 119, 734 P.2d 705, 709 (1987).

SUPREME COURT
OF
NEVADA

(O) 1947A

3

absent plain or constitutional error.[7]   After considering the challenged comments in context, we conclude that the prosecutor's remarks did not rise to the level of improper argument that would justify overturning Weaver's conviction.[8]

Having considered Weaver's contentions and concluded that they lack merit, we

ORDER the judgment of conviction AFFIRMED.



_____, C. J.
Shearing

_____, J.
Rose

_____, J.
Maupin

cc:   Hon. Jerome Polaha, District Judge
John P. Calvert
Attorney General Brian Sandoval/Carson City
Washoe County District Attorney Richard A. Gammick
Washoe District Court Clerk

---

[7]Williams v. State, 103 Nev. 106, 110-11, 734 P.2d 700, 703 (1987).

[8]See Rowland v. State, 118 Nev. 31, 38, 39 P.3d 114, 118-19 (2002); Greene v. State, 113 Nev. 157, 169-70, 931 P.2d 54, 62 (1997), modified prospectively on other grounds by Byford v. State, 116 Nev. 215, 994 P.2d 700 (2000).

SUPREME COURT
OF
NEVADA

(O) 1947A

4

*When you need to impress someone with the truth...*

## JACK TRIMARCO
## & ASSOCIATES
## POLYGRAPH / INVESTIGATIONS, INC.

9454 Wilshire Blvd., 6th Floor
Beverly Hills, CA 90212
**(310) 247-2637**
email: jtrimarco@aol.com
www.jacktrimarco.com

CA P.I. # 20970

CONFIDENTIAL COMMUNICATION PROTECTED BY
ATTORNEY-CLIENT & WORK PRODUCT PRIVILEGES RE:
RAMON ALVAREZ V. ATTORNEY GENERAL CV -15-987-DMG-
KS

Edward I. Gelb, Ph.D.
Los Angeles, California

December 9, 2016

Ronald W. Hilley
San Francisco, California

Callie Glanton Steele
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, CA  90012

Ronald R. Homer
San Francisco, California

**RE:  Polygraph Examination of Ramon Alvarez, conducted**
**December 8, 2016, 2016 at Santa Ana, CA.**

Dear Ms. Steele:

Richard W. Keifer
Orlando, Florida

Pursuant to your request, I conducted a Psychophysiological
Detection of Deception (PDD) Test (polygraph) with the Examinee, Ramon
Alvarez.  The following is a synopsis of the case, as I understand the facts
presented to me:

William K. Teigen
Dallas, Texas

The Examinee was convicted of murder based on the testimony of
jailhouse informant, Craig Gonzales.  Gonzales testified that he was in the
Examinee's cell when the Examinee confessed to him that he was
responsible for the murder.  The Examinee advised that Craig Gonzales
was never in his cell.

Kenneth A. Vardell
Boulder, Colorado

At the conclusion of the pre-test interview, an acquaintance test was
conducted.  The test was designed to demonstrate to the Examinee and to
me that he was a suitable subject for a Psychophysiological Detection of
Deception (polygraph) Test.  Adequate recordings of the Examinee's
physiology were obtained during this procedure, and the examination
continued.  A comparison question test was then conducted using the
methods developed and taught at the National Center for Credibility
Assessment, (NCCA), formerly known as the U.S. Department of Defense
Polygraph Institute.

### *Health Statement*

The Examinee stated that he is in good health. He does not take prescribed medication at this time.

The Examinee advised that he was in no pain or discomfort at the time of the test. He further claimed to have had 8 hours of sleep the night of December 7-8, 2016.

The Lafayette Computerized Polygraph System, Model LX4000 was used for collection of the polygraph charts (test data). The instrument makes a continuous recording of autonomic responses associated with respiration, electro-dermal activity and cardiovascular functioning. The instrument also includes sensors designed to record peripheral behavior activity and cooperation during the examination. A functionality check conducted periodically confirmed the instrument was in proper working order.

The terms "cell" and "Craig Gonzales" were defined by the Examinee to my satisfaction.

The examination was video-recorded with permission of the Examinee.

The technique utilized during the PDD Examination was the standard "Zone Comparison", more specifically identified as the "You Phase". The polygraph wave forms were evaluated numerically, using the Empirical Scoring System (ESS) (3-point scale).

Series I included the following relevant questions, which were reviewed with the Examinee prior to testing:

> A. *Was Craig Gonzales ever in your cell?*
>    *(Answered: No)*
>
> B. *Before the year 2000, was Craig Gonzalez ever in your cell?*
>    *(Answered: No)*

### *Empirical Scoring System:*

Analysis of the polygraph wave forms using the Empirical Scoring System resulted in statistically significant numerical scores that support a conclusion of "non-deceptive" when the Examinee was answering the above listed questions. The statistical probability that the Examinee's pattern of data were produced by a person belonging to a deceptive distribution is less than 1 chance in a hundred (p-value -<.1) when compared to a validation sample used to produce the normative data and considered representative of the general testing population. In other words, the likelihood that the Examinee's responses were produced by someone lying was less than 1%.

An overall evaluation of -4 or less (i.e. -5, -6, -7...) is indicative of significant response to the relevant issue (deceptive). A score of +2 or higher (i.e. +3, +4, +5...) is evaluated as no significant response to the relevant issue (truthful, non-deceptive).

### Evaluation:

The total cumulative score for Series I relevant questions "A" and "B" is +4 (vertical scoring, 4 charts).

### Opinion:

The results of Series I examination indicate that Ramon Alvarez was telling the truth when he answered the relevant questions above.

The examination was conducted by Jack Trimarco who received the prestigious National 2010 Holly Canty Memorial Award, from the American Association of Police Polygraphists (AAPP), for outstanding leadership and dedicated service to the AAPP and to the polygraph profession. Jack also received the 2013/2014 Distinguished Service Award from the California Association of Polygraph Examiners (CAPE).

If I may be of any further assistance, please do not hesitate to contact me.

Sincerely,

Jack Trimarco
Jack Trimarco & Associates

241

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   SACV 15-987-DMG (KS)                                Date: August 30, 2019

Title   _Ramon Alvarez v. Attorney General_

Present: The Honorable:   Karen L. Stevenson, United States Magistrate Judge

Gay Roberson
Deputy Clerk

Court Reporter / Recorder

Attorneys Present for Plaintiffs:                    Attorneys Present for Defendants:

**Proceedings:   (IN CHAMBERS) ORDER GRANTING STAY AND DENYING MOTION
TO DISMISS WITHOUT PREJUDICE**

**I.      Background**

On June 19, 2015, Petitioner, a state prisoner proceeding _pro se_, filed a Petition For Writ Of Habeas Corpus ("Petition"). (Dkt. No. 1.) On August 28, 2015, Respondent filed an Answer. (Dkt. No. 8.) On January 29, 2016, Petitioner filed a Reply. (Dkt. No. 13.) On May 18, 2016, the Court appointed counsel for Petitioner. (Dkt. No. 14.) On January 18, 2017, following Petitioner's request for a stay pursuant to _Rhines v. Weber_, 544 U.S. 269 (2005) (Dkt. No. 30), the Court stayed the action and held the Petition in abeyance pending Petitioner's completion of the state court exhaustion process (Dkt. No. 31). On August 23, 2017, the Court, upon motion of Petitioner's counsel, relieved the Office of the Federal Public Defender as counsel for Petitioner and appointed new counsel. (Dkt. No. 40.) On December 8, 2017, the Court lifted the stay and set a deadline for Petitioner to file a First Amended Petition. (Dkt. No. 44.)

On May 31, 2019, Petitioner filed a First Amended Petition (the "FAP"), which is now the operative petition. (Dkt. No. 86.) On June 10, 2019, the Court required Respondent to file a response to the Petition (Dkt. No. 87), and, on July 25, 2019, Respondent filed a Motion to Dismiss the Petition (the "Motion to Dismiss") on the grounds that the Petition is "mixed" and subject to dismissal because Ground One was not properly exhausted. (Dkt. No. 88.) On August 7, 2019, Petitioner filed an Opposition and an unopposed motion for a second _Rhines_ Stay (the "Stay Motion"). (Dkt. No. 89.) Respondent's deadline for filing a Reply to the Opposition has now

CV-90 (03/15)                    Civil Minutes – General                    Page **1** of **3**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   SACV 15-987-DMG (KS)                                    Date: August 30, 2019

Title   _Ramon Alvarez v. Attorney General_

passed, and no Reply has been filed.  Accordingly, the Motion to Dismiss is under submission to the Court for decision.

**II.       Petitioner's Stay Motion Is Granted.**

A habeas petitioner is entitled to a *Rhines* stay if, and only if, he can establish:  (1) "good cause" for the failure to exhaust the claim at issue; (2) the unexhausted claim is "potentially meritorious;" and (3) he has not engaged in "intentionally dilatory litigation tactics."  *See Rhines*, 544 U.S. at 277, 278.  Here, Respondent does not oppose the Stay Motion (Motion to Dismiss at 1 ("Respondent does not oppose the granting of a *Rhines* stay."); *see also* Stay Motion at 1 (characterizing Stay Motion as "unopposed")), which suggests that he agrees that Petitioner satisfies all three preconditions for a *Rhines* stay.  Accordingly, **IT IS ORDERED** that the Motion to Dismiss is **DENIED without prejudice** and the Stay Motion is **GRANTED** as follows:

1.       This action is stayed, and the First Amended Petition is held in abeyance, pending the conclusion of Petitioner's state court habeas proceedings to exhaust his claim(s);

2.       **Within 30 days of this Order**, Petitioner must:  (a) unless he has already done so, file a habeas petition in the California Supreme Court fairly presenting Ground One;[1] and (b) file a Status Report advising the Court of the status of his state habeas proceeding.

3.       Petitioner must then file a Status Report with the Court **every 60 days to** advise the Court of the status of his state habeas proceeding.  If his state habeas petition remains pending, Petitioner simply may state that fact in his Status Report(s).

4.       Once the California Supreme Court rules on Petitioner's petition, then, within **30 days** of the California Supreme Court's order, Petitioner must file <u>one</u> of the following:  (1) if relief is denied, a motion to lift the stay; or, (2) if relief is granted, a stipulation of the parties of voluntary dismissal.  At this time, the Court does not anticipate Petitioner filing a Motion to File a Second Amended Petition following the completion of state court exhaustion proceedings.
\\

---

[1]       Petitioner does not need permission from this Court to include in that petition any other potentially unexhausted claims for habeas relief.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**


Case No.   SACV 15-987-DMG (KS)                              Date: August 30, 2019

Title      *Ramon Alvarez v. Attorney General*


**5.      Petitioner is cautioned that the failure to comply with these instructions may result in the Court ordering the stay to be vacated *nunc pro tunc* and the action dismissed for failure to prosecute and comply with court orders.**


**III.      Respondent's Motion to Dismiss is Denied Without Prejudice**


Because Respondent does not oppose granting Petitioner this opportunity to correct the defect that is the basis of Respondent's Motion to Dismiss the FAP, **IT IS HEREBY ORDERED** that Respondent's Motion to Dismiss is **DENIED**.  However, this ruling is without prejudice to Respondent reiterating his arguments for dismissal in a future motion or other pleading if doing so is warranted under the circumstances at that time.


                                                                    _____ :
**Initials of Preparer**   gr


CV-90 (03/15)                          Civil Minutes – General                          Page **3** of **3**

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically FILED on 9/27/2019 by Celia Rivera, Deputy Clerk

**STATE OF CALIFORNIA**
Supreme Court of California

*PROOF OF SERVICE*

**STATE OF CALIFORNIA**
Supreme Court of California

Case Name: **In re Ramon Alvarez, Petitioner on Habeas Corpus**
Case Number: **TEMP-J09HG2YW**
Lower Court Case Number:

1. At the time of service I was at least 18 years of age and not a party to this legal action.

2. My email address used to e-serve: **tffarmani@aol.com**

3. I served by email a copy of the following document(s) indicated below:

Title(s) of papers e-served:

| Filing Type | Document Title |
|---|---|
| PETITION FOR WRIT OF HABEAS CORPUS | 00000-EXHAUSTION PETITION _BOOKMARKED_FINALpdf |

Service Recipients:

| Person Served | Email Address | Type | Date / Time |
|---|---|---|---|
| Faryar Farmani<br>Farmani, A Professional Law Corporation | tffarmani@aol.com | e-Serve | 9/27/2019 12:01:37 PM |

This proof of service was automatically created, submitted and signed on my behalf through my agreements with TrueFiling and its contents are true to the best of my information, knowledge, and belief.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

9/27/2019
Date

/s/Faryar Farmani
Signature

Farmani, Faryar (211101)
Last Name, First Name (PNum)

Farmani, A Professional Law Corporation
Law Firm